## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | )    Chapter 11 |
| | ) |
| **HSH DELAWARE GP LLC**, *et al.*,[1] | )    Case No. 10-_____ (___) |
| | ) |
| Debtors. | )    (Joint Administration Requested) |
| | ) |

### AFFIDAVIT OF DANIEL KATSIKAS IN SUPPORT OF DEBTORS'
### CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

COUNTY OF NEW YORK     §
                                 §    ss:
STATE OF NEW YORK       §

      Before me, the undersigned notary, appeared Daniel Katsikas, who, being duly sworn, stated as follows:

      1.     I am the Chief Financial Officer ("CFO") of J.C. Flowers & Co. LLC. I work at the corporate office located at 717 Fifth Avenue, 26th Floor, New York, New York 10022. In my capacity as CFO of J.C. Flowers & Co. LLC ("JCF"), I have been responsible for overseeing treasury, cash management, and credit functions of HSH Delaware GP LLC and its related debtors in the above-referenced chapter 11 cases (the "Chapter 11 Cases"), as debtors and debtors in possession (collectively, the "Debtors"). Consequently, I am familiar with the business and financial affairs of the Debtors.

      2.     Concurrently with the filing of this affidavit (the "Affidavit") on the date hereof (the "Commencement Date"), HSH Alberta I L.P. ("Alberta I"), HSH Alberta II L.P.

---

[1] The Debtors in these cases, along with the last four (4) digits of each Debtor's federal tax identification number (if applicable), are: HSH Delaware GP LLC, HSH Alberta I L.P. (No. 6492), HSH Alberta II L.P. (No. 1821), HSH Alberta V L.P. (No. 6854), HSH Coinvest (Alberta) L.P. (No. 1592), JCF HSH (DE) GP LP, HSH Luxembourg S.à r.l. (No. 6862), HSH Delaware L.P. (No. 9336), and HSH Luxembourg Coinvest S.à r.l. (No. 6826).

("Alberta II"), HSH Alberta V L.P. ("Alberta V"), HSH Coinvest (Alberta) L.P. ("Alberta Coinvest" and together with Alberta I, Alberta II, and Alberta V, the "Alberta Debtors"), JCF HSH (DE) GP LP ("JCF HSH"), and HSH Delaware GP LLC ("HSH Delaware GP" and together with JCF HSH and the Alberta Debtors, the "Voluntary Debtors") have each filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

      3.     On September 8, 2009, involuntary petitions for relief under chapter 7 of the Bankruptcy Code (the "Chapter 7 Cases") were filed in this Court with respect to the following related entities: HSH Delaware L.P. ("HSH Delaware L.P."); HSH Luxembourg S.à.r.l. ("HSH Luxembourg"); and HSH Luxembourg Coinvest S.à.r.l. ("HSH Luxembourg Coinvest," collectively, the "Involuntary Debtors," and together with the Voluntary Debtors, the "Debtors"). Contemporaneously herewith, the Involuntary Debtors have consented to the involuntary petitions and have filed a motion to convert the Chapter 7 Cases to cases under chapter 11 of the Bankruptcy Code (the "Conversion Motion"), as well as a motion to shorten the notice period for such Conversion Motion so that it may be considered by the Court at the "first day" hearing in the Debtors' cases.

      4.     To minimize certain of the potential adverse affects of the commencement of the Chapter 11 Cases, the Debtors have requested certain relief in "first day" applications and motions filed with the Court (the "First Day Pleadings"). The First Day Pleadings seek, among other things and as described in detail below, to ensure the maintenance of the Debtors' Bank Accounts (as defined below) without interruption, to establish certain administrative procedures to promote a seamless transition into chapter 11, and to appoint the Alberta Debtors as foreign

representatives of their estates so that they can seek recognition of their Chapter 11 Cases in Canada. This relief will be critical to the Debtors' restructuring efforts.

5.      This Affidavit is submitted to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these Chapter 11 Cases and in support of (i) the Voluntary Debtors' petitions for relief under chapter 11 of the Bankruptcy Code, and (ii) the First Day Pleadings. Except as otherwise indicated herein, all facts set forth in this Affidavit are based on my personal knowledge, my discussions with other members of JCF involved with the management of the Debtors, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial affairs. If called upon to testify, I could and would testify competently as to the facts set forth in this Affidavit. I am authorized to submit this Affidavit on behalf of the Debtors.

6.      Parts I through III of this Affidavit provide an overview of the organizational and capital structure of the Debtors, and the circumstances giving rise to the commencement of these Chapter 11 Cases. Part IV summarizes the First Day Pleadings filed concurrently herewith.

## I.
## Debtors' Business

7.      In 2006, JCF advised[2] seven investment vehicles in their collective acquisition from WestLB AG (the "Acquisition") of approximately 26% of the then-outstanding

---

[2] Since its inception in 2000, investment funds advised by JCF have invested over $10 billion in equity capital in more than 20 separate transactions. JCF advises three primary private equity funds, J.C. Flowers Fund I, J.C. Flowers Fund II and J.C. Flowers Fund III. Investors in J.C. Flowers Fund II participated in the Acquisition (defined below) and are the investors that are relevant to the matters discussed herein. Three funds, J.C. Flowers II LP, J.C. Flowers II-A LP and J.C. Flowers II-B LP, comprise J.C. Flowers Fund II. These funds' investors include high net worth individuals and institutional investors, among others.

shares of HSH Nordbank AG ("HSH Nordbank"),[3] a large German bank with registered offices in Hamburg and Kiel, for an aggregate purchase price of €1.25 billion.[4] Each of the seven investment vehicles is an independent trust formed for the purpose of indirectly acquiring and holding HSH Nordbank shares and whose beneficiaries are primarily investors in J.C. Flowers Fund II (the "Trusts").[5] The Trusts each formed a limited partnership or equivalent entity (the Alberta Debtors and the Involuntary Debtors, collectively, the "Shareholder Debtors")[6] through which to acquire and hold the HSH Nordbank shares. The reason this structure was used at the time of the Acquisition was in order to allow the Shareholder Debtors to be managed and controlled independently of one another, which was principally in order to avoid any regulatory delays with the Acquisition that might have arisen had J.C. Flowers Fund II been considered as controlling 25% or more of the shares in HSH Nordbank.

        8.     The current organizational structure of each of the Debtors is described below and depicted in the chart attached hereto and incorporated herein as Exhibit 1 (the "Organizational Chart"):

---

[3] HSH Nordbank is a commercial bank that focuses on ship and aviation financing, international real estate lending, and large corporate banking. HSH Nordbank is the largest shipping bank globally by reported shipping loans - currently its balance sheet shows assets of approximately €186 billion.

[4] A majority of HSH Nordbank's shares have been held by the City of Hamburg and the State of Schleswig-Holstein. The remaining shares are held by German savings banks and entities owned by investors in funds advised by JCF.

[5] As beneficiaries of the Trusts, investors in J.C. Flowers Fund II have at all times held in excess of 99.9% of the beneficial interest in Alberta I, Alberta II and Alberta V. Certain of these investors also elected to co-invest in the HSH Nordbank investment through a fourth Trust, and such co-investors own in excess of 99.9% of the beneficial interest in Alberta Coinvest. The *de minimis* balance of the beneficial interest in each case is held by the relevant limited partnership's general partners.

[6] The Shareholder Debtors are organized in different jurisdictions to accommodate the needs of certain of the Trusts' ultimate beneficiaries.

RLF1 3525845v.8

(a)  **The Alberta Debtors** - Each of the Alberta Debtors is a limited partnership organized under the laws of Alberta, Canada. As depicted on the Organizational Chart, each has two general partners: one is a Cayman Islands entity,[7] and the other is JCF HSH.[8] Under the Certificate of Limited Partnership of each of the Alberta Debtors, these general partners have the exclusive right to control and manage the business of the Alberta Debtors.

(b)  **JCF HSH** - JCF HSH was created in October 2009 as a limited partnership organized under the laws of the State of Delaware, to serve as the general partner of the Alberta Debtors. Its general partner is JCF HSH (DE) GP LLC, a limited liability company organized under the laws of the State of Delaware, which has as its sole member Mr. J. Christopher Flowers. JCF HSH's limited partner is Mr. Flowers.

(c)  **HSH Delaware GP** - HSH Delaware GP was created in September 2006 as a limited liability company organized under the laws of the State of Delaware to serve as the general partner of HSH Delaware L.P. HSH Delaware GP's single member is The HSH AIV 4 Trust (the "HSH Delaware Trust"), a statutory trust organized under the laws of the State of Delaware, which has as its trustee the Wilmington Trust Company, and as its beneficiaries the investors in J.C. Flowers II-A L.P.

(d)  **HSH Delaware L.P.** - HSH Delaware L.P. is a limited partnership organized under the laws of the State of Delaware. Its general partner is HSH Delaware GP LLC. Pursuant to HSH Delaware L.P.'s limited partnership agreement and HSH Delaware GP's

---

[7] HSH Cayman I GP Ltd. ("Cayman I"), HSH Cayman II GP Ltd ("Cayman II"), HSH Cayman V GP Ltd ("Cayman V"), and HSH Coinvest (Cayman) GP Ltd ("Cayman Coinvest" and together with Cayman I, Cayman II, and Cayman V, the "Cayman GPs"), are the Cayman Islands general partners of Alberta I, Alberta II, Alberta V, and Alberta Coinvest, respectively.

[8] Prior to October 30, 2009, the Cayman GPs were the sole general partners of each of the Alberta Debtors. As of October 30, 2009, the Certificate of Limited Partnership of each of the Alberta Debtors was amended such that JCF HSH was added as a general partner of each of the Alberta Debtors.

5

limited liability company agreement, the HSH Delaware Trust, as the sole member of HSH Delaware GP, manages HSH Delaware L.P.'s business and affairs.

(e) **HSH Luxembourg** - HSH Luxembourg is a société à responsabilité limitée organized under the laws of Luxembourg. Its majority shareholder is The HSH AIV 3 Trust (the "HSH S.à r.l. Trust"), a trust organized under the laws of the Cayman Islands. JCF is the advisor of, and HSH Cayman Partners L.P. is a beneficiary of, the HSH S.à r.l. Trust. HSH Cayman Partners GP Ltd., an exempted company incorporated with limited liability in the Cayman Islands, is the general partner of HSH Cayman Partners L.P., and Genesis Trust & Corporate Services ("Genesis"), an exempted company incorporated with limited liability in the Cayman Islands, is its director. Genesis is also is the trustee of the HSH S.à r.l. Trust and has the power to, *inter alia*, appoint the advisor of the trust, pay or allow any debt or claim, and settle any debt, account, or claim relating to the trust.

(f) **HSH Luxembourg Coinvest** - HSH Luxembourg Coinvest is a société à responsabilité limitée organized under the laws of Luxembourg. Its majority shareholder is The HSH Coinvest (Cayman) Trust-B (the "HSH Coinvest S.à r.l. Trust"), a trust organized under the laws of the Cayman Islands. JCF is the advisor of, and HSH Coinvest Partners L.P. is a beneficiary of, the HSH Coinvest S.à r.l. Trust. HSH Coinvest Partners GP Ltd., an exempted company incorporated with limited liability in the Cayman Islands, is the general partner of HSH Coinvest Partners L.P., and The Harbour Trust Co. Ltd. ("Harbour"), an exempted company incorporated with limited liability in the Cayman Islands, is its director. Harbour is also the trustee of the HSH Coinvest S.à r.l. Trust and has the power to, *inter alia*, appoint the advisor of the trust, pay or allow any debt or claim, and settle any debt, account, or claim relating to the trust.

6

9.  As of the Commencement Date, the Shareholder Debtors' primary assets are their common shares in HSH Nordbank. Table 1, below, shows for each of the Shareholder Debtors: (i) the number of HSH Nordbank common shares owned and (ii) the percentage ownership of the total number of common shares of HSH Nordbank.

**TABLE 1**

| Shareholder Debtor | Number of Common Shares Owned | Percentage Ownership of Total Number of Common Shares of HSH Nordbank |
|---|---|---|
| HSH Alberta I | 7,961,765 | 3.24% |
| HSH Alberta II | 3,713,811 | 1.51% |
| HSH Alberta V | 903,878 | 0.37% |
| HSH Alberta Coinvest | 3,031,170 | 1.23% |
| HSH Luxembourg | 3,953,787 | 1.61% |
| HSH Delaware L.P. | 1,232,799 | 0.50% |
| HSH Luxembourg Coinvest | 1,481,720 | 0.60% |

10.  In light of the weakening financial markets, a recapitalization of HSH Nordbank occurred in July 2008 (the "July 2008 Recapitalization"), whereby HSH Nordbank issued mandatory convertible shares (the "Mandatory Convertible Shares") and new common shares. Alberta I, Alberta II, Alberta V, HSH Luxembourg and HSH Delaware L.P. purchased a portion of these new common shares and Mandatory Convertible Shares, which will convert to full shares in HSH Nordbank in December 2010, in the amounts shown below in Table 2:

7

**TABLE 2**

| Shareholder Debtor | Number of Mandatory Convertible Shares Owned |
|---|---|
| HSH Alberta I | 2,303,727 |
| HSH Alberta II | 1,074,588 |
| HSH Alberta V | 261,536 |
| HSH Luxembourg | 1,144,024 |
| HSH Delaware | 356,709 |

11.     JPMorgan Chase Bank, N.A. ("JPMorgan") is the custodian of these shares pursuant to bank accounts opened in New York in accordance with the JPMorgan General Terms for Accounts and Services Account Agreements.

## II.
## Capital Structure

12.     To partially finance the Acquisition, the Shareholder Debtors, as "Borrowers," each entered into virtually identical credit agreements, dated October 19, 2006, with ABN AMRO Bank N.V., London Branch ("ABN") as "Facility Agent" and as the original "Lender" (the "Credit Agreements"), to lend a total of €375,000,000.[9] The Credit Agreements were arranged and structured based upon a business plan that projected HSH Nordbank's future performance, stock dividends, and finance costs (the "Base Case Model").

13.     Under each Credit Agreement, there are two unsecured credit facilities. One is the term loan (the "Term Loan") that was used to partially finance the Acquisition. Further, as the Shareholder Debtors do not generate any income other than any dividend payment

---

[9] Of this €375,000,000, €350,000,000 was actually funded on the date of closing pursuant to the Term Loans (defined herein) provided for in the Credit Agreements, with an additional €25,000,000 available pursuant to the Revolving Credit Loans provided for in the Credit Agreements.

RLF1 3525845v.8

from HSH Nordbank, the Credit Agreement also included revolving credit loans (the "Revolving Credit Loans") to be used as "bridge" facilities for servicing the interest accruing on the Term Loans during the period between dividend payment dates. Because the HSH Nordbank dividend was paid, at most, annually, the Revolving Credit Loans were necessary to fund the interest payments on the Term Loans. Each Revolving Credit Loan was to be for an agreed term of one, two, three or six months, and was required to be repaid in full on the last day of the term of such Revolving Credit Loan. Pursuant to the Credit Agreements, the aggregate amounts outstanding as of December 31, 2009, under each facility are described below in Table 3:[10]

## TABLE 3

| Shareholder Debtor | Aggregate Amount of Term Loan Facility | Aggregate Amount of Revolving Credit Loan Facility | Term Loan Principal | Term Loan Interest | Revolving Credit Loan Principal | Revolving Credit Loan interest |
|---|---|---|---|---|---|---|
| HSH Alberta I | €115,610,915.77 | €8,257,922.56 | €114,965,650.95 | €6,670,927.40 | €4,548,456.43 | €284,273.88 |
| HSH Alberta II | €53,927,342.77 | €3,851,953.05 | €53,636,355.31 | €3,111,690.40 | €2,121,652.33 | €132,601.10 |
| HSH Alberta V | €13,125,007.57 | €937,500.54 | €13,051,752.60 | €757,333.21 | €516,374.47 | €32,272.89 |
| HSH Alberta Coinvest | €61,809,411.00 | €4,414,957.93 | €61,464,431.09 | €3,566,497.90 | €2,431,754.92 | €151,982.18 |
| HSH Luxembourg | €57,411,995.89 | €4,100,856.85 | €57,091,559.99 | €3,312,760.40 | €2,258,748.32 | €141,169.41 |
| HSH Delaware L.P. | €17,901,170.59 | €1,278,655.04 | €17,801,257.66 | €1,032,925.00 | €704,282.08 | €44,016.91 |
| HSH Luxembourg Coinvest | €30,214,156.41 | €2,158,154.03 | €30,045,520.23 | €1,743,403.20 | €1,188,709.32 | €74,293.11 |

---

[10] As of December 31, 2009, there was approximately €382,870,000 outstanding under the Credit Agreements, including interest.

14.     As of the Commencement Date, the Shareholder Debtors had cash holdings (using the current prevailing exchange rates), as reflected below in Table 4:

**TABLE 4**

| Shareholder | Cash Holdings |
|---|---|
| HSH Alberta I | $187,542.69 |
| HSH Alberta II | $13,056.52 |
| HSH Alberta V | $43,320.05 |
| HSH Alberta Coinvest | $7,773.99 |
| HSH Luxembourg | $2,949,207.74 |
| HSH Delaware L.P. | $215,603.44 |
| HSH Luxembourg Coinvest | $1,922,387.38 |
| TOTAL | $5,338,891.81 |

15.     Neither the Voluntary Debtors nor the Involuntary Debtors have any secured debt.

### III.
### Events Leading to the Chapter 11 Cases

**A.      Negotiations to Restructure the Credit Agreements**

16.     In connection with the July 2008 Recapitalization, the Shareholder Debtors became aware of and notified the Lenders that certain covenants in the Credit Agreements needed to be reset, including the Asset Cover and Interest Cover covenants (as such terms are defined in the Credit Agreements). This process became necessary on account of (i) the historic global financial meltdown that the Shareholder Debtors' business plan did not and could not reasonably have been expected to foresee and (ii) certain financial covenants in the Credit Agreements that were (and always had been) impossible for the Shareholder Debtors to fulfill as drafted, due to a mischaracterization of certain tax laws and improperly set payment deadlines.

RLF1 3525845v.8

17. The Shareholder Debtors and the Lenders thereafter engaged in negotiations to restructure the Credit Agreements to reset the financial covenant obligations and adjust the debt service terms on a going forward basis. I was involved in these negotiations on behalf of the Shareholder Debtors. I participated in numerous conference calls and worked diligently— both internally at JCF and externally with my counterparts at ABN— to restructure the Credit Agreements. Numerous conference calls took place, face-to-face meetings were held, and at least three detailed restructuring proposals were exchanged between the parties. These negotiations, which began in November 2008, continued through June 2009.

18. While those negotiations were ongoing, certain interim payment obligations were due on January 30, 2009 under the Credit Agreements, including payment of the principal on certain Revolving Credit Loans and interest on the Term Loans (the "January Payment"). Because these interim payment obligations were part of the above negotiations, the Lenders agreed in writing on January 20, 2009, to "roll the loans forward for one month which will allow us [the parties] to continue and finalise [sic] our discussions on the term sheet during February ready for the new terms to commence thereafter."[11]

19. ABN thereafter continued, through further rollover notices delivered each month (and sometimes twice a month), to rollover the January payment, the last of which was

---

[11] While the negotiations were ongoing, the Lenders began to send the Shareholder Debtors reservation of rights letters (the "Reservations of Rights Letters") in regard to the purported "events of default." Specifically, on December 10, 2008, the Lenders sent letters to each of the Shareholder Debtors notifying them that purported events of default had occurred with respect to the Asset Coverage and Interest Cover covenants. The Lenders continued to send additional Reservation of Rights Letters in February, March, May, and July 2009.

received by each Shareholder Debtor in August 2009 and rolled the January payments through September 11, 2009.[12]

20.      The negotiations were lengthy, in part, because another recapitalization of HSH Nordbank was being considered that was highly relevant to efforts to restructure the Credit Agreement.   In July 2009, HSH Nordbank was recapitalized by contributions from the German states of Schleswig-Holstein and Hamburg, which agreed to provide approximately €3 billion (over $4 billion) in capital and €10 billion (over $14 billion) in guarantees to HSH Nordbank. The Lenders supported JCF's and the Shareholder Debtors' involvement in the negotiations surrounding the HSH Nordbank recapitalization because, without JCF's and the Shareholder Debtors' involvement, such recapitalization could have substantially diluted the Shareholder Debtors' interest in HSH Nordbank.   Instead, to the benefit of the Lenders, JCF and the Shareholder Debtors were able to significantly reduce the dilutive effect of the June 2009 recapitalization from what would have otherwise occurred without JCF's and the Shareholder Debtors' involvement.

21.      While the Shareholder Debtors were awaiting a response from ABN regarding the outstanding restructuring proposal, on September 8, 2009, the Lenders delivered acceleration notices to each of the Shareholder Debtors (the "Acceleration Notices").   The Acceleration Notices referred to the earlier Reservation of Rights Letters and demanded immediate repayment of all amounts outstanding under the Credit Agreements, including the Term Loans that were not due until October 2011.

_____

[12]   ABN also sent HSH Alberta I a rollover notice on September 9, 2009 despite earlier having sent this borrower an acceleration notice, presumably in error and as a result of its past course of dealing under the Credit Agreements.

12

## B. The Cayman Proceedings

22. On the same day that the Lenders delivered the Acceleration Notices, the Lenders filed winding up petitions in the Cayman Islands against the Cayman GPs[13] in the Cayman Islands Court (the "Grand Court"), under the respective case numbers 425 of 2009, 426 of 2009, 427 of 2009, and 428 of 2009 (the "Winding Up Petitions"). On November 13, 2009, the Grand Court ordered the winding up of the Gayman GPs, and appointed PricewaterhouseCoopers ("PWC") as liquidators; however, on December 9, 2009, the Cayman Islands Court of Appeal dismissed the Winding Up Petitions, discharging PwC (as of December 16, 2009) and remitted the matter back to the Grand Court. On December 16, 2009, the Grand Court granted the Lenders permission to amend the Winding Up Petitions, but dismissed the Lenders' application to appoint provisional liquidators. The Lenders subsequently amended the Winding Up Petitions, and such amended Winding Up Petitions are scheduled to be heard by the Grand Court on January 26 and 27, 2010.

## C. Chapter 11 Proceedings Are In The Best Interests of All Stakeholders

23. So far as I am aware, the Lenders have not made any proposal or given any explanation as to what course of action would be taken if liquidators are appointed over the Cayman GPs by the Grand Court; however, I presume that the liquidators will seek to sell the HSH Nordbank shares held by the Alberta Debtors, presumably by some kind of auction process. If that is the plan, in my view the resulting "fire-sale" would be catastrophic, resulting in a liquidation price far below the true value of the shares to the detriment of all stakeholders in these cases.

---

[13] The Cayman GPs are not Debtors in these Chapter 11 Cases.

RLF1 3525845v.8

24. Despite HSH Nordbank's recent struggles, the bank remains an important bank to Germany and will likely have ongoing ownership support from the German states of Hamburg and Schleswig-Holstein. With this assistance, the Debtors believe that the value of the HSH Nordbank stock will continue to rebound as the global market crisis eases, thus providing for increased financial health of the Debtors. However, in order to realize the benefit of the increased value of the HSH Nordbank stock in the future, the Debtors must be allowed to control the shares while HSH Nordbank works to rehabilitate its business.

25. Through the Commencement Date, the Debtors continued to negotiate in good faith with the Lenders in an attempt to restructure the terms of the Credit Agreements; however, despite numerous discussions and settlement proposals, the parties simply could not agree. Consequently, the Debtors commenced these Chapter 11 Cases with the hope that in the context of chapter 11 and with the oversight of the Bankruptcy Court they will be able to reach a consensual resolution with the Lenders that maximizes the value of the Debtors' shares in HSH Nordbank for the benefit of all stakeholders. The chapter 11 process is preferable to all other viable alternatives because: (i) the automatic stay will provide a "breathing spell" for the Debtors to formulate a consensual plan of reorganization with the Lenders, while ensuring that the value of the Debtors' assets are maintained and are not otherwise disposed of or foreclosed upon without first maximizing their value for the benefit of all stakeholders; (ii) the chapter 11 process will allow for the HSH Nordbank shares at issue to be dealt with in a single block, despite the fact that they are currently being held by seven Shareholder Debtors organized under the laws of three different countries; (iii) existing management will remain in place during the Chapter 11 Cases, contributing to a successful restructuring as existing management is most familiar with the Debtors and their assets and is in the best position to formulate, negotiate, and propose a

14

restructuring plan[14]; and (iv) Bankruptcy Court oversight through the implementation of a fair, flexible and open chapter 11 restructuring process will ensure that the Debtors' assets are maintained and their value is ultimately maximized.

## IV.
## Summary of First Day Pleadings

26.     Concurrently with the filing of their chapter 11 petitions, the Debtors seek the Court's approval of a number of motions and accompanying proposed orders (the "First Day Orders"), which the Debtors believe are necessary to enable them to operate with minimum disruption. The Debtors request that each of the First Day Orders be entered as critical elements in stabilizing and facilitating their operations during the pendency of the Chapter 11 Cases. A description of the relief requested and the facts supporting each of the First Day Orders is set forth below.

### Debtors' Motion Pursuant to Rule 1015(b) of the
### Federal Rules of Bankruptcy Procedure Requesting Joint Administration
### of Chapter 11 Cases (the "Joint Administration Motion")

27.     By the Joint Administration Motion, the Debtors seek entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and section 105(a) of the Bankruptcy Code.

28.     Given the Debtors' relationships, joint administration of the Chapter 11 Cases is warranted. The Alberta Debtors are limited partnerships that share JCF HSH, a

---

[14] In order to assist them in their Chapter 11 Cases, the Debtors intend to file a motion for the appointment of H. Ronald Weissman as Chief Restructuring Officer. Mr. Weissman, who has significant business experience as a former senior member of both Arthur Anderson and Ernst & Young, is an independent third party who will work toward assisting the Debtors and the Lenders to reach a consensual resolution of their issues. Having represented large financial institutions in the past, Mr. Weissman will bring years of experience in a dispassionate way to the Chapter 11 Cases, which will be extremely beneficial for all parties. Among other activities, Mr. Weissman will work in concert with the Debtors' existing management and the creditors' committee to develop and implement (i) a consensual chapter 11 plan of reorganization or (ii) a value maximizing transaction for the benefit of all stakeholders.

Delaware entity, as a general partner. Further, each of the Alberta Debtors has a Cayman GP as a general partner. Although the Shareholder Debtors do not satisfy the technical requirements of "affiliation" with one another under section 101(2) of the Bankruptcy Code, the Shareholder Debtors are similarly structured entities that hold the exact same type of assets, are each party to identical credit agreements that involve the same lenders, and are all managed by JCF. Similarly, the Involuntary Debtors are, with respect to each other and the Voluntary Shareholder Debtors, similarly structured entities that hold the exact same type of assets, and are each party to identical credit agreements that involve the same lenders. Accordingly, joint administration of the Chapter 11 Cases is warranted.

29.    Joint administration of the Debtors' cases will avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and orders in each of the nine Chapter 11 Cases, thereby saving the Debtors' estates considerable expense and resources. The relief requested will not adversely affect creditors' rights, as the Joint Administration Motion requests only administrative, and not substantive, consolidation of the Debtors' estates. Moreover, each creditor may still file its claim against a particular estate. In fact, the reduced costs that will result from the joint administration of the Chapter 11 Cases will enhance the rights of all creditors. The relief requested will also relieve the Court of the burden of entering duplicative orders and maintaining duplicative files and dockets, and, similarly, simplify supervision of the administrative aspects of the Chapter 11 Cases by the United States Trustee for the District of Delaware (the "U.S. Trustee"). Therefore, the Chapter 11 Cases should be jointly administered as it will ease the administrative burden for the Court and the parties.

RLF1 3525845v.8

**Debtors' Motion For An Order (I) Authorizing Shareholder Debtors To
Maintain Existing Bank Accounts And Business Forms, And (II) Granting An
Extension of Time to Comply With Section 345(b) Of Title 11 Of The
United States Code (the "Bank Account Motion")**

30. By the Bank Account Motion, the Debtors request that the Court enter an order, pursuant to sections 105(a), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing the Shareholder Debtors to maintain existing bank accounts and business forms and (ii) granting an extension of time to comply with section 345(b) of the Bankruptcy Code.

31. Because the Shareholder Debtors have limited operations, they each have a similarly limited but efficient bank account system (the "Bank Accounts") to collect and disburse funds to satisfy their financial obligations and expenses. Further, because each of the Shareholder Debtors is a separate entity and has its own Bank Account, there is no centralized system whereby the Shareholder Debtors share funds amongst themselves. The Bank Accounts facilitate the Shareholder Debtors' cash monitoring, and reporting, and enable each Shareholder Debtor to maintain control over the collection and disbursement of funds.

32. Funds in the Bank Accounts are disbursed, as needed, to fund the Shareholder Debtors' general operating expenses, including, but not limited to, (i) servicing the debt under the Credit Agreements; and (ii) meeting obligations related to administrative expenses.

33. The only recurring obligations owed by the Shareholder Debtors, other than payment on amounts due under the Credit Agreements, are for administrative expenses related to facility fees, commitment fees, annual fees to maintain the business organization, audit fees, taxes, and legal or other professional fees. Such expenses, when paid by the Shareholder Debtors, are paid from the Bank Accounts.

RLF1 3525845v.8

34. The Bank Accounts consist of the following cash amounts:

- A JPMorgan Asset Account housed in New York City, in the name of HSH Delaware (the "HSH Delaware Asset Account"). As of the Commencement Date, there was €152,742.32 in cash in the HSH Delaware Asset Account. HSH Delaware, like the other Shareholder Debtors, often holds cash in Euros because most of its obligations are payable in Euros. Although there currently are no US Dollars in the HSH Delaware Asset Account, when there are, such dollars reside in a Morgan International Deposit Account ("MIDA"), pursuant to which, at the end of each business day, the funds are swept into a JP Morgan overnight investment account. The JP Morgan overnight investment account automatically invests the funds in a JPMorgan off-shore interest-bearing account in the Bahamas, thereby enabling HSH Delaware to take advantage of a higher interest rate than earned on funds in a traditional bank account.

- A JPMorgan Asset Account located in New York City, in the name of HSH Alberta I (the "HSH Alberta I Asset Account"). As of the Commencement Date, there was €132,773.38 in cash in the HSH Alberta I Asset Account. Further, there is $126.41 in a MIDA, which generates interest payments for HSH Alberta I.

- A JPMorgan Asset Account located in New York City, in the name of HSH Alberta II (the "HSH Alberta II Asset Account"). As of the Commencement Date, there was €9,214.70 in cash in the HSH Alberta II Asset Account. Further, there is $49.51 in a MIDA, which generates interest payments for HSH Alberta II.

- A JPMorgan Asset Account located in New York City, in the name of HSH Alberta V (the "HSH Alberta V Asset Account"). As of the Commencement Date, there was $43,320.05 in a MIDA, which generates interest payments for HSH Alberta V.

- A JPMorgan Asset Account located in New York City, in the name of HSH Alberta Coinvest (the "HSH Alberta Coinvest Asset Account"). As of the Commencement Date, there was €5,435.25 in cash in the HSH Alberta Coinvest Asset Account. Further, there is $101.86 in a MIDA, which generates interest payments for HSH Alberta Coinvest.

- A JPMorgan Asset Account located in New York City, in the name of HSH Luxembourg (the "HSH Luxembourg Asset Account"). As of the Commencement Date, there was €1,826,869.61 in cash in the HSH Luxembourg Asset Account. Further, there was

18

$366,166.90 in a MIDA, which generates interest payments for HSH Luxembourg.

- A JPMorgan Asset Account housed in New York City, in the name of HSH Luxembourg Coinvest (the "HSH Luxembourg Coinvest Asset Account"). As of the Commencement Date, there was €1,351,480.06 in cash in the HSH Luxembourg Coinvest Asset Account. Although there are currently no US Dollars in the HSH Luxembourg Coinvest Asset Account, when there are, such dollars reside in a MIDA, and generate interest payments for HSH Luxembourg Coinvest.

- A BGL BNP Paribas Asset Account housed in Luxembourg, in the name of HSH Luxembourg S.à r.l. (the "HSH Luxembourg Paribas Account"). As of the Commencement Date, there was €3,047.91 in cash in the HSH Luxembourg Paribas Account.

- A BGL BNP Paribas Asset Account housed in Luxembourg, in the name of HSH Luxembourg Coinvest S.à r.l. (the "HSH Luxembourg Coinvest Account"). As of the Commencement Date, there was €10,249.91 in cash in the HSH Luxembourg Paribas Account.

35. Neither JCF HSH nor HSH Delaware GP have any bank accounts.

36. In the ordinary course of business, the Shareholder Debtors use their Bank Accounts to accurately and efficiently collect, transfer, and disburse funds generated by the Shareholder Debtors' assets. The Shareholder Debtors' Bank Accounts collect cash arising primarily from dividends paid on the shares of HSH Nordbank or contributions from the limited partners or shareholders of the Shareholder Debtors, and the Shareholder Debtors pay cash disbursements to fund the Shareholder Debtors' operations and financial obligations, which consist primarily of payments to ABN as Facility Agent under the Credit Agreements from the Bank Accounts.

37. The Debtors seek authorization to maintain their Bank Accounts and retain their business forms consistent with their prepetition practices and operations. Maintenance of the Bank Accounts and business forms constitutes ordinary course, essential business practices

19

providing benefits to the Debtors, including, among other things, providing the Shareholder Debtors with the ability to: (i) control corporate funds; and (ii) reduce administrative expenses by facilitating the disbursement of funds. The Debtors, therefore, request Court approval to continue their existing Bank Accounts after the Commencement Date.

38. The Debtors further seek a waiver of the United States Trustee's "Operating Guidelines and Financial Reporting Requirements Required in All Cases Under Chapter 11" with respect to the requirement for the closure of the Debtors' prepetition bank accounts, the opening of new accounts, and the immediate printing of new checks with a "Debtor in Possession" designation on them. If the Debtors are required to comply with these guidelines, the opening of new accounts and the immediate printing of new checks would be unnecessarily burdensome. The Debtors therefore, respectfully submit that a waiver of this requirement will aid their transition to chapter 11 and be to the benefit of their estates and creditors.

39. Additionally, by the Bank Account Motion, the Debtors seek a 60-day extension of the time to comply with section 345(b) of the Bankruptcy Code. During the extension period, the Debtors propose to engage the Office of the United States Trustee in discussions to determine what modifications to their current practices, if any, would be appropriate under the circumstances. The funds held in each of the Bank Accounts, which may exceed the amounts insured by the Federal Deposit Insurance Corporation or may not be insured at all, are secure and that obtaining bonds to secure these funds, as required by section 345(b) of the Bankruptcy Code, is unnecessary to the Debtors' estates and creditors. Moreover, there is no question that the Shareholder Debtors' cash located at JPMorgan and Paribas is protected, as both JPMorgan and Paribas are secure banking institutions. Therefore, the Debtors believe that the benefits of the requested extension far outweigh any harm to the estates.

20

40.     Authorizing the Debtors to maintain their Bank Accounts and granting an extension of the time to comply with section 345(b) of the Bankruptcy Code will avoid the possible disruptions and distractions as the Debtors transition to chapter 11.  Consequently, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and creditors and is both necessary and appropriate to the efficient administration of these cases and the Debtors' reorganization efforts.

### Debtors' Motion Pursuant to Section 1505 of the Bankruptcy Code for Authorization to Act as the Foreign Representatives of Their Estates in Canada (the "Foreign Representation Motion)

41.     The Debtors request entry of an order authorizing the Alberta Debtors to: (i) act as the foreign representatives of their estates in Canada; (ii) seek recognition of their Chapter 11 Cases on behalf of their estates; and (iii) request that the Alberta Court lend assistance to this Court in protecting the property of the Debtors' estates (the "Foreign Representation Motion").

42.     The Debtors are concerned that certain parties whose interests are at odds with the interests of the Debtors and their creditors may avail themselves of the Court of Queen's Bench of Alberta (the "Alberta Court") in an attempt to dissolve and liquidate the Alberta Debtors' assets.   To protect against the risk of seizure, the Alberta Debtors intend to seek, in the Alberta Court, recognition of their Chapter 11 Cases as foreign main proceedings and entry of a stay protecting the Alberta Debtors' assets, pursuant to sections 46, 47, and 48 of the Companies' Creditors Arrangement Act (the "CCAA"), which enacts into Canadian law the UNCITRAL Model Law on Cross-Border Insolvency (the "Model Law" and, with the accompanying Guide to Enactment, the "Guide to Enactment").

RLF1 3525845v.8

43.	I believe that the relief requested in the Foreign Representation Motion is in the best interests of the Debtors' estates and creditors and is both necessary and appropriate to the efficient administration of these cases and the Debtors' reorganization efforts.

I declare under penalty of perjury that this Affidavit is true and correct to the best of my knowledge, information, and belief.

Further Affiant Sayeth Not.

_____
Daniel Katsikas

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned Notary Public, on this 21 day of January, 2010.

_____
NOTARY PUBLIC

YVONNE IZNAGA
Notary Public, State of New York
No. 01IZ6137207
Qualified in Kings County
Certified in New York County
Commission Expires NOV. 3L. 2013

RLFI 3525845v.8

# **EXHIBIT 1**

**Organizational Chart**

# HSM Structure Chart (after Capital Measures)

