IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HSH DELAWARE GP LLC, *et al.*,[1] | Case No. 10-10187 (PJW) |
| Debtors. | (Jointly Administered) |
| | Hearing Date: February 24, 2010 at 11:30 a.m. |
| | Objection Deadline: February 17, 2010 at 4:00 p.m. |

**MOTION OF DEBTORS AND DEBTORS IN POSSESSION
FOR AN ORDER (A) AUTHORIZING HSH ALBERTA I L.P., HSH ALBERTA
II L.P., HSH ALBERTA V L.P., HSH COINVEST (ALBERTA) L.P., HSH
LUXEMBOURG S.À R.L., HSH LUXEMBOURG COINVEST S.À R.L., AND HSH
DELAWARE L.P. TO OBTAIN POSTPETITION FINANCING; (B) AUTHORIZING
JCF HSH (DE) GP LP AND HSH DELAWARE GP LLC TO ISSUE GUARANTEES IN
RESPECT OF SUCH POSTPETITION FINANCING; (C) AUTHORIZING DEBTORS
TO GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105 AND 364; AND
<u>(D) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362</u>**

HSH Alberta I L.P., HSH Alberta II L.P., HSH Alberta V L.P., HSH Coinvest (Alberta) L.P., HSH Luxembourg S.à r.l., HSH Luxembourg Coinvest S.à r.l., and HSH Delaware L.P. (collectively, the "Borrowers") and certain of their affiliates, as debtors and debtors in possession (collectively with the Borrowers, the "Debtors," and each individually a "Debtor") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), hereby file this motion (the "Motion") for the entry of an order (the "DIP Order"): (i) authorizing the Borrowers to obtain postpetition financing up to an aggregate principal amount of $5,000,000 pursuant to sections 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), by entering into that certain Senior Secured Super-Priority Debtor-in-Possession Credit

---

[1] The Debtors in these cases, along with the last four (4) digits of each Debtor's federal tax identification number (if applicable), are: HSH Delaware GP LLC, HSH Alberta I L.P. (No. 6492), HSH Alberta II L.P. (No. 1821), HSH Alberta V L.P. (No. 6854), HSH Coinvest (Alberta) L.P. (No. 1592), JCF HSH (DE) GP LP, HSH Luxembourg S.à r.l. (No. 6862), HSH Delaware L.P. (No. 9336), and HSH Luxembourg Coinvest S.à r.l. (No. 6826).

Agreement (as the same may be amended, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), substantially in the form attached hereto as Exhibit A, among the Borrowers and each additional borrower that becomes a party thereto pursuant to the terms thereof, JC Flowers II L.P., JC Flowers II-A L.P. and JC Flowers II-B L.P., as lenders, and each additional lender that becomes a party thereto pursuant to the terms thereof (collectively, the "DIP Lenders"), and JC Flowers II L.P., as administrative agent (the "DIP Agent"); (ii) authorizing JCF HSH (DE) GP LP and HSH Delaware GP LLC (collectively, the "Guarantors") to issue Guarantees[2] to the DIP Lenders in respect of the Borrowers' obligations under the DIP Credit Agreement; (iii) authorizing the Debtors to grant Super-Priority Claims in each of the Chapter 11 Cases for all unpaid Postpetition Obligations; (iv) authorizing the Debtors to grant DIP Liens in all Collateral to secure any and all Postpetition Obligations; (v) authorizing the Debtors to pay the Postpetition Obligations as they become due, including, without limitation, interest, fees, and expenses, all to the extent provided by and in accordance with the terms of the respective DIP Financing Documents; and (vi) modifying the automatic stay imposed under section 362 of the Bankruptcy Code. In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction

This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 105, 362, 363, and 364(c) of the Bankruptcy Code, Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Order.

"Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

1. On January 21, 2010 (the "Commencement Date"), each of HSH Alberta I L.P. ("HSH Alberta I"), HSH Alberta II L.P. ("HSH Alberta II"), HSH Alberta V L.P. ("HSH Alberta V"), and HSH Coinvest (Alberta) L.P. ("HSH Coinvest Alberta," and together with HSH Alberta I, HSH Alberta II, HSH Alberta V, the "Alberta Debtors,"), JCF HSH (DE) GP LP, and HSH Delaware GP LLC (together with the Alberta Debtors, the "Voluntary Debtors") filed a voluntary petition for relief with this Court under chapter 11 of the Bankruptcy Code.

2. On September 8, 2009, involuntary petitions for relief under chapter 7 of the Bankruptcy Code (the "Chapter 7 Cases") were filed in this Court with respect to HSH Luxembourg S.à r.l. ("HSH Luxembourg"), HSH Delaware L.P. ("HSH Delaware L.P."), and HSH Luxembourg Coinvest S.à r.l. ("HSH Luxembourg Coinvest," and together with HSH Luxembourg and HSH Delaware L.P., the "Involuntary Debtors"). On the Commencement Date, the Involuntary Debtors filed a motion to convert their Chapter 7 Cases to cases under chapter 11 of the Bankruptcy Code (the "Conversion Motion"). On January 22, 2010, the Court entered an order approving the relief requested in the Conversion Motion, and entered a further order [Docket No. 14] jointly administering the chapter 11 cases of the Voluntary and Involuntary Debtors.

3. Each of the Debtors is authorized to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. No trustee, examiner or official committee of unsecured creditors has been appointed in the Chapter 11 Cases.

3

## Debtors' Businesses

### A. The HSH Entities

5. In 2006, J.C. Flowers & Co. LLC ("JCF") advised[3] seven investment vehicles in their collective acquisition from WestLB AG (the "Acquisition") of approximately 26% of the then-outstanding shares of HSH Nordbank AG ("HSH Nordbank"),[4] a large German bank with registered offices in Hamburg and Kiel, for an aggregate purchase price of €1.25 billion. Each of the seven investment vehicles is an independent trust formed for the purpose of indirectly acquiring and holding HSH Nordbank shares and whose beneficiaries are primarily investors in J.C. Flowers Fund II (the "Trusts"). The Trusts each formed a limited partnership or equivalent entity (the Alberta Debtors and the Involuntary Debtors, collectively, the "Shareholder Debtors")[5] through which to acquire and hold the HSH Nordbank shares.

### B. The Prepetition Credit Agreements

6. To partially finance the Acquisition, the Shareholder Debtors, as "Borrowers," each entered into virtually identical credit agreements, dated October 19, 2006 (collectively, the "Prepetition Credit Agreements"), with ABN AMRO Bank N.V., London Branch ("ABN") as "Facility Agent" and ABN AMRO Bank N.V. as the original "Lender" (the "Prepetition

---

[3] Since its inception in 2000, investment funds advised by JCF have invested over $10 billion in equity capital in more than 20 separate transactions. JCF advises three primary private equity funds, J.C. Flowers Fund I, J.C. Flowers Fund II and J.C. Flowers Fund III. Investors in J.C. Flowers Fund II participated in the Acquisition (defined below) and are the investors that are relevant to the matters discussed herein. Three funds, J.C. Flowers II LP, J.C. Flowers II-A LP and J.C. Flowers II-B LP, comprise J.C. Flowers Fund II. These funds' investors include high net worth individuals and institutional investors, among others.

[4] HSH Nordbank is a commercial bank that focuses on ship and aviation financing, international real estate lending, and large corporate banking. HSH Nordbank is the largest shipping bank globally by reported shipping loans - currently its balance sheet shows assets of approximately €186 billion.

[5] The Shareholder Debtors are organized in different jurisdictions to accommodate the needs of certain of the Trusts' ultimate beneficiaries.

Lenders"), to lend a total of €375,000,000.[6] The Prepetition Credit Agreements were arranged and structured based upon a business plan that projected HSH Nordbank's future performance, stock dividends, and finance costs.

7. Under each Prepetition Credit Agreement, there are two unsecured credit facilities. One is the term loan (the "Term Loan") that was used to finance the Acquisition. The Term Loans were required to be paid in full on October 19, 2011. Further, as the Shareholder Debtors do not generate any income other than any dividend payment from HSH Nordbank, the Prepetition Credit Agreements also included revolving credit loans (the "Revolving Credit Loans") to be used as "bridge" facilities for servicing the interest accruing on the Term Loans during the period between dividend payment dates. Because the HSH Nordbank dividend was paid, at most, annually, and only if HSH Nordbank's balance sheet reflected a profit, the Revolving Credit Loans were necessary to fund the interest payments on the Term Loans. Each Revolving Credit Loan was to be for an agreed term of one, two, three or six months, and was required to be repaid in full on the last day of the term of such Revolving Credit Loan.

C.  **The July 2008 Recapitalization and The Bankruptcy Filings**

8. In early 2008, HSH Nordbank came to the conclusion that a recapitalization of the bank was needed. Therefore, a recapitalization of HSH Nordbank occurred in July 2008 (the "July 2008 Recapitalization"), whereby HSH Nordbank issued 17,490,909 mandatory convertible shares, of which Alberta I, Alberta II, Alberta V, HSH Delaware L.P. and HSH Luxembourg purchased a combined 5,140,584 shares (the "Mandatory Convertible Shares") on or about August 7, 2008.[7]

---

[6] Of this €375,000,000, €350,000,000 was actually funded on the date of closing pursuant to the Term Loans (defined herein) provided for in the Credit Agreements, with an additional €25,000,000 available pursuant to the Revolving Credit Loans provided for in the Prepetition Credit Agreements.

[7] Alberta Coinvest did not purchase any mandatory convertible shares.

5

9. In connection with the July 2008 Recapitalization, the Shareholder Debtors became aware of and notified ABN that certain financial covenant obligations, including an asset cover covenant and an interest cover covenant in the Prepetition Credit Agreements, needed to be reset.

10. The parties thereafter engaged in negotiations to restructure the Prepetition Credit Agreements in order to reset these financial covenant obligations and adjust the debt service terms on a go forward basis. During the negotiations, the Shareholder Debtors were faced with a January 2009 payment date, which included Revolving Credit Payments and a payment on certain interest on the Term Loans under each of the Prepetition Credit Agreements. Issues related to debt service terms were the subject of the parties' negotiations, and, thus, on January 20, 2009, ABN agreed in writing to "roll the loans forward for one month which will allow us [the parties] to continue and finalise [sic] our discussions on the term sheet during February ready for the new terms to commence thereafter." ABN thereafter continued, through further rollover notices delivered each month (and sometimes twice a month), to rollover the January payment, the last of which was received by each Debtor in August 2009 and rolled the January payments through September 11, 2009.

11. While the Shareholder Debtors were awaiting a response from ABN regarding the outstanding restructuring proposal, on September 8, 2009, the Prepetition Lenders delivered acceleration notices to each of the Shareholder Debtors (the "Acceleration Notices"). The Acceleration Notices demanded immediate repayment of all amounts outstanding under the Prepetition Credit Agreements, including the Term Loans that were not due until October 2011.

12. Through the Commencement Date, the Debtors negotiated in good faith with the Prepetition Lenders in an attempt to restructure the terms of the Prepetition Credit Agreements;

6

however, despite numerous discussions and settlement proposals, the parties simply could not agree. Consequently, the Debtors commenced these Chapter 11 Cases in order to maximize the value of the Debtors' assets for the benefit of all stakeholders.

## THE DIP FINANCING

### A. The Debtors' Financing Needs

13. The Shareholder Debtors generate revenue mainly from the payment of dividends on account of their shares of HSH Nordbank. HSH Nordbank pays dividends, at most, on an annual basis, but is restricted from doing so if it cannot meet certain profitability requirements. The last annual dividend paid by HSH Nordbank was on May 20, 2008, pursuant to which the Shareholder Debtors received a total of €22,866,533.57. HSH Nordbank did not pay an annual dividend in 2009, and the Debtors do not expect HSH Nordbank to pay an annual dividend in 2010. Additionally, the non-shareholder Debtors, JCF HSH (DE) GP LP, and HSH Delaware GP LLC, generate only a small amount of revenue from cash held in interest bearing accounts. Most, but not all, of the Debtors have limited amounts of cash available in certain bank accounts ("Available Cash"); however, the Debtors have determined that such amounts are insufficient to fund all of the expenses of the Chapter 11 Cases. Consequently, the Debtors require access to post-petition funds in order to, among other things, preserve the value of the Debtors' estates and to fund the costs of administration of the Chapter 11 Cases.

### B. The DIP Financing

14. Accordingly, the Borrowers seek authorization to enter into the DIP Credit Agreement, whereby the DIP Lenders agree to provide post-petition financing up to an aggregate principal amount of $5,000,000, and the Guarantors seek authorization to issue Guarantees to the DIP Lenders in respect of such obligations; provided, however, that each Borrower shall first utilize all of its respective Available Cash prior to borrowing funds from the DIP Lenders. The

7

Debtors have contacted several lenders in hopes of obtaining unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, but were unable to find a lender willing to extend unsecured credit. Indeed, the only offer to provide post-petition financing received by the Debtors was from the DIP Lenders, and such offer was contingent upon the Lenders receiving, *inter alia*, Liens on the Debtors' Collateral and a Super-Priority Claim in the Chapter 11 Cases.

15. As disclosed above, the DIP Lenders are JC Flowers II L.P., JC Flowers II-A L.P. and JC Flowers II-B L.P., and the DIP Agent is JC Flowers II L.P., each of which is related to the Debtors' equity holders and managing entities. Despite these relationships, the terms of the DIP Financing Documents have been negotiated at arms' length and in "good faith," as that term is used in section 364(e) of the Bankruptcy Code. Additionally, the proposed DIP Financing is for valid business purposes and uses, is in the best interests of the Debtors, their estates and creditors, and is supported by reasonably equivalent value and consideration, as evidenced by the reasonableness of its terms (discussed in detail below).

16. The pertinent terms of the DIP Credit Agreement and related DIP Order are as follows:

   A.  **The Loans: The DIP Lenders agree to provide post-petition financing to the Borrowers, in an aggregate principal amount not to exceed $5,000,000, pursuant to that certain Commitment Schedule attached to the DIP Credit Agreement. There shall be seven Tranche Loans (Tranche 1 Loans through Tranche 7 Loans) made to HSH Alberta I L.P., HSH Alberta II L.P., HSH Alberta V L.P., HSH Coinvest (Alberta) L.P., HSH Luxembourg S.à r.l, HSH Luxembourg Coinvest S.à r.l, and HSH Delaware L.P., respectively. JCF HSH (DE) GP LP has agreed to guarantee the Obligations of the Tranche 1 Borrower, the Tranche 2 Borrower, the Tranche 3 Borrower, and the Tranche 4 Borrower, and HSH Delaware GP LLC has agreed to guarantee the Obligations of the Tranche 7 Borrower.**

   B.  **Available Cash: Prior to any Borrower borrowing funds under the DIP Facility, such Borrower shall first utilize all of its respective Available Cash.**

8

C. **Use of Loan Proceeds:** Section 3.10 of the DIP Credit Agreement provides that the Borrowers will use the proceeds of the Loans solely to fund the fees, costs and expenses of the Chapter 11 Cases authorized by the DIP Order or the Bankruptcy Court. No proceeds of the Facility (including amounts subject to the Carve-Out) will be used, directly or indirectly, by any Borrower, Guarantor or any Subsidiary (a) to fund any investigation, adversary action, suit, arbitration, proceeding or other litigation of any type or any prosecution or assertion of any claims against the DIP Agent or the DIP Lenders, each in its capacity as lender or agent, as applicable, under the DIP Credit Agreement or the other Loan Documents or (b) as otherwise prohibited under Section 2.17 of the DIP Credit Agreement. Under no circumstances may Loans be used (i) to pay all or part of any Indebtedness of the Borrowers arising prior to the Commencement Date unless consented to by the DIP Agent, or (ii) in violation of the DIP Order or for any purpose that is prohibited under the Bankruptcy Code.

D. **Maturity Date:** The "Maturity Date" is defined in Section 1.01 of the DIP Credit Agreement as the earliest of (a) the 12 month anniversary of the Commencement Date, (b) the date of the dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to cases under Chapter 7, (c) the date of the appointment of an interim or permanent trustee in any of the Chapter 11 Cases or the appointment of an examiner with expanded powers to operate or manage the financial affairs, the business, or the reorganization of any Loan Party, (d) the date of the termination of the DIP Lenders' Commitments and/or the acceleration of any outstanding Obligations pursuant to Section 7.01 of the DIP Credit Agreement and the DIP Order, and (e) the effective date of a Chapter 11 Plan in any of the Chapter 11 Cases.

E. **Security:** Paragraph 16 of the DIP Order provides that, as security for the Postpetition Obligations, the DIP Agent, for its own behalf and as collateral agent for the benefit of the DIP Lenders, is granted, pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable, and automatically perfected First Priority senior security interests in and Liens on all of the property and assets of each of the respective Loan Parties, whether real or personal, tangible or intangible, whether now owned or hereinafter acquired or arising, and regardless of wherever located, including, without limitation, the proceeds of any Avoidance Actions, and products and proceeds of all of the foregoing. (See also § 2.17(a) of DIP Credit Agreement). The DIP Liens shall be effective and perfected upon the date of entry of the DIP Order without the necessity of the execution or recordation of filings by the Loan Parties or the DIP Lenders of mortgages, security agreements, control

9

F.  **Superpriority Claim:** Paragraph 15 of the DIP Order provides that all Postpetition Obligations shall constitute, under section 364(c)(1) of the Bankruptcy Code, allowed super-priority administrative expense claims of the nature and priority set forth in section 364 of the Bankruptcy Code severally (but not jointly) against each of the Loan Parties, having priority over any and all administrative expense claims, diminution claims, unsecured claims, and all other claims against each of the Loan Parties, now or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), or 726 of the Bankruptcy Code (whether incurred in one or more of the Chapter 11 Cases or any conversion thereof to a case under chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto), which Super-Priority Claims shall, subject to the Carve-Out, be payable from and have recourse to all prepetition and postpetition property of the respective Loan Parties and all proceeds thereof (including the proceeds of any claim or cause of action under chapter 5 of the Bankruptcy Code. (See also § 2.17(a) of DIP Credit Agreement).

G.  **Interest Rate:** Section 2.05(a) of the DIP Credit Agreement provides that the Loans comprising each ABR Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 days) at a rate per annum equal to the Alternate Base Rate (which shall be at least 2.00%) plus the Applicable Rate in effect from time to time. The Applicable Rate in the case of ABR Loans shall be 7.00% per annum. Section 2.05(b) of the DIP Credit Agreement provides that the Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 days) at a rate per annum equal to the Adjusted LIBO Rate (which shall be at least 1.00%) for the Interest Period in effect for such Borrowing plus the Applicable Rate in effect from time to time. The Applicable Rate in the case of Eurodollar Loans shall be 8.00% per annum. Pursuant to Section 2.06, if any Event of Default shall occur and be continuing under the DIP Credit Agreement, the Borrowers shall on demand from time to time pay interest, to the extent permitted by law, on all outstanding amounts at a rate per annum (computed on the basis of actual number of days elapsed over a year of 365 days) equal to the rate that would be applicable to such amounts plus 2.00%.

H.  **Events of Default:** Section 7.01 of the DIP Credit Agreement provides for the following Events of Default: (a) any representation or warranty made or deemed made in or in connection with any Loan

10

Document or the Borrowings, or any representation, warranty or statement of fact contained in any report, certificate, financial statement or other instrument required to be furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished; (b) default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise; (c) default shall be made in the payment of any interest on any Loan or any other amount (other than an amount referred to in (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three Business Days; (d) default shall be made in the due observance or performance by the Borrowers or any Guarantor of any covenant, condition or agreement contained in Section 5.01(a), Section 5.03(a), Section 5.05 or Section 5.07 or in Article 6 of the DIP Credit Agreement; (e) default shall be made in the due observance or performance by the Borrowers or any Guarantor of any covenant, condition or agreement contained in any Loan Document (other than those specified in clauses (b), (c) or (d) above) and such default shall continue unremedied for a period of five Business Days after notice thereof has been given to the Borrowers by the DIP Agent; (f) (i) the Borrowers or any Guarantor shall fail to pay any principal or interest (subject, in the case of interest, to any applicable grace period), regardless of amount, due in respect of any Material Indebtedness incurred on or after the Commencement Date, when and as the same shall become due and payable, or (ii) any other event or condition occurs that results in any Material Indebtedness incurred on or after the Commencement Date becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any such Material Indebtedness or any trustee or agent on its or their behalf to cause any such Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; (g) one or more judgments or orders as to any obligation arising after the Commencement Date in excess of $50,000 (to the extent not covered by independent third-party insurance as to which the insurer has not denied or disputed its obligation to cover such judgment) or that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect shall be rendered against the Borrowers, any Guarantor or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed by reason of appeal or otherwise, or any action shall be legally taken by a judgment creditor

RLF1 3529064v.4

to levy upon assets or properties of the Borrowers or any Guarantor to enforce any such judgment; (h) any Guarantee under the Guarantee Agreement for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall deny that it has any further liability under its Guarantee (other than as a result of the discharge of such Guarantor in accordance with the terms of the Loan Documents); (i) any Lien purported to be created under any Security Document or the DIP Order shall cease to be, or shall be asserted by the Borrowers or any other Loan Party not to be, a valid, perfected and, with respect to the Secured Parties, First Priority (except as otherwise expressly provided in this Agreement, the DIP Order or such Security Document) Lien on any Collateral covered thereby; (j) any of the Cases shall be dismissed or converted to a case under Chapter 7 or otherwise; a trustee under Chapter 7 or Chapter 11, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within 30 days after the Entry thereof; or an application shall be filed by any of the Loan Parties without the consent of each of the DIP Lenders for the approval of any other Super-Priority Claim (other than the Carve-Out) in any of the Cases that is *pari passu* with or senior to the claims of the DIP Agent and the DIP Lenders against the Loan Parties hereunder, or there shall arise or be granted any such *pari passu* or senior Super-Priority Claim; (k) any of the Loan Parties shall file a pleading seeking, or otherwise consenting to, any of the matters listed in Section 7.01(j); (l) the Bankruptcy Court shall enter an order or orders in any of the Cases granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Loan Parties or allowing the Existing Lenders and Existing Agent to exercise rights pursuant to the Existing Credit Agreements; (m) any order of the Bankruptcy Court shall be entered in any of the Cases (i) staying, reversing or vacating the DIP Order or the Facility or (ii) without the written consent of the DIP Lenders (which consent shall be in their sole discretion), otherwise amending, supplementing or modifying the DIP Order or the Facility; (n) (i) any Loan Party shall assert any claims against the DIP Lenders pursuant to section 506(c) of the Bankruptcy Code or any other action is commenced by any Loan Party that is adverse to the DIP Lenders or the DIP Lenders' respective rights and remedies under the Facility or any Bankruptcy Court order, or (ii) any person shall prevail in the assertion of any claim against the DIP Lenders pursuant to section 506(c) of the

12

Bankruptcy Code; (o) with respect to any of the Borrowers or the Guarantors, (i) the entry of any decree or order for relief by a court having jurisdiction in an involuntary case under foreign bankruptcy laws or insolvency proceedings, appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of one or more of the Borrowers or the Guarantors or any substantial part of their property, or ordering the winding up or liquidation of the affairs of one or more of the Borrowers or the Guarantors, and the continuance of any such decree or order unstayed and in effect for a period of sixty (60) consecutive days, or (ii) the commencement of a voluntary case under foreign bankruptcy laws or insolvency proceedings (other than to the extent consented to by the DIP Lenders), the consent by one or more of the Borrowers or the Guarantors to the entry of any decree or order for relief in an involuntary case under any such law or to the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of one or more of the Borrowers or the Guarantors or any substantial part of their property, or the making by one or more of the Borrowers or the Guarantors of an assignment for the benefit of creditors, or the taking of corporate action in furtherance of any of the foregoing; (p) any Loan Party shall fail to comply with the terms of the DIP Order in any material respect; or (q) the filing of any Chapter 11 Plan or any other plan of reorganization with the Bankruptcy Court, or any direct or indirect amendment to any Chapter 11 Plan or other plan of reorganization, by the Loan Parties that does not provide for the termination of the Commitments and the indefeasible payment in full in cash of all Obligations under this Agreement and any other Loan Document on or before the effective date of such plan or plans.

I. Remedies/Automatic Stay: Paragraph 24 of the DIP Order provides that, notwithstanding the provisions of section 362 of the Bankruptcy Code and without any further order of, or application or motion to the Court, in the event of an Event of Default, the DIP Lender may take any or all of the following actions: (a) immediately terminate the Commitments; (b) declare all Postpetition Obligations to be immediately due and payable as provided in the DIP Credit Agreement; (c) enforce rights against Collateral in the possession of the Collateral Agent or any of the DIP Lenders for application towards the Postpetition Obligations; (d) take all or any actions and exercise any remedies available to a secured party under the Security Documents, the DIP Order, or applicable law or in equity, including, without limitation, the right to freeze, block, and/or offset against any deposit or securities account constituting Collateral, and (e) take any other action or exercise any other right or remedy permitted under the DIP Order, the other DIP Financing Documents, or applicable law to effect the repayment and satisfaction of the Postpetition

13

|   | Obligations; provided, however, that the Collateral Agent shall provide five (5) Business Days' prior written notice to the United States Trustee for the District of Delaware, counsel to the Loan Parties, and counsel to the Committee prior to exercising any enforcement right or remedy in respect of the Collateral (other than the rights described in clauses (a) and (b) above (to the extent they might be deemed remedies in respect of the Collateral) and other than with respect to freezing or offsetting amounts in any deposit account or securities account); provided, further, that nothing in the DIP Order shall prevent the Collateral Agent from seeking an order from the Bankruptcy Court to exercise its remedies on less than five (5) Business Days' notice. (See also § 7.01 of DIP Credit Agreement). Additionally, paragraph 22 of the DIP Order provides that the Collateral Agent is authorized, but not required, in its sole discretion, to file or record financing statements, notices of Liens, and/or other similar documents in any jurisdiction, take possession or control over, or take any other action in order to validate and perfect the DIP Liens under any applicable non bankruptcy law, and is granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so. Moreover, paragraph 37 of the DIP Order provides that the automatic stay is modified as necessary to effectuate all of the terms and provisions of the DIP Order, including, without limitation, to: (i) permit the Debtors to grant the DIP Liens and Super-Priority Claims; (ii) permit the Debtors to perform such acts as the DIP Agent may request in its sole discretion to assure the perfection and priority of the liens granted by the DIP Order; (iii) permit the Debtors to incur all liabilities and obligations to the DIP Agent and the DIP Lenders under the DIP order and the other DIP Financing Documents; and (iv) authorize the Debtors to pay, and the DIP Agent and DIP Lenders to retain and apply, payments made in accordance with the terms of the DIP Order and the other DIP Financing Documents. |
|---|---|
| J. | 506(c) Waiver: Paragraph 11 of the DIP Order provides that, except with respect to the Carve-Out, the Loan Parties (and any successors thereto or any representatives thereof, including a trustee appointed in a Chapter 11 Case, if any) have irrevocably waived and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any cost or expense incurred in connection with the preservation, protection, or enhancement of, or realization upon the Collateral. |
| K. | Lien on Avoidance Actions: Paragraph 16 of the DIP Order specifically provides that that the DIP Liens will extend to proceeds of Avoidance Actions. |
| L. | Carve-out: Paragraph 12 of the DIP Order provides that, upon the occurrence and during the continuation of an Event of Default (as |

14

defined in the DIP Credit Agreement), to the extent unencumbered funds are not readily available to pay administrative expenses in full, the claims granted hereunder to the DIP Lenders and the DIP Liens shall be subject to payment of the Carve-Out. For purposes of the DIP Order and the other DIP Financing Documents, "<u>Carve-Out</u>" shall mean (i) unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) and (ii) unpaid and allowed fees and expenses payable under sections 330 and 331 of the Bankruptcy Code to professional persons retained pursuant to an order of the Bankruptcy Court by any Debtor, the Committee, or any other committee ("<u>Case Professionals</u>") that (x) were incurred prior to the occurrence of the Event of Default but were unpaid as of such date or (y) were incurred after the occurrence of the Event of Default, in an aggregate amount (taking into account fees and expenses under both (x) and (y) above) not to exceed $1,000,000 (collectively, the "<u>Carve-Out Professional Fees</u>"); provided, however, that the Carve-Out shall not include, apply to, be utilized to, or be available for any fees or expenses incurred by any party, including any Debtor or any committee, or its respective professionals, in connection with, or relating to, the investigation, initiation, prosecution, or assertion of any claim, cause of action, adversary proceeding, or other litigation against the DIP Agent or any of the DIP Lenders, including, without limitation, challenging the amount, validity, perfection, priority, or enforceability of, or asserting any defense, counterclaim or offset to, the Postpetition Obligations and/or the DIP Liens. Any payment or reimbursement made after an Event of Default in respect of Carve-Out Professional Fees (exclusive of the application of any retainers by any of the Case Professionals) shall permanently reduce the Carve-Out on a dollar-for-dollar basis. Any funding of the Carve-Out shall be added to and made a part of the Postpetition Obligations, as part of the Super-Priority Claim, secured by the Collateral, and otherwise entitled to the protections granted under the DIP Order, the other DIP Financing Documents, the Bankruptcy Code, and applicable law.

M. <u>Indemnification</u>: Paragraph 34 of the DIP Order approves certain indemnification obligations of the Debtors, as more fully set forth in Sections 2.14 and 9.05 of the DIP Credit Agreement.

N. <u>Budget</u>: The Budget shall consist of a 4-week forecast of revenues and expenditures, must be in form and substance acceptable to the DIP Lenders, and may be updated from time to time pursuant to Section 5.02(f) of the DIP Credit Agreement.

17. To the extent there is any conflict between the summary set forth herein and the DIP Credit Agreement, the terms of the DIP Credit Agreement shall govern. To the extent there

is any conflict between the terms of the DIP Credit Agreement and the proposed DIP Order being submitted herewith, the terms of the DIP Order shall govern.

## BASIS FOR RELIEF

18.  Section 364(c) of the Bankruptcy Code provides (in relevant part) that:

> If the [debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> (1) with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien.

11 U.S.C. § 364(c).

19.  Bankruptcy Rule 4001(c)(2) provides, in relevant part, that:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion.

Fed. R. Bankr. P. 4001(c)(2).

20.  Bankruptcy Rule 4001(d) provides, in relevant part, that (i) a motion for approval to modify or terminate the automatic stay shall be served on any committee appointed pursuant to section 1102 of the Bankruptcy Code, on the creditors included on the list filed under Bankruptcy Rule 1007(d), and on such other entities as the court may direct, and (ii) objections may be filed within 14 days of the mailing of the notice of the motion and the time for filing objections thereto. See Fed. R. Bankr. P. 4001(d)(1) - (2).

**A.  The DIP Financing**

21.  As set forth above, based on discussions with potential lenders other than the DIP Lenders, the Debtors were unable to obtain alternative postpetition financing on an unsecured basis in an amount that the Debtors' current liquidity situation mandated. Additionally, the

Debtors are unable to obtain the funds to be provided pursuant to the DIP Financing on more favorable terms than those contained in the DIP Credit Agreement.

22. The Debtors have determined, in the exercise of their business judgment, that it is the best proposal under the circumstances. Provided that this judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its business judgment. See, e.g., In re Ames Dept. Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (courts have discretion under section 364 of the Bankruptcy Code to permit debtors to exercise reasonable business judgment so long as (i) the terms of the financing agreement do not "leverage the bankruptcy process and powers" and (ii) the financing agreement's purpose is primarily to benefit the estate, and not a party in interest).

23. The financing under the DIP Financing Documents provides additional liquidity to the Debtors sufficient to enable them, *inter alia*, to (a) preserve the value of their estates while crafting a value maximizing reorganization through the chapter 11 process, and (b) enable the Debtors to fund expenses incurred in connection with the Chapter 11 Cases. Without the financing provided for in the DIP Credit Agreement, the Debtors will simply not be able to fund their chapter 11 expenses, thereby putting the value of their assets in jeopardy.

24. The Debtors believe that the terms and conditions of the DIP Credit Agreement, summarized above, are fair and reasonable under the circumstances. In addition, the proposed DIP Financing is for valid business purposes and uses, is in the best interests of the Debtors, their estates and creditors, and is supported by reasonably equivalent value and consideration, as evidenced by the reasonableness of its terms. Accordingly, the Debtors request that the DIP Lenders be afforded the benefits of section 364(e) of the Bankruptcy Code in respect of the DIP Financing Documents.

25. Based upon the foregoing, the Debtors respectfully request that the Court approve the DIP Financing in accordance with the terms set forth in the DIP Order and the DIP Credit Agreement.

**B. <u>Modification of the Automatic Stay</u>**

26. Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed DIP Financing contemplates modification of the automatic stay (to the extent applicable), to the extent necessary to permit the DIP Agent and the DIP Lenders to perform any act authorized or permitted under, or by virtue of, the DIP Order or the other DIP Financing Documents.

27. Stay modification provisions of this type are standard features of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the DIP Order and DIP Financing Documents.

<u>Notice</u>

28. The Debtors have provided notice of this Motion to: (i) the Office of the United States Trustee for the District of Delaware, (ii) the attorneys for the Prepetition Lenders, and (iii) those creditors holding the 20 largest unsecured claims against the Debtors' estates (on a consolidated basis).[8] The Debtors submit that no other or further notice need be provided.

---

[8] Excluding "insiders" as set forth in section 101(31) of the Bankruptcy Code, there exist only 11 creditors of the Debtors on a consolidated basis.

18

WHEREFORE, the Debtors respectfully request that this Court enter the proposed DIP Order, substantially in the form attached hereto as <u>Exhibit B</u>, and grant the Debtors the relief requested herein along with such other relief as this Court deems just and appropriate.

Dated: February 3, 2010
      Wilmington, Delaware

Respectfully submitted,

/s/ Mark D. Collins

Mark D. Collins (No. 2981)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Proposed Attorneys for Debtors
and Debtors in Possession*