## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **HSH DELAWARE GP LLC,** *et al.*, | ) | **Case No. 10-10187 (MFW)** |
| | ) | |
| **Debtors.** | ) | **Jointly Administered** |
| | ) | |

## JOINT PLAN OF REORGANIZATION
## <u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>

Dated: August 13, 2010
       Wilmington, Delaware

Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Michael J. Merchant (No. 3854)
Marcos A. Ramos (No. 4450)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for the Debtors and Debtors-in-Possession*

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

ARTICLE I    DEFINITIONS AND INTERPRETATION .......................................1

ARTICLE II   TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS,
PRIORITY TAX CLAIMS AND PROFESSIONAL COMPENSATION
CLAIMS AGAINST THE DEBTORS ...........................................................15

ARTICLE III  CLASSIFICATION OF CLAIMS AGAINST AND INTERESTS IN THE
DEBTORS ..................................................................................................16

ARTICLE IV  TREATMENT OF CLAIMS AND INTERESTS AND DESIGNATION
WITH RESPECT TO IMPAIRMENT ............................................................17

ARTICLE V   VOTING AND DISTRIBUTIONS .................................................19

ARTICLE VI  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ....................................................................................................20

ARTICLE VII  IMPLEMENTATION OF PLAN.....................................................20

ARTICLE VIII POST-EFFECTIVE DATE COMMITTEE .....................................25

ARTICLE IX   CONDITIONS PRECEDENT .......................................................26

ARTICLE X    EFFECT OF THIS PLAN ON ASSETS, CLAIMS AND INTERESTS .......28

ARTICLE XI   RETENTION OF JURISDICTION .................................................33

ARTICLE XII  MISCELLANEOUS PROVISIONS ...............................................34

## **PLAN EXHIBITS**

Exhibit A      List of Debtors

Exhibit B1     Priority Non-Tax Claims

Exhibit B2     Secured Claims

Exhibit B3     Lender Claims

Exhibit B4     General Unsecured Claims

Exhibit B5     YFCPEC Claims

Exhibit B6     Interests

Exhibit C      Term Sheet

# PLAN SUPPLEMENTS

**The following Plan Supplements shall be Filed on or before the Supplement Filing Date:**

Plan Supplement 1:    Form of Amended and Restated Credit Agreements

Plan Supplement 2:    Form of Upside Sharing Agreement

Plan Supplement 3:    Form of New GP Withdrawal and Release Documents

Plan Supplement 4:    Form of Security Agreements

Plan Supplement 5:    Form of Cayman Settlement Agreements

Plan Supplement 6:    Form of Restructured Alberta Limited Partnership Agreements and Notices to Amend

Plan Supplement 7:    Form of Luxembourg Settlement Agreements

Plan Supplement 8:    Form of Luxembourg Voting Agreement

Plan Supplement 9:    Form of Luxembourg Shareholders Agreement

Plan Supplement 10:  Form of Amended YFCPEC Documents

Plan Supplement 11:  Form of Amended LuxCo Articles of Association

Plan Supplement 12:  Form of Restructured Delaware Limited Partnership Agreement

Plan Supplement 13:  Form of Restructured LLC Agreement

Plan Supplement 14:  Post-Effective Date Directors, Officers and Managers of the Reorganized Debtors

Plan Supplement 15:  Post-Effective Date Management Agreements

Plan Supplement 16:  Form of Custodian Agreement

Plan Supplement 17:  Form of Professional Compensation Claims Escrow Agreement

Plan Supplement 18:  Assumed Executory Contracts and Unexpired Leases

Plan Supplement 19:  Post-Effective Date Committee Members

Plan Supplement 20:  Statement of Available Cash

# INTRODUCTION

HSH Delaware GP LLC, HSH Alberta I L.P., HSH Alberta II L.P., HSH Alberta V L.P., HSH Coinvest (Alberta) L.P., JCF HSH (DE) GP LP, HSH Delaware L.P., HSH Luxembourg S.à r.l., and HSH Luxembourg Coinvest S.à r.l, as debtors and debtors in possession (collectively, the "**Debtors**"), hereby propose the following Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, pursuant to section 1121(a) of the Bankruptcy Code.[1]

Reference is made to the Disclosure Statement with respect to the Plan, distributed contemporaneously herewith, for a discussion of the Debtors' history, businesses, properties, operations, risk factors, a summary and analysis of the Plan, and certain related matters. Subject to the restrictions in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors respectfully reserve the right to alter, amend, modify, revoke or withdraw the Plan in the manner set forth in Sections 12.8 and 12.9 of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan cannot be solicited from a Holder of a Claim or Interest until such time as the Disclosure Statement has been approved by the Bankruptcy Court and distributed to Holders of Claims and Interests.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THIS PLAN AND THE RELATED DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. NO MATERIALS, OTHER THAN THE ACCOMPANYING SOLICITATION MATERIALS AND ANY EXHIBITS AND ANY EXHIBITS AND SCHEDULES ATTACHED THERETO OR REFERENCED THEREIN, HAVE BEEN APPROVED BY THE BANKRUPTCY COURT OR THE DEBTORS FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN. THE PLAN PROPONENTS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THIS PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

**A.** **Definitions.** The following terms (which appear in this Plan as capitalized terms) shall have the meanings set forth below. A term used in this Plan and not defined in this Plan but that is defined in the Bankruptcy Code has the meaning set forth in the Bankruptcy Code.

**1.1** *Administrative Expense Claim* means a Claim to the extent that it is of the kind described in section 503(b) of the Bankruptcy Code and is entitled to priority under section 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) any actual and

---

[1] Capitalized terms used in the Introduction shall have the meanings ascribed to them in Article I below.

necessary expenses of preserving the Estate, (b) any actual and necessary expenses of operating the business of the Debtors, (c) any actual indebtedness or obligations incurred or assumed by the Debtors during the pendency of the Chapter 11 Cases in connection with the conduct of their business, (d) any actual expenses necessary or appropriate to facilitate or effectuate this Plan, (e) any amount required to be paid under section 365(b)(1) of the Bankruptcy Code in connection with the assumption of Executory Contracts or Unexpired Leases, (f) all allowances of compensation or reimbursement of expenses to the extent Allowed by the Bankruptcy Court under sections 330(a), 331 or 503(b)(2), (3), (4) or (5) of the Bankruptcy Code, and (g) all U.S. Trustee Fees.

1.2     ***Agreed Sale Conditions*** has the meaning set forth in the Term Sheet.

1.3     ***Alberta Debtors*** means HSH Alberta I L.P., HSH Alberta II L.P., HSH Alberta V L.P. and HSH Coinvest (Alberta) L.P.

1.4     ***Allowed*** means with respect to any Claim or Interest, except as otherwise provided herein: (i) a Claim or Interest that is scheduled by the Debtors on their Schedules as neither disputed, contingent, nor unliquidated, and as to which the Debtors or other party in interest have not Filed an objection by the Claims Objection Bar Date; (ii) a Claim that either is not a Disputed Claim or has been Allowed by a Final Order; (iii) a Claim or Interest that is Allowed (a) pursuant to the Plan, (b) in any stipulation that is approved by the Bankruptcy Court, or (c) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan; (iv) a Claim relating to a rejected Executory Contract or Unexpired Lease that either (a) is not a Disputed Claim or (b) has been Allowed by Final Order; or (v) a Claim as to which a Proof of Claim has been Filed on or before the applicable Bar Date and as to which no objection has been Filed by the Claims Objection Bar Date.

1.5     ***Allowed Claim*** means a Claim or any portion thereof, without duplication, that has been Allowed.

1.6     ***Amended and Restated Credit Agreements*** means the seven separate amended and restated credit agreements between a Debtor, the Lenders, the Facility Agent and the Security Trustee, to be executed by the parties thereto on the Effective Date, which agreements shall amend and restate the Credit Agreements and shall be substantially in the form set forth in a Plan Supplement to be Filed on or before the Supplement Filing Date.

1.7     ***Amended Luxco Articles of Association*** means the articles of association of the Luxembourg Fund II Debtor, as amended on the Effective Date, which articles shall be substantially in the form set forth in a Plan Supplement to be Filed on or before the Supplement Filing Date.

1.8     ***Amended YFCPEC Documents*** means the agreements amending the terms of the YFCPEC Documents and governing the terms subordination of the YFCPEC Claims, to be entered into on the Effective Date between, among others, the Lenders and the Holders of YFCPEC Claims, substantially in the form set forth in a Plan Supplement to be Filed on or before the Supplement Filing Date; *provided, however,* that no amendment to the maturity

date shall detrimentally affect the tax situation of the Luxembourg Fund II Debtor or the tax situation of the Holders of the YFCPEC Claims.

**1.9** *Article* means any article of this Plan.

**1.10** *Asset* means any and all property that would be property of the Debtors and the Debtors' Estate under section 541 of the Bankruptcy Code, whether such property is now existing or hereafter arising or acquired and wherever located including, without limitation, Causes of Action and all proceeds of and recoveries on Causes of Action.

**1.11** *Available Cash* means, in respect of each Debtor, the aggregate of the following amounts of Cash: (i) the aggregate amount held in each bank account of that Debtor, and (ii) the aggregate amount (if any) distributed by that Debtor to any Trust since the date that the last payment of interest was made to the Facility Agent under a Credit Agreement during the course of 2008 (such amounts to be set out in a Plan Supplement to be provided to the Facility Agent in draft by August 16, 2010 and to be Filed on or before the Supplement Filing Date).

**1.12** *Avoidance Action* means, collectively, causes of action arising under sections 542, 543, 544, 545, 546, 547, 548, 549, 550 or 553 of the Bankruptcy Code, or under similar or related state or federal statutes or common law, including fraudulent transfer laws, in each case whether or not litigation to prosecute such causes of action was commenced prior to the Effective Date.

**1.13** *B Shares* has the meaning set forth in Section 7.1(c) of this Plan.

**1.14** *Ballot* means the form distributed to each Holder of an Impaired Claim or Interest upon which is to be indicated, among other things, acceptance or rejection of the Plan.

**1.15** *Bankruptcy Code* means the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq., as amended from time to time.

**1.16** *Bankruptcy Court* means the United States Bankruptcy Court for the District of Delaware in which the Chapter 11 Cases were Filed or any other court with jurisdiction over the Chapter 11 Cases.

**1.17** *Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure and the local rules and standing orders of the Bankruptcy Court, as amended from time to time.

**1.18** *Bar Date* means such date(s) fixed by the Bankruptcy Court by which proofs of Claim, proofs of Interest, or requests for allowance of Administrative Claims must be Filed, as applicable.

**1.19** *Business Day* means any day other than a Saturday, Sunday, or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

**1.20** *Cash* means cash and cash equivalents, such as bank deposits, checks and other similar items or instruments.

**1.21** *Cause(s) of Action* means any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, asserted or unasserted and whether asserted or assertable directly or derivatively, in law, equity or otherwise, including Avoidance Actions.

**1.22** *Cayman Court* means the Grand Court of the Cayman Islands (Financial Services Division).

**1.23** *Cayman GP(s)* means HSH Cayman I GP Limited (in liquidation), HSH Cayman II GP Limited (in liquidation), HSH Cayman V GP Limited (in liquidation), and HSH Coinvest (Cayman) GP Limited (in liquidation).

**1.24** *Cayman GP Indemnity Claims(s)* means, with respect to each Cayman GP, the contingent Claim of the Cayman GP arising out of its entitlement to an indemnity from the Alberta Debtor of which it is a general partner, for payments made and liabilities incurred by the Cayman GP in the ordinary and proper conduct of the Alberta Debtor's business, by virtue of the Alberta Partnership Act, R.S.A. 2000, c.P-3.

**1.25** *Cayman Settlement Agreement(s)* means the settlement agreements to be entered into on the Effective Date between, among others, each Cayman GP and its relevant Trust limited partner, substantially in the form set forth in a Plan Supplement to be Filed on or before the Supplement Filing Date.

**1.26** *Chapter 11 Cases* means the Debtors' chapter 11 cases pending in the Bankruptcy Court, which are being jointly administered under Case No. 10-10187.

**1.27** *Claim* means "claim" as defined in section 101(5) of the Bankruptcy Code, as supplemented by section 102(2) of the Bankruptcy Code, against any of the Debtors, whether or not asserted.

**1.28** *Claims Objection Bar Date* means with respect to any Claim, the 90th day following the latest of the Effective Date, the date such Claim is Filed, and such later date as may be established from time to time by the Bankruptcy Court.

**1.29** *Class* means each category or group of Holders of Claims or Interests as designated under this Plan.

**1.30** *Class [ ] Claim* means a Claim in the particular class of Claims identified and described in Article IV of the Plan.

**1.31** *Class 6 Interest* means an Interest in Class 6, identified and described in Article IV of the Plan.

**1.32** *Confirmation* means "confirmation" as used in section 1129 of the Bankruptcy Code.

**1.33** *Confirmation Date* means the date on which the Confirmation Order is entered on the docket by the clerk of the Bankruptcy Court.

**1.34** *Confirmation Hearing* means the hearing(s) at which the Bankruptcy Court considers Confirmation of this Plan.

**1.35** *Confirmation Order* means an order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

**1.36** *Credit Agreements* means the seven separate term and revolving credit facilities agreements dated as of October 19, 2006 (as amended from time to time) between a Debtor, the Lenders and the Facility Agent.

**1.37** *Cure Claim* means a Claim based upon the Debtors' defaults under an Executory Contract or Unexpired Lease existing as of the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

**1.38** *Custodian Agreement* means the custodian agreement under which the HSH Share Title Documents are held by the HSH Shares Custodian, substantially in the form set forth in a Plan Supplement to be Filed on or before the Supplement Filing Date.

**1.39** *Debtor(s)* has the meaning set forth on page 1 of this Plan, a list of which entities, together with their individual case numbers in the Chapter 11 Cases, is attached hereto as <u>Exhibit A</u>.

**1.40** *Debtors' CRO Motion* means that certain Motion of the Debtors and Debtors in Possession Pursuant to Bankruptcy Code Section 363 for Entry of an Order Approving the Services Agreement Between the Debtors and H Ronald Weissman Nunc Pro Tunc to the Commencement Date, dated February 3, 2010 [D.I. 24].

**1.41** *Debtors' DIP Motion* means that certain Motion of the Debtors and Debtors in Possession for an Order (A) Authorizing HSH Alberta I L.P., HSH Alberta II L.P., HSH Albert V L.P., HSH Coinvest (Alberta) L.P., HSH Luxembourg S.a. r.l., HSH Luxembourg Coinvest S.a. r.l., and HSH Delaware L.P. to Obtain Postpetition Financing; (B) Authorizing JCF HSH (DE) GP LP and HSH Delaware GP LLC to Issue Guarantees in Respect of Such Postpetition Financing; (C) Authorizing Debtors to Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. Sections 105 and 364; and (D) Modifying the Automatic Stay Pursuant to 11 U.S.C. Section 362, dated February 3, 2010 [D.I. 25].

**1.42** *Delaware Debtor* means HSH Delaware L.P.

**1.43** *Delaware LLC* means HSH Delaware GP LLC.

**1.44** *Disclosure Statement* means the Disclosure Statement with respect to this Plan approved by order of the Bankruptcy Court and all supplements, schedules and exhibits thereto.

**1.45** *Disputed Claim* means any Claim against a Debtor to the extent that (a) the allowance of such Claim or any portion thereof is the subject of an objection, appeal or motion to estimate that has been timely Filed by a party in interest and which objection, appeal or motion has not been determined by a Final Order, (b) such Claim is scheduled by the Debtors in the Schedules as disputed, contingent and/or unliquidated, (c) during the period prior to the Claims Objection Bar Date, such Claim is in excess of the amount scheduled as other than disputed, unliquidated or contingent, or (d) such Claim may be subject to section 502(d) of the Bankruptcy Code.

**1.46** *Effective Date* means the first Business Day this Plan becomes effective and is implemented in accordance with Article IX hereof.

**1.47** *Estate* means the estates of the Debtors, individually or collectively, as is appropriate in the context, created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

**1.48** *Exculpated Party* or *Parties* means: (i) each of the Debtors, and their respective affiliates, managers, officers, directors, employees, attorneys, advisors, agents and Professionals; (ii) each of the Trusts, and their respective affiliates, managers, officers, directors, employees, trustees, attorneys, advisors and agents; (iii) each of the Cayman GPs, and their respective affiliates, managers, officers, directors, employees, trustees, attorneys, advisors and agents; (iv) each of the Lenders and the Facility Agent, and their respective affiliates, managers, officers, directors, employees, attorneys, advisors and agents; (v) each of the Liquidators, and their respective firms or future firms, affiliates, managers, officers, directors, employees, fellow members, partners, personal representatives, attorneys, advisors and agents; and (vi) J. Christopher Flowers, JCF Associates II-A LLC, JCF Associates II-A L.P., J.C. Flowers II-A L.P., JCF Associates II Ltd., JCF Associates II L.P., J.C. Flowers II L.P., J.C. Flowers II-B L.P., J.C. Flowers & Co. LLC, J.C. Flowers & Co. UK Ltd, HSH Cayman Associates Ltd, and JCF HSH (DE) GP LLC, and their respective affiliates, managers, officers, directors, employees, attorneys, advisors and agents; along with the successors and assigns of each of the foregoing.

**1.49** *Executory Contract* means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

**1.50** *Exhibit* means any exhibit attached to or incorporated by this Plan.

**1.51** *Exit Fee* has the meaning set forth in the Amended and Restated Credit Agreements.

**1.52** *Facilities* means the seven separate single term loan facilities under the respective Amended and Restated Credit Agreements.

**1.53** *Facility Agent* means The Royal Bank of Scotland, N.V., London Branch and any successor thereto appointed in accordance with the relevant Amended and Restated Credit Agreement.

**1.54**    *File or Filed* means file or filed with the Bankruptcy Court in the Chapter 11 Cases.

**1.55**    *Final Order* means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the subject matter: (a) that has not been reversed, stayed, modified or amended and as to which (i) any right to appeal or seek certiorari, review, reargument, stay or rehearing has been waived or (ii) the time to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending; or (b) as to which an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought or (ii) the time to appeal further or seek certiorari, further review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, further review, reargument, stay or rehearing is pending.

**1.56**    *Final Settlement Date* means the date on which the Reorganized Debtors have satisfied all of their payment obligations to the Lenders under the Plan (including, without limitation, the payment of any Upside Amount).

**1.57**    *General Unsecured Claim* means any Claim that is not an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, a Lender Claim, or a YFCPEC Claim.

**1.58**    *Hedging Arrangements* means any interest hedging arrangements entered into in connection with the Credit Agreements and which were terminated on or before October 19, 2009.

**1.59**    *Holder* means any Person holding an Interest or Claim.

**1.60**    *HSH* means HSH Nordbank AG.

**1.61**    *HSH Shares* means all shares and other interests of any nature (including, without limitation, any silent participations) in HSH held by the Debtors.

**1.62**    *HSH Shares Custodian* means any custodian appointed by the Debtors, the Facility Agent and the Security Trustee to hold the HSH Share Title Documents under the Custodian Agreement.

**1.63**    *HSH Share Title Documents* means: (i) prior to the completion of an initial public offering of the HSH Shares, (a) all notarial deeds held by the Debtors, the Trusts, or J.C. Flowers & Co. LLC and/or its affiliates issued to the The HSH AIV 1 Trust, The HSH AIV 2 Trust, The HSH AIV 3 Trust, The HSH AIV 4 Trust, The HSH AIV 5 Trust and Close Trustees (Cayman) Limited containing the sale and purchase agreement under which the HSH Shares were acquired, (b) all original agreements held by the Debtors, the Trusts, or J.C. Flowers & Co. LLC and/or its affiliates transferring shares in HSH from WestLB Beteiligungsholding GmbH to any of the Debtors, (c) notarial protocol of general meeting and copies of the subscription certificates held by the Debtors, the Trusts, or J.C. Flowers & Co. LLC and/or its

affiliates relating to the subscription of shares issued by HSH after August 30, 2006 by any of the Debtors, and (d) all original documents relating to the silent participations in HSH held by the Debtors, the Trusts, or J.C. Flowers & Co. LLC and/or its affiliates; or (ii) following the completion of an initial public offering of the HSH Shares, any documents of title or access to securities accounts which evidence title to the listed HSH Shares.

1.64 **HSH Supervisory Board Representative** means David Morgan, or any successor appointed to the supervisory board of HSH Nordbank AG having been proposed by the relevant Reorganized Debtor(s) and approved by the Post-Effective Date Committee, in each case in accordance with Section 8.4(d) of this Plan.

1.65 **Impaired** means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.66 **Interest** means the interest held by any Person in the equity of the Debtors, including, without limitation: (i) any "equity security" issued by the Debtors, as defined by section 101(16) of the Bankruptcy Code; (ii) a share in a corporation, whether or not transferable or denominated "stock", or similar security; (iii) a membership interest in a limited liability company; (iv) interest of a limited partner in a limited partnership; (v) a warrant, option or right, contractual or otherwise, other than a right to convert, to purchase, sell or subscribe to a share, security or interest of a kind specified in subparagraphs (i), (ii), (iii) and (iv) of this paragraph; or (vi) an interest of a general partner in a limited or general partnership.

1.67 **Lenders** means Commerzbank AG, Crédit Agricole Corporate and Investment Bank, Landsbanki Islands hf, Lloyds TSB Bank plc, The Royal Bank of Scotland, N.V. and The Royal Bank of Scotland plc, and any of their assignees or transferees; provided, that such assignment or transfer is made in accordance with the terms of an Amended and Restated Credit Agreement.

1.68 **Lender Claim(s)** means the Claims of the Lenders and the Facility Agent on account of the Credit Agreements and all amounts outstanding under the Hedging Arrangements, as set forth in Exhibit B3 of this Plan, which are Allowed Claims under the Plan.

1.69 **Lenders' Trustee Motion** means that certain Motion of the Lenders for an Order (A) Directing the Appointment of a Trustee Pursuant to 11 U.S.C. §§ 1104(a)(1)-(3); or, in the Alternative, (B) Terminating the Debtors' Exclusive Rights Pursuant to 11 U.S.C. § 1121(d) to Allow the Lenders to File and Solicit Acceptances of a Chapter 11 Plan, dated February 23, 2010 [D.I. 80].

1.70 **Liens** means, with respect to any interest in property, any mortgage, lien, pledge, charge, security interest, easement or encumbrance of any kind whatsoever affecting such interest in property.

1.71 **Liquidators** means David Walker and Ian Stokoe of PwC Corporate Finance and Recovery (Cayman) Ltd, each in their capacity as joint official liquidator of each of the Cayman GPs pursuant to orders of the Cayman Court dated 12 February 2010, and any additional or successor liquidator appointed by the Cayman Court or otherwise.

**1.72** *LLC Interest* means the interest of The HSH AIV 4 Trust in the Delaware LLC.

**1.73** *Lock Up Period* means the period commencing on the Effective Date and ending on the earlier of (i) midnight on June 30, 2013, and (ii) termination by they Facility Agent following the occurrence of a Termination Event.

**1.74** *Luxembourg Debtor(s)* means the Luxembourg Fund II Debtor and the Luxembourg Co-Invest Debtor.

**1.75** *Luxembourg Co-Invest Debtor* means HSH Luxembourg Coinvest S.à r.l.

**1.76** *Luxembourg Fund II Debtor* means HSH Luxembourg S.à r.l.

**1.77** *Luxembourg Voting Agreement* means the voting agreement to be entered into on the Effective Date in respect of the Luxembourg Fund II Debtor, by the Trust which is the shareholder of the Luxembourg Fund II Debtor and PlanCo SPV, substantially in the form set forth in a Plan Supplement to be Filed on or before the Supplement Filing Date.

**1.78** *Luxembourg Settlement Agreement(s)* means the settlement agreements to be entered into on the Effective Date between, among others, each Luxembourg Debtor and the Trust which is its shareholder, substantially in the form set forth in a Plan Supplement to be Filed on or before the Supplement Filing Date.

**1.79** *New Organizational Documents* means the documents evidencing the corporate structure applicable to the Reorganized Debtors, including, without limitation, the Restructured Alberta Limited Partnership Agreements, the Restructured Delaware Limited Partnership Agreement, the Restructured LLC Agreement, the Amended Luxco Articles of Association, the Luxembourg Voting Agreement and any other applicable agreements set forth in the Term Sheet, which documents will be substantially in the form set forth in a Plan Supplement to be Filed on or before the Supplement Filing Date.

**1.80** *New GP* means JCF HSH (DE) GP LP.

**1.81** *New GP Withdrawal and Release Documents* means the documentation governing the withdrawal of the New GP as a general partner of the Alberta Debtors, to be entered into on the Effective Date between, among others, the New GP, each Cayman GP, and each Alberta Debtor, substantially in the form set forth in a Plan Supplement to be Filed on or before the Supplement Filing Date.

**1.82** *Par Amount* means, at any time, an amount equal to the following payment obligations of the Debtors and/or the Trusts to the Lenders and the Facility Agent at that time: (i) the aggregate amount of all costs and expenses of the Lenders and the Facility Agent and Security Trustee relating to the Credit Agreements and Plan (including, without limitation, any default interest accrued to date, all legal and other professional costs and expenses (including, without limitation, those of the Liquidators and such Liquidators' legal and other professional costs and expenses)) which the Facility Agent has determined (in its sole discretion) should be added to the Par Amount; (ii) the aggregate amount of any accrued but uncapitalized

interest under the Credit Agreements and any Hedging Arrangements; (iii) the aggregate amount of any outstanding principal or close out amounts under the Amended and Restated Credit Agreements and the Hedging Arrangements (including, without limitation, any capitalized interest); and (iv) the aggregate of any Exit Fees payable.

**1.83** ***Person*** means any person, including, without limitation, any individual, partnership, joint venture, venture capital fund, association, corporation, limited liability company, limited liability partnership, unlimited liability company, trust, trustee, executor, administrator, legal personal representative, estate, group, unincorporated association or organization or governmental unit.

**1.84** ***Petition Date*** means, (i) in the case of the Alberta Debtors, the Delaware LLC and the New GP, January 21, 2010, and (ii) in the case of the Luxembourg Debtors and the Delaware Debtor, September 8, 2009.

**1.85** ***Plan*** means this Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, the Plan Supplement, and all addenda, exhibits, schedules and other attachments hereto, all of which are incorporated herein by reference, as the same may be amended from time to time, pursuant to this Plan, the Bankruptcy Code or the Bankruptcy Rules.

**1.86** ***PlanCo SPV*** means a special purpose vehicle incorporated in the Cayman Islands for the purposes of holding certain equity interests in the general partners of any Debtor which is a limited partnership and in the Luxembourg Fund II Debtor and to be managed in a manner consistent with the Plan and the Restructuring Documents for the purposes of implementing the Plan.

**1.87** ***Plan Supplement*** means, collectively, any and all Supplements to this Plan that will be Filed by the Debtors with the Bankruptcy Court not later than 10 days prior to the Confirmation Hearing, which supplements shall contain substantially final forms of documents required for the implementation of the Plan.

**1.88** ***Post-Effective Date Committee*** means the committee to be established pursuant to Article VIII of this Plan.

**1.89** ***Postpetition Period*** means the period of time following the Petition Date through the Confirmation Date.

**1.90** ***Priority Non-Tax Claims*** means a Claim to the extent that it is of the kind described in, and entitled to priority under, section 507(a) of the Bankruptcy Code, but other than any Priority Tax Claim.

**1.91** ***Priority Tax Claim*** means a Claim to the extent that it is of the kind described in, and entitled to priority under, section 507(a)(8) of the Bankruptcy Code.

**1.92** ***Professional*** means (a) Richards, Layton & Finger, P.A., (b) Walkers, (c) Barlow Lyde & Gilbert LLP, (d) McCarthy Tetrault LLP, (e) Mourant Fund Services LLC, (f) SGG S.A., and (g) Arendt & Medernach.

**1.93** *Professional Compensation Claim(s)* means Allowed Administrative Expense Claims of Professionals.

**1.94** *Professional Compensation Claims Escrow* has the meaning set forth in Section 2.2 of this Plan.

**1.95** *Professional Compensation Claims Escrow Agreement* means the agreement relating to the Professional Compensation Claims Escrow, such agreement to be substantially in the form set forth in a Plan Supplement to be Filed on or before the Supplement Filing Date.

**1.96** *Record Date* means February 1, 2009.

**1.97** *Reinstated* means, with respect to any Claim, (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder of such Claim so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder of such Claim.

**1.98** *Released Party* or *Parties* means: (i) each of the Debtors, and their respective affiliates, managers, officers, directors, employees, attorneys, advisors, agents and Professionals; (ii) each of the Trusts, and their respective affiliates, managers, officers, directors, employees, trustees, attorneys, advisors and agents; (iii) each of the Cayman GPs, and their respective affiliates, managers, officers, directors, employees, trustees, attorneys, advisors and agents; (iv) each of the Lenders and the Facility Agent, and their respective affiliates, managers, officers, directors, employees, attorneys, advisors and agents; (v) each of the Liquidators, and their respective firms or future firms, affiliates, managers, officers, directors, employees, fellow members, partners, personal representatives, attorneys, advisors and agents; and (vi) J. Christopher Flowers, JCF Associates II-A LLC, JCF Associates II-A L.P., J.C. Flowers II-A L.P., JCF Associates II Ltd., JCF Associates II L.P., J.C. Flowers II L.P., J.C. Flowers II-B L.P., J.C. Flowers & Co. LLC, J.C. Flowers & Co. UK Ltd, HSH Cayman Associates Ltd, and JCF HSH (DE) GP LLC, and their respective affiliates, managers, officers, directors, employees, attorneys, advisors and agents; along with the successors and assigns of each of the foregoing.

**1.99** *Relevant Equity Interests* means the shares, partnership interests or other equity interests in the Alberta Debtors, the Luxembourg Debtors and the Delaware Debtor, but excluding (i) the partnership interests held by the Cayman GPs in the Alberta Debtors, (ii) the partnership interest held by the Delaware LLC in the Delaware Debtor, and (iii) any shares, partnership interests or other equity interests held by PlanCo SPV.

**1.100** *Reorganized Debtors* means, on and after the Effective Date, collectively, all of the surviving Debtors that are reorganized under and pursuant to this Plan.

**1.101** *Restructured Alberta Limited Partnership Agreement(s)* means the amended partnership agreements of each of the Alberta Debtors, to be adopted on the Effective Date substantially in the form set forth in a Plan Supplement to be Filed on or before the Supplement Filing Date.

**1.102** *Restructured Delaware Limited Partnership Agreement* means the amended partnership agreement of the Delaware Debtor, to be adopted on the Effective Date substantially in the form set forth in a Plan Supplement to be Filed on or before the Supplement Filing Date.

**1.103** *Restructured LLC Agreement* means the amended limited liability company agreement of the Delaware LLC, to be adopted on the Effective Date substantially in the form set forth in a Plan Supplement to be Filed on or before the Supplement Filing Date.

**1.104** *Restructuring* means the restructuring of the obligations of the Debtors pursuant to the Restructuring Documents.

**1.105** *Restructuring Documents* means the Plan, any document referred to in Annex 2 (Documentation Summary) of the Term Sheet, and any other contractual agreements or other documents contemplated to be entered into pursuant to the Term Sheet.

**1.106** *Schedules* means the Schedules of Assets and Liabilities Filed in the Chapter 11 Cases, as amended, revised or modified from time-to time.

**1.107** *Section* means any section of this Plan.

**1.108** *Secured Obligations* means all present and future obligations and liabilities (whether actual or contingent and whether owed jointly or severally or in any other capacity whatsoever) of the Debtors and the Trusts to any Lender under any Restructuring Document (other than, after a Voluntary Prepayment in full, in respect of any Upside Amount).

**1.109** *Security Agreements* means each agreement relating to the grant of security over the HSH Shares, the YFCPEC Claims and the Relevant Equity Interests and all ancillary documents thereto (including, without limitation, any powers of attorney granted in support of such security), which agreements will be substantially in the form set forth in a Plan Supplement to be Filed on or before the Supplement Filing Date.

**1.110** *Security Trustee* means The Royal Bank of Scotland, N.V., London Branch and any successor thereto appointed in accordance with the relevant Amended and Restated Credit Agreement.

**1.111** *Supplement(s)* means any supplement attached to or incorporated into this Plan, including the Plan Supplement.

**1.112** *Supplement Filing Date* means the date or dates on which certain exhibits, schedules and supplements to this Plan, including the Plan Supplement, each of which shall be in a form reasonably acceptable to the Debtors and the Facility Agent, shall be Filed with the Bankruptcy Court, which date or dates shall be at least ten days prior to the Confirmation Hearing.

**1.113** *Termination Event* has the meaning set forth in the Amended and Restated Credit Agreements.

**1.114** *Term Sheet* means that certain term sheet, attached as <u>Exhibit C</u> hereto, setting forth the terms of the restructuring of the Debtors' obligations to the Lenders to be implemented pursuant to this Plan. The provisions of the Term Sheet will be incorporated into the Restructuring Documents.

**1.115** *Trust(s)* means The HSH AIV 1 Trust, The HSH AIV 2 Trust, The HSH AIV 3 Trust, The HSH AIV 4 Trust, The HSH AIV 5 Trust, The HSH Coinvest (Cayman) Trust-A and The HSH Coinvest (Cayman) Trust-B.

**1.116** *Trust Agreements* means the trust agreements in respect of each of the Trusts.

**1.117** *Unexpired Lease* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

**1.118** *Unimpaired* means "unimpaired" within the meaning of section 1124 of the Bankruptcy Code.

**1.119** *Upside Amount* has the meaning set forth in Section 7.1(b) of this Plan.

**1.120** *Upside Sharing Agreement* means each and every agreement governing the allocation and payment of the Upside Amount to be entered into on the Effective Date between, among others, the Lenders, the Trusts and the Debtors, substantially in the form set forth in a Plan Supplement to be Filed on or before the Supplement Filing Date.

**1.121** *U.S. Trustee* means the United States Trustee for the District of Delaware.

**1.122** *U.S. Trustee Examiner Motion* means that certain United States Trustee's (I) Statement with Respect to Motion for an Order (A) Directing the Appointment of a Trustee Pursuant to 11 U.S.C. §§ 1104(a)(1)-(3); or in the Alternative, (B) Terminating the Debtors' Exclusive Rights Pursuant to § 1121(d) to Allow the Lenders to File and Solicit Acceptances of a

Chapter 11 Plan and (II) Independent Motion of the United States Trustee for an Order Directing the Appointment of an Examiner, dated March 24, 2010 [D.I. 186].

**1.123** *U.S. Trustee Fees* means all fees and charges assessed against the Estate by the U.S. Trustee and due pursuant to section 1930 of title 28 of the United States Code.

**1.124** *Voluntary Prepayment* has the meaning set forth in Section 7.1(a) of this Plan.

**1.125** *Voting Deadline* means the date set in an order of the Bankruptcy Court as the deadline for the return of Ballots accepting or rejecting this Plan.

**1.126** *YFCPEC Claim* means any Claim that any Person has in respect of the Luxembourg Fund II Debtor under the YFCPEC Documents.

**1.127** *YFCPEC Document(s)* means: (i) the certificate of designation dated August 19, 2008 for 12,552,606,900 HSH Luxembourg S.à r.l. Yield Free Convertible Preferred Equity Certificates subscribed to by Genesis Trust & Corporate Services Ltd. acting in its capacity as trustee for The HSH AIV 3 Trust for a total aggregate nominal value of EUR 125,526,069 and (ii) the Register of Yield Free Convertible Preferred Equity Certificates (YFCPEC).

**B.** **Interpretation**.  For purposes of this Plan:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) unless otherwise provided in this Plan, any reference in this Plan to an existing document or exhibit means such document or exhibit, as it may have been or may be amended, modified or supplemented pursuant to this Plan; (d) unless otherwise specified herein, any reference to a Person as a Holder of a Claim includes that Person's successors, assigns and affiliates; (e) unless otherwise specified, all references in this Plan to sections, Articles, schedules, Supplements and Exhibits are references to sections, Articles, schedules, Supplements and Exhibits of or to this Plan; (f) the words "herein", "hereof" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and sections are inserted for convenience of reference only and are not intended to be part of or to affect the interpretation of this Plan; and (h) the rules of construction set forth in section 102 of the Bankruptcy Code will apply.

**C.** **Computation of Time**.  In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

**D.** **Currency Denomination**.  All references in this Plan to monetary figures shall refer to currency of the United States of America unless otherwise indicated.

# ARTICLE II
## TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND PROFESSIONAL COMPENSATION CLAIMS AGAINST THE DEBTORS

**2.1      Administrative Expense Claims**.  On the later of (i) the Effective Date or (ii) if the Administrative Expense Claim is not Allowed as of the Effective Date, 30 days after the date on which an Administrative Expense Claim becomes Allowed, the Debtors shall either (x) pay to each Holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (y) satisfy and discharge such Administrative Expense Claim in accordance with such other terms that the Debtors and such Holder shall have agreed upon; provided, however, that such agreed-upon treatment shall not be more favorable than the treatment provided in clause (x); and provided further, that U.S. Trustee Fees shall be paid in accordance with Section 2.4 of the Plan.  Other than with respect to Professional Compensation Claims and Cure Claims, notwithstanding anything in the Plan to the contrary, if an Administrative Expense Claim arises (i) based on liabilities incurred in, or to be paid in, the ordinary course of business during the Postpetition Period or (ii) pursuant to an Executory Contract or Unexpired Lease, the Holder of such Administrative Expense Claim shall be paid in Cash by the applicable Debtor (or after the Effective Date, by the applicable Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreements giving rise to such Administrative Expense Claim without the need or requirement for the Holder of such Administrative Expense Claim to file a motion, application, claim or request for allowance or payment of an Administrative Expense Claim with the Bankruptcy Court.

**2.2      Professional Compensation Claims**.      Notwithstanding any other provision of the Plan to the contrary, payment of any Professional Compensation Claims shall be made solely by the Trusts, and in no event shall any Professional Compensation Claims be paid out of Assets of the Estate or otherwise become an obligation of any other Person, including, but not limited to, the Debtors or the Reorganized Debtors. Any Person asserting a Professional Compensation Claim shall, no later than 30 days after the Confirmation Date, file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date.  To the extent that such an application is granted by the Bankruptcy Court, the requesting Person shall receive from the Trusts: (i) payment of Cash in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Cases, such payment to be made within the later of (a) the Effective Date or (b) three Business Days after the order granting such Person's final fee application becomes a Final Order; or (ii) payment on such other terms as may be mutually agreed upon by the Holder of the Professional Compensation Claim and the Trusts (but in no event shall the payment exceed the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Cases). On or prior to the Effective Date, the Trusts shall deposit to an escrow account (the "**Professional Compensation Claims Escrow**") with Richards, Layton & Finger, P.A. an amount equal to the Professional Compensation Claims (including a reasonable estimate of an amount necessary to satisfy any Professional Compensation Claims pending approval by the Bankruptcy Court), pursuant to the terms of the Professional Compensation Claims Escrow Agreement.

**2.3      Priority Tax Claims**.  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement,

release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) or (D), as applicable, of the Bankruptcy Code.

**2.4     U.S. Trustee Fees**.  U.S. Trustee Fees incurred prior to the Effective Date shall be paid on the Effective Date or as soon as possible thereafter, in accordance with the applicable schedule for payment of such fees.  Until each of the Chapter 11 Cases is closed by entry of a final decree of the Bankruptcy Court, any additional U.S. Trustee Fees shall be paid by the Reorganized Debtors.

## ARTICLE III
## CLASSIFICATION OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS

**3.1     Classification**.  Pursuant to sections 1122 and 1123 of the Bankruptcy Code, the following designates the Classes of Claims and Interests under this Plan.  A Claim or Interest is in a particular Class for purposes of voting on, and receiving distributions pursuant to, this Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified, and their treatment is set forth in Article II of this Plan.

**3.2     Separate Plans**.  The Plan constitutes a separate chapter 11 plan for each of the Debtors, and does not provide for substantive consolidation of the Estate.

**3.3     Classes**.  The Claims against and Interests in the Debtors are classified as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 2 | Secured Claims | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 3 | Lender Claims | Impaired | Entitled to vote |
| Class 4 | General Unsecured Claims | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 5 | YFCPEC Claims | Impaired | Entitled to vote |

| Class 6 | Interests | Impaired | Entitled to vote |

**3.4    Effect of Non-Voting; Modifications.**  At the Confirmation Hearing, the Debtors may seek a ruling that if no Holder of a Claim or Interest eligible to vote in a particular Class timely votes to accept or reject the Plan, the Plan will be deemed accepted by the Holders of such Claims or Interests in such Class for the purposes of section 1129(b) of the Bankruptcy Code (provided that, the Debtors will not seek any such ruling without the consent of the Facility Agent).  Subject to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to modify the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, provided that such modifications are made in accordance with Section 12.8 below.

## ARTICLE IV
## TREATMENT OF CLAIMS AND INTERESTS AND DESIGNATION WITH RESPECT TO IMPAIRMENT

**4.1    Class 1 – Priority Non-Tax Claims**.

(a)    **Classification**.  Class 1A through 1I (collectively, the "**Class 1 Claims**"), as set forth on Exhibit B1, consist of all Priority Non-Tax Claims against the Debtors.[2]

(b)    **Impairment and Voting**.  Class 1 Claims are Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(c)    **Treatment**.  Unless the Holder of such Claim and the Debtors agree to different treatment, on the later of the Effective Date and the date such Claim is Allowed, each Holder of an Allowed Class 1 Claim, in full satisfaction of such Claim, shall be paid in full in Cash.

**4.2    Class 2 – Secured Claims.**

(a)    **Classification.**  Class 2A through 2I (collectively, the "**Class 2 Claims**"), as set forth on Exhibit B2, consist of all Secured Claims against the Debtors.[3]

(b)    **Impairment and Voting.**  Class 2 Claims are Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

---

[2]  The Debtors currently are not aware of any Priority Non-Tax Claims, however, out of an abundance of caution, the Debtors have created a Class for Priority Non-Tax Claims in the event that they become aware of any prior to confirmation of the Plan.

[3]  The Debtors currently are not aware of any Secured Claims; however, out of an abundance of caution, the Debtors have created a Class for Secured Claims in the event that they become aware of any prior to the Confirmation Date.

(c)     **Treatment.**  Unless the Holder of such Claim and the Debtors agree to different treatment, on the Effective Date, each Holder of an Allowed Secured Claim shall have its Claim Reinstated.

### 4.3     **Class 3 – Lender Claims**.

(a)     **Classification**.  Class 3A through 3I (collectively, the "**Class 3 Claims**"), as set forth on Exhibit B3, consist of all Lender Claims against the Debtors.

(b)     **Impairment and Voting**.  Class 3 Claims are Impaired by the Plan.  Each Holder of an Allowed Lender Claim is entitled to vote to accept or reject the Plan.

(c)     **Allowance**.  The Lender Claims set forth on Exhibit B3 shall be Allowed Class 3 Claims in the amount set forth, and against the applicable Debtor(s) identified, in Exhibit B3.

(d)     **Treatment**.  Each Holder of an Allowed Lender Claim shall participate, with respect to each Debtor, for its pro rata share of indebtedness under the Amended and Restated Credit Agreements, on the terms and in the amounts set forth in the Amended and Restated Credit Agreements and the Upside Sharing Agreement.  Additionally, and as set forth in more detail in Article VII below, the organizational documents of the Reorganized Debtors will be amended to ensure that the Reorganized Debtors are managed in accordance, and in compliance, with the Restructuring Documents, and to provide for oversight by the Post-Effective Date Committee of the Reorganized Debtors' implementation of and compliance with the provisions of the Plan.  Each Lender shall be entitled to participate in the Post-Effective Date Committee.

### 4.4     **Class 4 – General Unsecured Claims**.

(a)     **Classification**.  Class 4A through 4I (collectively, the "**Class 4 Claims**"), as set forth on Exhibit B4, consist of all General Unsecured Claims against the Debtors.

(b)     **Impairment and Voting**.  Class 4 Claims are Unimpaired by the Plan.  Each Holder of an Allowed General Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(c)     **Allowance.**  The General Unsecured Claims set forth on Exhibit B4 shall be Allowed Class 4 Claims in the amount set forth, and against the applicable Debtor(s) identified, in Exhibit B4.

(d)     **Treatment**.  Unless the Holder of such Claim and the Debtors agree to different treatment, on the later of the Effective Date and the date such Claim is Allowed, each Holder of an Allowed Class 4 Claim, in full satisfaction of such Claim, shall be paid in full in Cash; *provided that*, each Holder of a Cayman GP Indemnity Claim shall have its Claim Reinstated; and *provided further that,* the Allowed Class 4 Claims of McCarthy Tetrault LLP and Barlow Lyde & Gilbert LLP shall be paid in full in Cash by the Trusts.

**4.5    Class 5 – YFCPEC Claims.**

(a)    **Classification.**  Class 5, as set forth in <u>Exhibit B5</u>, consists of all YFCPEC Claims against the Luxembourg Fund II Debtor.

(b)    **Impairment and Voting.**  Class 5 Claims are Impaired by the Plan. Each Holder of an Allowed YFCPEC Claim is entitled to vote to accept or reject the Plan.

(c)    **Allowance.**  The YFCPEC Claims set forth on <u>Exhibit B5</u> shall be Allowed Class 5 Claims in the amount set forth, and against the applicable Debtor(s) identified, in <u>Exhibit B5</u>.

(d)    **Treatment.**  Each Holder of an Allowed YFCPEC Claim shall be entitled to retain such YFCPEC Claim, *provided that,* the rights attaching to such YFCPEC Claim shall be modified in accordance with the Amended YFCPEC Documents, the Plan and any other applicable Restructuring Document; and *provided, further,* that no such modification or amendment to the maturity date shall detrimentally affect the tax situation of the Luxembourg Fund II Debtor or the tax situation of the Holders of the YFCPEC Claims.

**4.6    Class 6 – Interests**.

(a)    **Classification**.  Class 6A through 6I (collectively, the "**Class 6 Interests**"), as set forth in <u>Exhibit B6</u>, consist of all Interests in the Debtors.

(b)    **Impairment and Voting**.  Class 6 Interests are Impaired by the Plan.  Each Holder of an Allowed Interest is entitled to vote to accept or reject the Plan.

(c)    **Allowance**.  The Interests set forth on <u>Exhibit B6</u> shall be Allowed Class 6 Interests to the extent set forth therein, and in the applicable Debtor(s) identified, in <u>Exhibit B6</u>.  The Interests held by New GP are specifically deemed not Allowed, and no distribution shall be made to the New GP on account thereof.

(d)    **Treatment**.  Each Holder of an Allowed Interest shall be entitled to retain such Interest, *provided that,* the rights attaching to such Interest shall be modified in accordance with the New Organizational Documents, the Plan and any other applicable Restructuring Document.

<div align="center">

**ARTICLE V**
**VOTING AND DISTRIBUTIONS**

</div>

**5.1    Voting of Claims and Interests**.  Each Holder of an Allowed Claim or Allowed Interest in an impaired Class of Claims or Interests that is entitled to vote on the Plan pursuant to Article IV of this Plan shall be entitled to vote separately to accept or reject the Plan as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

# ARTICLE VI
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1 **Executory Contracts and Unexpired Leases**. Except as otherwise provided herein or pursuant to the Confirmation Order, all Executory Contracts and Unexpired Leases that exist between the Debtors and any Person shall be deemed rejected as of the Confirmation Date, except for such contract or lease (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Confirmation Date, or (ii) as to which a motion for approval of the assumption or rejection of such contract or lease has been Filed prior to the Confirmation Date; *provided that*, the applicable Debtor or Debtors will assume, or assume and assign, each Executory Contract or Unexpired Lease listed in a Plan Supplement to be Filed on or before the Supplement Filing Date.

6.2 **Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases**. Entry of the Confirmation Order shall constitute the approval, pursuant to section 365(a) of the Bankruptcy Code, of the assumption or rejection of the Executory Contracts and Unexpired Leases assumed or rejected pursuant to Section 6.1 of this Plan.

# ARTICLE VII
## IMPLEMENTATION OF PLAN

7.1 **Overview**. As discussed in the Disclosure Statement and as provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Restructuring, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. The Plan provides for, among other things, the capitalization of all outstanding and unpaid interest and costs under the Credit Agreements as at the Record Date, the amendment and restatement of the Credit Agreements and the extension of the maturities thereunder, the terms under which the HSH Shares or the Relevant Equity Interests can be disposed of (in accordance with the Agreed Sale Conditions), and the rights of the Lenders to share in any Upside Amount recovered pursuant to any such sale, on the terms described in the Term Sheet and the Restructuring Documents. The organizational documents of certain Debtors will be amended to ensure that they are managed in accordance, and in compliance, with the Restructuring Documents, and a Post-Effective Date Committee will be appointed to oversee the compliance by the Reorganized Debtors with the provisions of the Plan and the Restructuring Documents. The key terms of the Restructuring include, without limitation, the following:

(a) Subject to the terms of the Amended and Restated Credit Agreements, the amounts outstanding under the Facilities and the Hedging Arrangements will remain outstanding until they are put on demand by the Facility Agent, at which time they will become immediately due and payable. The Facility Agent will have the ability to put the Facilities and the Hedging Arrangements on demand (i) at any time on and from December 31, 2014 provided that the relevant Reorganized Debtor has received not less than 30 days prior written notice from the Facility Agent (such that the first date that the Facility Agent can put the Facilities on demand under this paragraph (i) is December 31, 2014 if prior notice has been given in accordance with this paragraph (i)); (ii) immediately on the occurrence of a Termination

Event; or (iii) simultaneously with the completion of any sale or transfer of all of the HSH Shares or Relevant Equity Interests. During the Lock Up Period only, the Reorganized Debtors will have the ability to prepay all (but not part) of the Facilities and the Hedging Arrangements by prepaying an amount equal to the Par Amount at that time (and at the same time for each Facility) on 10 Business Days notice ("**Voluntary Prepayment**"). For the avoidance of doubt, a Voluntary Prepayment must be in respect of all the Facilities and the Hedging Arrangements.

(b)     Until the Facilities are repaid in full, the Reorganized Debtors will, provided that they do so in accordance with the terms of the Amended and Restated Credit Agreements and the Agreed Sale Conditions, have the ability to effect a sale of the HSH Shares or the Relevant Equity Interests at any time (subject to a right of first refusal or consultation, as applicable, as set out in the Restructuring Documents), in order to effect a full or, as the case may be, partial repayment or prepayment of the Par Amount (provided that, during the Lock Up Period, the Reorganized Debtors will not effect a disposal of the HSH Shares or the Relevant Equity Interests below the Par Amount without the consent of the Trusts). Any excess amount over and above the Par Amount received on a sale or other disposal of the HSH Shares and/or the Relevant Equity Interests ("**Upside Amount**") will be split between the Lenders and the relevant Debtors or the Trusts, as applicable, on a 50/50 basis; provided that if contracts for the sale or disposal of the HSH Shares and/or the Relevant Equity Interests are executed on a date which is later than 6 months after a Voluntary Prepayment, any Upside Amount will be split between the Lenders and the relevant Debtors or the Trusts, as applicable, on a 25/75 basis.

(c)     To ensure compliance with the agreed terms of the Restructuring and the Plan, certain modifications and amendments will be made to the corporate structure and organizational documents of the Alberta Debtors, the Delaware Debtor, the Delaware LLC and the Luxembourg Fund II Debtor. In particular (but without limitation): (i) the New GP will withdraw as a general partner of each of the Alberta Debtors and the Alberta Debtors will be managed solely by the Cayman GPs; (ii) PlanCo SPV will be admitted as a member of the Delaware LLC with sole power to control the appointment and removal of the managers of the Delaware LLC; (iii) an additional class of shares in the Luxembourg Fund II Debtor (the "**B Shares**") will be created and allocated to PlanCo SPV (which shares will grant PlanCo SPV the exclusive right to propose to the general shareholders meeting of the Luxembourg Fund II Debtor candidates to be appointed at board level); and (iv) all of the shares in the Cayman GPs will be transferred to PlanCo SPV. The New Organizational Documents will, among other things, prohibit any sale or transfer of the HSH Shares or the Relevant Equity Interests other than in accordance with the Agreed Sale Conditions and in accordance with the terms of the Amended and Restated Credit Agreements.

(d)     The Luxembourg Co-Invest Debtor will not be subject to any changes to its constitution, management or corporate structure. The Luxembourg Co-Invest Debtor and the Trust which is its shareholder will enter into certain contractual arrangements described in the Term Sheet and the Restructuring Documents which will bind the Luxembourg Co-Invest Debtor and its shareholder Trust to the arrangements contemplated by the Term Sheet and this Plan, including, without limitation, the sale of the HSH Shares and/or the Relevant Equity Interests in accordance with the Agreed Sale Conditions, the granting of security for the Secured Obligations and the sharing of any Upside Amount.

(e)     To secure the Secured Obligations, the Reorganized Debtors and the Trusts will provide to the Lenders security over the YFCPEC Claims, the Relevant Equity Interests, the LLC Interest and, to the extent possible, the HSH Shares, together with certain powers of attorney, stock powers and other applicable instruments in order to enable the Lenders to enforce their security and effect a sale of the YFCPEC Claims, the Relevant Equity Interests, the LLC Interest and/or the HSH Shares in accordance with the terms of the Restructuring Documents.  The applicable Debtors and the Trusts will use their commercially reasonable efforts to obtain the consent of HSH to enable the applicable Debtors to provide direct security over the HSH Shares held by the Debtors to the Lenders.  If the Lenders are not granted security over the HSH Shares, all HSH Share Title Documents will be physically deposited with the HSH Shares Custodian on the Effective Date and held pursuant to the terms of the Custodian Agreement.  If the Lenders are granted security over the HSH Shares, all HSH Share Title Documents will be physically deposited with the Security Trustee on the Effective Date; provided that,  following a Voluntary Prepayment, such documents will be transferred to the HSH Shares Custodian and held pursuant to the terms of the Custodian Agreement, pending payment of any Upside Amount.

(f)     The Post-Effective Date Committee established pursuant to Article VIII of this Plan will oversee the implementation of the Plan in accordance with the Plan and the New Organizational Documents.

(g)     The Liquidators will remain in office and will continue to manage the Cayman GPs, provided that, for the avoidance of doubt, nothing in the Plan is intended to, nor shall it, supersede any authorizations and/or statutory compliance required of the Liquidators under the law of the Cayman Islands.

**7.2     Distribution of Available Cash**.  On the Effective Date, all Available Cash of each Debtor will be applied against the obligations of that Debtor in the manner described in the Amended and Restated Credit Agreements.

**7.3     Continued Existence of Debtors**.  Except as provided herein, each Debtor will continue to exist on or after the Effective Date as a separate corporate or other applicable entity, with all the rights and powers applicable to such entity under applicable law, subject to, where applicable, the terms of the New Organizational Documents.

**7.4     Implementation Transactions**.  The Debtors (or, after the Effective Date, the Reorganized Debtors) and the Trusts shall implement the Plan through the transactions described in the Term Sheet, including, without limitation: (i) the withdrawal of the New GP as a general partner of each of the Alberta Debtors; (ii) the transfer of all shares in the Cayman GPs to PlanCo SPV; (iii) the admission of PlanCo SPV as a member of the Delaware LLC; and (iv) the creation and allocation of the B Shares to PlanCo SPV.  The Reorganized Debtors may engage in any other transaction in furtherance of the Plan, provided that such transaction does not conflict with the terms of the Amended and Restated Credit Agreements and the Restructuring Documents.

**7.5     Reorganized Debtors; Restructuring Transactions and Documents**.  On the Effective Date, the Reorganized Debtors, the Trusts and the Lenders (as applicable), and

any other necessary Person, will adopt, execute, or enter into, as applicable, the Restructuring Documents, including, without limitation, the Amended and Restated Credit Agreements, the Upside Sharing Agreement, the Cayman Settlement Agreements, the Luxembourg Settlement Agreements, the Luxembourg Voting Agreement, the New GP Withdrawal and Release Documents, the Security Agreements, and the New Organizational Documents. The Reorganized Debtors may, provided that such action does not conflict with the terms of the Amended and Restated Credit Agreements or the Restructuring Documents, adopt any other agreements, documents and instruments and to take any other action necessary and desirable to consummate the Plan. The New Organizational Documents, which evidence the new corporate and corporate governance structure of the Reorganized Debtors, will be substantially as described in the Term Sheet and in the form Filed in the Plan Supplement. After the Effective Date, the New Organizational Documents may not be amended other than in accordance with the terms of such documents (such terms to include a prohibition on any amendment to the New Organizational Documents absent the prior consent of the Cayman GPs, the Delaware LLC or PlanCo SPV, as applicable). Unless the prior written consent of the Post-Effective Date Committee, Cayman GP, or Delaware LLC, as applicable, is obtained, (i) the appointment or removal of any general partner of a Reorganized Debtor that is a limited partnership, and (ii) the removal of PlanCo SPV as a member of the Delaware LLC or the Luxembourg Fund II Debtor, will be prohibited.

**7.6     Prohibition on Issuance of Non-Voting Equity Securities.**  The New Organizational Documents shall prohibit the issuance of non-voting equity securities to the extent required by section 1123(a) of the Bankruptcy Code.

**7.7     Post-Effective Date Management**.  On and after the Effective Date, other than in the case of the Luxembourg Co-Invest Debtor, the business and affairs of the Reorganized Debtors will be managed by the officers, directors or other responsible persons identified in the New Organizational Documents.  Information regarding these proposed officers, directors, managers and other responsible persons as required by section 1129(a)(5) of the Bankruptcy Code will be set forth in a Plan Supplement to be filed on or before the Supplement Filing Date.

**7.8     Effectuating Documents; Further Transactions**.  On and after the Effective Date, the Reorganized Debtors are authorized to and may, in the name of and on behalf of the applicable Reorganized Debtors, issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Amended and Restated Credit Agreements, the other Restructuring Documents and/or the Plan.

**7.9     Entity Action**.  Upon the Effective Date, all actions contemplated by the Plan shall be deemed ratified, authorized, and approved in all respects, including but not limited to: (i) the adoption of the New Organizational Documents; (ii) the selection of the new directors, officers and managers of the Reorganized Debtors; (iii) the issuance of B Shares in the Luxembourg Fund II Debtor to PlanCo SPV; (iv) the admission of PlanCo SPV as a member of the Delaware LLC; (v) the transfer of the shares in the Cayman GPs to PlanCo SPV; (vi) the

execution and entry into the Restructuring Documents, including, without limitation, the Amended and Restated Credit Agreements, the Upside Sharing Agreement, the Security Agreements, and any other ancillary agreements relating thereto; and (vii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, the documents set forth in the Plan Supplement and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated herein shall be effective notwithstanding any requirements under any non-bankruptcy law.

**7.10    Liquidation / Dissolution of the Reorganized Debtors**.  Upon a sale or transfer of the HSH Shares, and provided that the Secured Obligations are not repaid in full as a result of such sale, the Reorganized Debtors will be liquidated or dissolved in a manner determined by the Post-Effective Date Committee, in its sole discretion.

**7.11    Control of the Debtors After Voluntary Prepayment**.  Following a Voluntary Prepayment in full and a discharge in full of the Secured Obligations, the Trusts will have the ability to alter the management of the Reorganized Debtors in accordance with the terms of the New Organizational Documents.  In such event, the Post-Effective Date Committee and the Facility Agent will thereafter retain the following two rights (as well as the right to veto or disapprove any amendment, waiver, limitation or termination of such rights):  (i) withhold consent to the sale of the HSH Shares and a sale of the Relevant Equity Interests only if they are not reasonably satisfied that the total sale proceeds will be paid to a bank account of a third party agent appointed by both the Reorganized Debtors and the Lenders who has unconditional instructions from the Reorganized Debtors and/or the Trusts to pay any Upside Amount due to the Lenders directly to the Lenders before any remaining proceeds are paid to the Reorganized Debtors or the Trusts, and (ii) consent to the granting of security over any assets of any Alberta Debtor, the Delaware Debtor or any Luxembourg Debtor (and the Trust may not grant any security over the Relevant Equity Interests to any third party financier of any Reorganized Debtor or the Trust) where the secured obligations (in aggregate) exceed the Par Amount with respect to the facilities borrowed by the relevant Reorganized Debtor or Trust.

# ARTICLE VIII
## POST-EFFECTIVE DATE COMMITTEE

**8.1     Creation and Dissolution**. On the Effective Date, there shall be created a Post-Effective Date Committee (the "**Post-Effective Date Committee**"). Unless the Post-Effective Date Committee unanimously votes to disband earlier, the Post-Effective Date Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with these Chapter 11 Cases and/or administration of the Plan on the Final Settlement Date.

**8.2     Membership**.  The members of the Post-Effective Date Committee shall be the Lenders, as identified in the Plan Supplement.  In the event of the resignation of a member of the Post-Effective Date Committee for any reason, the remaining members may, but need not, designate a successor. Unless and until such vacancy is filled, the Post-Effective Date Committee shall function with such reduced membership.

**8.3     Governance**.  The Post-Effective Date Committee shall have the power to adopt rules of procedure and may choose one of its members to act as chairperson.

**8.4     Responsibilities and Powers**.  The Post-Effective Date Committee shall have the following responsibilities and powers:

(a)     consent rights in respect of the matters expressly referred to in the Plan, the Term Sheet or the Restructuring Documents;

(b)     oversight to ensure that, prior to a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, any sale of the HSH Shares or Relevant Equity Interests pursuant to the Plan is made in accordance with the Agreed Sale Conditions;

(c)     oversight of the implementation of the Plan, to ensure that the Reorganized Debtors are performing their obligations in accordance with the Plan and that the Reorganized Debtors are being managed in accordance with the Plan;

(d)     prior to a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, a veto right in respect of any Person proposed to be the HSH Supervisory Board Representative;

(e)     independent standing to appear and be heard in the Bankruptcy Court as to any matter relating to the Plan, the Estate or the Reorganized Debtors, including any matter as to which the Bankruptcy Court has retained jurisdiction pursuant to the Plan;

(f)     power to perform such additional functions as may be agreed by the Reorganized Debtors, or contemplated in the Confirmation Order or any other order entered in connection with the Plan; and

(g)     prior to a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, a veto right in respect of the appointment, removal or replacement of

any manager of any Reorganized Debtor (other than the New GP or the Luxembourg Co-Invest Debtor).

8.5     **Limitation of Liability**.  Neither the Post-Effective Date Committee, nor any of its members, nor any of its employees (or the employees of its members), professionals or agents, shall in any way be liable or answerable for anything in connection with this Plan, including, but not limited to, the confirmation, execution, consummation, administration of the Plan and/or any transaction contemplated thereby, except for such acts or omissions that are finally determined by a court of competent jurisdiction to result from the willful misconduct, gross negligence, bad faith or fraud of such member or such member's employee, professional or agent. The Post-Effective Date Committee shall be entitled to rely upon any opinion of counsel and other professionals employed by the Post-Effective Date Committee, and shall not be liable for any action taken or omitted in good faith on such reliance.  The Post-Effective Date Committee shall not owe any fiduciary or other duties to any person, including without limitation, the Debtors, the Reorganized Debtors, or any Holder of a Claim against or Interest in the Debtors or the Reorganized Debtors.

8.6     **Indemnity**.  The Estate shall indemnify and hold harmless the Post-Effective Date Committee, its members, employees (or the employees of its members) and its professionals and agents from and against any and all liabilities, expenses, claims, damages or losses incurred by them as a direct result of acts or omissions taken by them in good faith in their capacities as members of or professionals or agents for the Post-Effective Date Committee, except those that are finally determined by a court of competent jurisdiction to have resulted from gross negligence, willful misconduct, bad faith or fraud.

8.7     **Co-operation**.  Until the termination or dissolution of the Post-Effective Date Committee in accordance with Section 8.1 of this Plan, the Reorganized Debtors will provide cooperation to the Post-Effective Date Committee as may be reasonably requested in respect of the exercise by the Post-Effective Date Committee of its powers and functions under the Plan.

## ARTICLE IX
## CONDITIONS PRECEDENT

9.1     **Conditions to Confirmation**.  The following are conditions precedent to Confirmation of this Plan, each of which must be (i) satisfied or (ii) waived in accordance with Section 9.3 of this Plan:

(a)     The Bankruptcy Court shall have approved by Final Order a Disclosure Statement with respect to this Plan in form and substance reasonably acceptable to the Debtors and the Facility Agent; and

(b)     The Exhibits, Supplements, schedules, documents, or agreements to be executed in connection with this Plan shall be in form and substance reasonably acceptable to the Debtors and the Facility Agent.

**9.2    Conditions to the Effective Date**.    The following are conditions precedent to the occurrence of the Effective Date, each of which must be (i) satisfied or (ii) waived in accordance with Section 9.3 of this Plan:

(a)    The Confirmation Order, in form and substance reasonably acceptable to the Debtors and the Facility Agent, shall have been entered by the Bankruptcy Court;

(b)    The Confirmation Order shall contain a provision, reasonably satisfactory to the Debtors and the Facility Agent, that deems the Debtors' CRO Motion, the Debtors' DIP Motion, the Lenders' Trustee Motion and the U.S. Trustee Examiner Motion withdrawn with prejudice upon the Effective Date;

(c)    The Confirmation Order shall be a Final Order, the Confirmation Date shall have occurred, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending;

(d)    All statutory fees then due and payable to the United States Trustee shall have been paid in full;

(e)    All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained;

(f)    Any and all consents required under the terms of the Trust Agreements shall have been obtained, and any necessary amendments and modifications to the Trust Agreements shall have made, in each case as is necessary to effect the transactions contemplated by the Plan and the Restructuring Documents (and such consents and/or amendments shall be in form and substance satisfactory to the Facility Agent);

(g)    All Restructuring Documents shall be completed and in final form acceptable in all material respects to the Debtors and the Facility Agent and, to the extent necessary, shall have been executed and delivered by the respective parties thereto, and become unconditional in all respects except for confirmation of the Plan, including, without limitation, the Amended and Restated Credit Agreements, the Upside Sharing Agreement, the Cayman Settlement Agreements, the Luxembourg Settlement Agreements, the Luxembourg Voting Agreement, the New GP Withdrawal and Release Documents, the Security Agreements, and the New Organizational Documents, and the releases to be exchanged between and among the Released Parties pursuant to the terms of the Term Sheet and consistent with the releases provided in Section 10.3 herein; and

(h)    All conditions precedent to the effectiveness of the Amended and Restated Credit Agreements shall have been provided to the Facility Agent in form and substance satisfactory to the Facility Agent.

**9.3    Waiver of Conditions**.  The Facility Agent may waive any or all of the conditions set forth in Sections 9.1 and 9.2 of this Plan (except for the conditions set forth in Section 9.1(a) or 9.2(a)) at any time, and provided that any waiver of the conditions set forth in

Sections 9.1(b) and 9.2(g) shall also require the consent of the Debtors. Any such waiver may be effected at any time by filing a notice thereof with the Bankruptcy Court.

**9.4 Notice of Effective Date**. The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Section 9.2 of the Plan have been satisfied or waived pursuant to Section 9.3 of the Plan.

**9.5 Order Denying Confirmation**. If an Order denying confirmation of the Plan is entered by the Bankruptcy Court and such Plan is not consummated, then nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Interests in the Debtors, (b) prejudice in any manner the rights of the Holder of any Claim against, or Interest in, the Debtors, (c) prejudice in any manner any right, remedy or Claim of the Debtors, (d) be deemed an admission against interest by the Debtors, or (e) constitute a settlement, implicit or otherwise, of any kind whatsoever.

<div align="center">

**ARTICLE X**
**EFFECT OF THIS PLAN ON ASSETS, CLAIMS AND INTERESTS**

</div>

**10.1 Revesting of Assets**. Except as expressly provided herein, or as provided in a prior or future order of the Bankruptcy Court, no Asset of the Estate shall be deemed abandoned and no Cause of Action shall be deemed released or compromised by or as a result of this Plan, its Confirmation, its consummation or its treatment of any Claim or Creditor. Further, no defense, set-off, counterclaim or right of recoupment of the Debtors or the Estate shall be deemed waived or compromised. The Reorganized Debtors, under the supervision and subject to the consent of the Post-Effective Date Committee, are authorized to investigate, prosecute and, if necessary, litigate, any Cause of Action.

**10.2 Discharge**.

(a) **Discharge of Claims Against the Debtors and the Reorganized Debtors. Except as otherwise expressly provided in the Plan or the Confirmation Order, the Confirmation of the Plan shall, as of the Effective Date: (i) discharge the Debtors, the Reorganized Debtors or any of its or their Assets from all Claims, demands, liabilities, other debts and Interests that arose on or before the Effective Date, including all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based on such debt has accepted the Plan; and (ii) preclude all Persons from asserting against the Debtors, the Reorganized Debtors, or any of their Assets, any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections 524 and 1141 of the Bankruptcy Code. The discharge provided in this provision shall extinguish any liability of the Debtors to the extent that such liability relates to a discharged Claim or cancelled Interest, whether such liability is reduced to judgment or not.**

(b)     **Injunction Related to the Discharge.   Except as otherwise provided in the Plan or the Confirmation Order, all entities, wherever located in the world, that have held, currently hold, or may hold Claims or other debts or liabilities against the Debtors, or any Interest in any or all of the Debtors, that are discharged pursuant to the terms of the Plan, are permanently enjoined, on and after the Effective Date, from taking, or causing any other entity to take, any of the following actions on account of any such Claims, debts, liabilities or Interests or rights: (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt, liability, Interest, or right, other than to enforce any right to a distribution pursuant to the Plan; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; (iii) creating, perfecting, or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors, or any of their Assets on account of any such Claim, debt, liability, Interest or right; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors, the Reorganized Debtors, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; and (v) commencing or continuing any action, in any manner, in any place in the world that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Such injunction shall extend to any successor of the Debtors, the Reorganized Debtors, and any of their Assets. Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.**

10.3     **Releases.**

(a)     **Releases by the Debtors.  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors in their individual capacity and as debtors in possession shall be deemed to release and forever waive and discharge the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtors, the Chapter 11 Cases, the Plan, the Restructuring Documents, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date and that could have been asserted by or on behalf of the Debtors or their Estate at any time on or prior to the Effective Date against one or more of the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released**

Party that constitutes willful misconduct, gross negligence, bad faith or fraud. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any Person under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

(b)     Releases by Holders of Claims and Interests.  For good and valuable consideration, on and after the Effective Date, Holders of Claims and Interests, and their respective successors, assigns and transferees, shall be deemed to have released and forever waived and discharged the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtors, the Chapter 11 Cases, the Plan, the Restructuring Documents, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiations, formulation, or preparation of the Plan, the related Disclosure Statement, the related Plan Supplement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date and that could have been asserted by or on behalf of any Holder of a Claim or Interest at any time up to immediately prior to the Effective Date against one or more of the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, gross negligence, bad faith, or fraud. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations (except Cure Claims that have not been Filed timely) of any Person under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

(c)     Exculpation. On and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party is hereby released from, any claim, cause of action, or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, for any act or omission that occurred during and in connection with the Chapter 11 Cases or in connection with the preparation and filing of the Chapter 11 Cases, the formulation, negotiation, and/or pursuit of confirmation of the Plan, the consummation of the Plan, and/or the administration of the Plan and/or the property to be distributed under the Plan, except for claims, causes of action, or liabilities arising from the gross negligence, willful misconduct or fraud of any Exculpated Party, in each case subject to determination of such by final order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the

Debtors, the Estate, the Trusts, the Lenders, and the Liquidators and their respective officers, directors, employees, members, attorneys, crisis managers, financial advisors, and professionals, shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code. Except as provided in this Section 10.3, no provision of the Plan, the Disclosure Statement, or the Confirmation Order shall be deemed to act upon or release any claims, Causes of Action or liabilities that the Debtors, the Estate, or any party in interest may have against or to any Person for any act, omission, or failure to act that occurred prior to the Petition Date other than in connection with the preparation and filing of the Chapter 11 Cases.

(d)    **Injunction Related to Releases and Exculpation.** To the fullest extent allowed by law, and except as otherwise provided in the Plan or the Confirmation Order, all Persons that have held, currently hold, or may hold claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities that are released, waived, or exculpated pursuant to this Section 10.3 are permanently enjoined, on and after the Effective Date, from taking or causing any other Person to take, any of the following actions, at any time or at any place in the world, on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities: (i) commencing or continuing in any manner any action or other proceeding of any kind against a Released Party or Exculpated Party with respect to any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against any Released Party or any Exculpated Party or any of its or their assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; (iii) creating, perfecting, or enforcing any Lien or encumbrance against any Released Party or any Exculpated Party or any of its or their assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to any Released Party or any Exculpated Party or any of its or their assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; and (v) commencing or continuing any action, in any manner, in any place in the world that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Such injunction shall extend to any successor of any Released Party or any Exculpated Party or any of its or their assets. Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

(e)    **Injunctions In Furtherance of the Plan.** As consideration for the releases set forth herein and in furtherance of the implementation of this Plan in accordance with its terms and the terms of the Restructuring Documents (i) prior to the Final Settlement Date, no Released Party shall take any step towards the commencement or initiation of bankruptcy, dissolution or other insolvency proceedings in any jurisdiction in relation to any Reorganized Debtor or any Trust other than in accordance with the New Organizational Documents and with the prior consent of the Post-Effective Date Committee; (ii) no Released Party shall commence or continue any action, or take any step,

in any manner, in any place in the world that does not comply with or is inconsistent with the provisions of the Restructuring Documents, the Plan or the Confirmation Order; (iii) no Released Party shall oppose any claim for specific performance brought by the Lenders, the Facility Agent, the Security Trustee, the Liquidators, the Post-Effective Date Committee or PlanCo SPV as a result of a breach of any term of a Restructuring Document (it being acknowledged by the Released Parties that specific performance and/or an injunction to compel performance are the appropriate remedies for any such breach and that damages are an inadequate and inappropriate remedy); and (iv) no Released Party shall oppose, obstruct, or refuse consent to any request, application, motion or proceeding brought by the Lenders, the Facility Agent, the Security Trustee, the Liquidators, the Post-Effective Date Committee or PlanCo SPV before any court or judicial, regulatory or administrative body in order to give effect to, or assist in the implementation of, the Plan and the Restructuring, provided that such request, application, motion or proceeding is consistent with the terms of the Plan and Restructuring Documents.**

(f)     **In exchange for the distributions pursuant to this Plan, each Holder of an Allowed Claim receiving such distribution pursuant to this Plan shall be deemed to have specifically consented to the injunctions set forth in this Section 10.3.**

**10.4     Integral to Plan.** Each of the discharge, injunction and release provisions provided in this Article X is an integral part of the Plan and is essential to its implementation. Each of the Released Parties shall have the right to independently seek the enforcement of the discharge, injunction and release provisions set forth in this Article X.

**10.5     No Successor Liability.** Except as otherwise expressly provided herein, none of the Released Parties shall be determined to be successors to any of the Debtors or to any Person for which the Debtors may be held legally responsible, by reason of any theory of law or equity, and none can be responsible for any successor or transferee liability of any kind or character.  The Released Parties do not agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors or the Reorganized Debtors, whether arising before, on, or after the Effective Date, except as otherwise expressly provided in the Plan.

**10.6     Release of Liens.** Except as otherwise expressly provided in the Plan, the Confirmation Order shall release any and all prepetition Liens against the Debtors, the Reorganized Debtors and any of their Assets.

**10.7     Withdrawal of Motions**.  On the Effective Date, the Debtors' CRO Motion, the Debtors' DIP Motion, the Lenders' Trustee Motion and the U.S. Trustee Examiner Motion shall be deemed withdrawn, with prejudice, without any further action.

**ARTICLE XI**
**RETENTION OF JURISDICTION**

      **11.1**    **Retention of Jurisdiction**.  Following the Effective Date, and in light of the close nexus to the interpretation, implementation, consummation, execution and administration of this Plan that each of the transactions contemplated hereby has, the Bankruptcy Court shall retain jurisdiction over all matters arising from or relating to the Chapter 11 Cases to the fullest extent of applicable law, including, without limitation, jurisdiction to:

          (a)     Determine any and all objections to the allowance of Claims;

          (b)     Ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished as provided herein;

          (c)     Determine any and all motions to estimate Claims at any time, regardless of whether the Claim to be estimated is the subject of a pending objection, a pending appeal, or otherwise;

          (d)     Hear and determine all Professional Compensation Claims and Administrative Expense Claims;

          (e)     Hear and determine all matters with respect to the assumption or rejection of any Executory Contract or Unexpired Lease to which one or more of the Debtors is a party or with respect to which the Debtors may be liable, including, if necessary, the nature or amount of any Cure Claim arising therefrom;

          (f)     Hear and determine any and all adversary proceedings, motions, applications and contested or litigated matters arising out of, under or related to, the Chapter 11 Cases;

          (g)     Enter such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

          (h)     Hear and determine disputes arising in connection with the interpretation, implementation, consummation or enforcement of the Plan and all contracts, instruments and other agreements executed in connection with the Plan;

          (i)     Hear and determine any request to modify the Plan or to cure any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court;

          (j)     Issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with the implementation, consummation or enforcement of the Plan or the Confirmation Order, including to invoke the Bankruptcy Court's power of contempt for any violation of the Confirmation Order and/or any

Person's failure to comply with their obligations under this Plan or the transactions contemplated hereby;

(k)     Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified or vacated;

(l)     Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(m)     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(n)     Recover all assets of the Debtors and property of the Debtors' Estate, wherever located;

(o)     Hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(p)     Hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

(q)     Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under or not inconsistent with, provisions of the Bankruptcy Code; and

(r)     Enter a final decree closing the Chapter 11 Cases.

From the Confirmation Date through the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters that were subject to its jurisdiction prior to the Confirmation Date.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

**12.1    Terms Binding**.    Upon the occurrence of the Effective Date, all provisions of this Plan, including all agreements, instruments and other documents Filed in connection with this Plan and executed by the Debtors or the Reorganized Debtors in connection with this Plan, shall be binding upon the Debtors, the Reorganized Debtors, all Holders of Claims and Interests and all other Persons that are affected in any manner by this Plan.    All agreements, instruments and other documents Filed in connection with this Plan shall have full force and effect, and shall bind all parties thereto as of the entry of the Confirmation Order, whether or not such exhibits actually shall be executed by parties other than the Debtors or the Reorganized Debtors, or shall be issued, delivered or recorded on the Effective Date or thereafter. The rights, benefits and obligations of any entity named or referred to in the Plan shall

be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

**12.2 Governing Law**.  Except to the extent that the Bankruptcy Code or any other federal law is applicable or to the extent the law of a different jurisdiction is validly elected by the Debtors and the Lenders, the rights, duties and obligations arising under this Plan shall be governed in accordance with the substantive laws of the United States of America and, to the extent federal law is not applicable, the laws of the State of Delaware.

**12.3 Severability**.  If the Bankruptcy Court determines at the Confirmation Hearing that any material provision of this Plan is invalid or unenforceable, with the consent of the Debtors and the Lenders, such provision, subject to section 1127 of the Bankruptcy Code, shall be altered or interpreted in such a way as to make the provision valid or enforceable to the maximum extent practicable, consistent with the original purpose of the provision, or, if not practicable, shall be severable from this Plan and shall be null and void, and, in such event, such determination shall in no way limit or affect the enforceability or operative effect of any or all other portions of this Plan.

**12.4 Confirmation of Plan for Single Debtor**.  The Plan constitutes a separate plan of reorganization for each Debtor.  However, in the event that the Plan cannot be confirmed with respect to one of the Debtors, the Plan may not be confirmed with respect to the other Debtors.

**12.5 Confirmation Order and Plan Control**.  Except as otherwise provided in this Plan, in the event of any inconsistency between this Plan and the Disclosure Statement, any exhibit to this Plan or any other instrument or document created or executed pursuant to this Plan, this Plan shall control.  In the event of any inconsistency between the Term Sheet and any Restructuring Document, such Restructuring Document shall control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

**12.6 Incorporation by Reference**.  Each Exhibit, schedule or Supplement to this Plan is incorporated herein by reference.

**12.7 Plan Supplements**.  Each of the Plan Supplements shall be in form and substance satisfactory to the Facility Agent.

**12.8 Modifications to this Plan**.  The Debtors, with the consent of the Facility Agent, may amend or modify this Plan, and any Exhibit, schedule or Supplement to this Plan, at any time prior to the Confirmation Date in accordance with the Bankruptcy Code and Bankruptcy Rules.  Notwithstanding the foregoing, prior to the Voting Deadline, the Debtors may make non-material, administrative amendments or modifications to this Plan, and any Exhibit, schedule or Supplement to this Plan, without the consent of the Facility Agent.

**12.9 Revocation, Withdrawal or Non-Consummation**.  The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Effective Date, provided that the Debtors may not revoke or withdraw this Plan without the consent of the Facility Agent. If the Debtors revoke or withdraw this Plan prior to the Effective Date, or if the Effective Date does

not occur by December 31, 2010 (unless extended by mutual agreement of the Debtors and the Facility Agent), then this Plan, any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), the assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be null and void; provided, however, that all orders of the Bankruptcy Court and all documents executed pursuant thereto, except the Confirmation Order and any order approving the Disclosure Statement, shall remain in full force and effect. In such event, nothing contained herein, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims by or against any of the Debtors or any other Person, to prejudice in any manner the rights of any of the Debtors or any Person in any further proceedings or to constitute an admission of any sort by any of the Debtors or any other Person.

**12.10  Exemption from Transfer Taxes**.  Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents under the Plan, (b) the creation of any mortgage, deed of trust, Lien, pledge or other security interest under the Plan, (c) the making or assignment of any lease or sublease pursuant to the Plan, or (d) the making or delivery of any deed or other instrument of transfer under, pursuant to, or in connection with the Plan, including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, assignments, and transfers of tangible property executed in connection with the Plan or the Confirmation Order shall not be subject to any stamp tax or similar tax or government assessment to the fullest extent provided for under the Bankruptcy Code.

**12.11  Payment of Statutory Fees**.  All U.S. Trustee Fees, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

**12.12  Notice**.  All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> (a)      If to the Debtors:
>
> c/o J.C. Flowers & Co. LLC
> 717 Fifth Avenue, 26th Floor
> New York, New York  10022
> Attn: Daniel Katsikas
>         Sally Rocker
> Facsimile: +1 (212) 404-6899
>
> with copies to:

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins, Esq.
Facsimile: +1 (302) 651-7701

- and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn: Lori R. Fife, Esq.
Facsimile: +1 (212) 310-8007

- and (if to the Alberta Debtors) –

PWC CORPORATE FINANCE & RECOVERY (CAYMAN) LIMITED
P.O. Box 258
Strathvale House, George Town, Grand Cayman, KY1-1104
Cayman Islands
Attn: Ian Stokoe and David Walker
Facsimile: +1 (345) 945-4237


(b)     If to the Reorganized Debtors:

- if to the Alberta Debtors, the Delaware Debtor, the Delaware LLC or the Luxembourg Fund II Debtor –

PWC CORPORATE FINANCE & RECOVERY (CAYMAN) LIMITED
P.O. Box 258
Strathvale House, George Town, Grand Cayman, KY1-1104
Cayman Islands
Attn: Ian Stokoe and David Walker
Facsimile: +1 (345) 945-4237

with copies to:

c/o J.C. Flowers & Co. LLC
717 Fifth Avenue, 26th Floor
New York, New York  10022
Attn: Daniel Katsikas
        Sally Rocker
Facsimile: +1 (212) 404-6899

- and -

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn: Lori R. Fife, Esq.
Facsimile: +1 (212) 310-8007

- and -

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins, Esq.
Facsimile: +1 (302) 651-7701

- if to the Luxembourg Co-Invest Debtor -

c/o J.C. Flowers & Co. LLC
717 Fifth Avenue, 26th Floor
New York, New York 10022
Attn: Daniel Katsikas
     Sally Rocker
Facsimile: +1 (212) 404-6899

- and -

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn: Lori R. Fife, Esq.
Facsimile: +1 (212) 310-8007

- and -

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins, Esq.
Facsimile: +1 (302) 651-7701

**12.13 No Waiver**. Neither the failure of a Debtor to list a Claim or Interest in the Debtor's Schedules, the failure of a Debtor to object to any Claim, Administrative Expense Claim or Interest for purposes of voting, the failure of a Debtor to object to a Claim, Administrative Expense Claim or Interest prior to the Confirmation Date or the Effective Date shall, in the absence of a legally-effective express waiver or release executed by the Debtor with the approval of the Bankruptcy Court, if required, and with any other consents or approvals

required under the Plan, be deemed a waiver or release of the right of a Debtor, a Reorganized Debtor, or their respective successors, either before or after solicitation of votes on the Plan, the Confirmation Date or the Effective Date, to object to or examine such Claim, Administrative Expense Claim or Interest, in whole or in part.

Dated: August 13, 2010

> HSH Alberta I L.P.
> HSH Alberta II L.P.
> HSH Alberta V L.P.
> HSH Coinvest (Alberta) L.P.
> HSH Delaware GP LLC
> HSH Delaware L.P.
> HSH Luxembourg Coinvest S.à r.l.
> HSH Luxembourg S.à r.l.
> JCF HSH (DE) GP LP

> */s/ Daniel Katsikas*
> Name: Daniel Katsikas
> Title: Authorized Signatory

**Plan Exhibit A**

**List of Debtors**

| Chapter 11 Debtor | Case Number |
|---|---|
| HSH Alberta I L.P. | 10-10189 (MFW) |
| HSH Alberta II L.P. | 10-10190 (MFW) |
| HSH Alberta V L.P. | 10-10191 (MFW) |
| HSH Coinvest (Alberta) L.P. | 10-10192 (MFW) |
| HSH Delaware GP LLC | 10-10187 (MFW) |
| HSH Delaware L.P. | 09-13145 (MFW) |
| HSH Luxembourg Coinvest S.à r.l. | 09-13147 (MFW) |
| HSH Luxembourg S.à r.l. | 09-13146 (MFW) |
| JCF HSH (DE) GP LP | 10-10188 (MFW) |

## Plan Exhibit B1

Class 1 Claims
(Priority Non-Tax Claims)

| Chapter 11 Debtor | Class No. |
|---|---|
| HSH Alberta I L.P. | 1A |
| HSH Alberta II L.P. | 1B |
| HSH Alberta V L.P. | 1C |
| HSH Coinvest (Alberta) L.P. | 1D |
| HSH Delaware GP LLC | 1E |
| HSH Delaware L.P. | 1F |
| HSH Luxembourg Coinvest S.à r.l. | 1G |
| HSH Luxembourg S.à r.l. | 1H |
| JCF HSH (DE) GP LP | 1I |

**Plan Exhibit B2**

Class 2 Claims
(Secured Claims)

| Chapter 11 Debtor | Class No. |
|---|---|
| HSH Alberta I L.P. | 2A |
| HSH Alberta II L.P. | 2B |
| HSH Alberta V L.P. | 2C |
| HSH Coinvest (Alberta) L.P. | 2D |
| HSH Delaware GP LLC | 2E |
| HSH Delaware L.P. | 2F |
| HSH Luxembourg Coinvest S.à r.l. | 2G |
| HSH Luxembourg S.à r.l. | 2H |
| JCF HSH (DE) GP LP | 2I |

## Plan Exhibit B3

### Class 3 Claims
### (Lender Claims)

| Chapter 11 Debtor | Class No. | Holder of Claim | Allowed Amount (USD) |
|---|---|---|---|
| HSH Alberta I L.P. | 3A | Commerzbank AG | 33,680,651.36 (plus all interest, default interest, costs, fees and expenses) |
| | | Credit Agricole Corporate and Investment Bank | 28,441,439.03 (plus all interest, default interest, costs, fees and expenses) |
| | | Landsbanki Islands hf | 15,717,636.71 (plus all interest, default interest, costs, fees and expenses) |
| | | Lloyds TSB Bank plc | 34,295,340.87[1] (plus all interest, default interest, costs, fees and expenses) |
| | | The Royal Bank of Scotland N.V. | 28,703,977.10[2] (plus all interest, default interest, costs, fees and expenses) |
| | | The Royal Bank of Scotland plc | 28,971,166.82[3] (plus all interest, default interest, costs, fees and expenses) |
| HSH Alberta II L.P. | 3B | Commerzbank AG | 15,710,523.64 (plus all interest, default interest, costs, fees and expenses) |
| | | Credit Agricole Corporate and Investment Bank | 13,266,664.46 (plus all interest, default interest, costs, fees and expenses) |
| | | Landsbanki Islands hf | 7,331,577.42 (plus all interest, default interest, costs, fees and expenses) |
| | | Lloyds TSB Bank plc | 15,710,523.64 (plus all interest, default interest, costs, fees and expenses) |
| | | The Royal Bank of Scotland N.V. | 13,266,664.88 (plus all interest, default interest, costs, fees and expenses) |

---

[1] 33,680,651.36 (outstanding principal) + 614,689.51 (close-out amount, swap closed out on September 8, 2009).
[2] 28,441,439.94 (outstanding principal) + 262,537.16 (close-out amount, swap closed out on October 19, 2009).
[3] 28,441,438.49 (outstanding principal) + 529,728.33 (close-out amount, swap closed out on September 9, 2009).

| Chapter 11 Debtor | Class No. | Holder of Claim | Allowed Amount (USD) |
|---|---|---|---|
| HSH Alberta II L.P. (cont.) | 3B | The Royal Bank of Scotland plc | 13,842,758.16[4] (plus all interest, default interest, costs, fees and expenses) |
| HSH Alberta V L.P. | 3C | Commerzbank AG | 3,823,677.17 (plus all interest, default interest, costs, fees and expenses) |
| | | Credit Agricole Corporate and Investment Bank | 3,228,882.96 (plus all interest, default interest, costs, fees and expenses) |
| | | Landsbanki Islands hf | 1,784,382.61 (plus all interest, default interest, costs, fees and expenses) |
| | | Lloyds TSB Bank plc | 3,823,677.17 (plus all interest, default interest, costs, fees and expenses) |
| | | The Royal Bank of Scotland N.V. | 3,228,883.06 (plus all interest, default interest, costs, fees and expenses) |
| | | The Royal Bank of Scotland plc | 3,619,301.79[5] (plus all interest, default interest, costs, fees and expenses) |
| HSH Coinvest (Alberta) L.P. | 3D | Commerzbank AG | 18,006,787.75 (plus all interest, default interest, costs, fees and expenses) |
| | | Credit Agricole Corporate and Investment Bank | 15,205,731.93 (plus all interest, default interest, costs, fees and expenses) |
| | | Landsbanki Islands hf | 8,403,167.30 (plus all interest, default interest, costs, fees and expenses) |
| | | Lloyds TSB Bank plc | 18,006,787.75 (plus all interest, default interest, costs, fees and expenses) |
| | | The Royal Bank of Scotland N.V. | 15,864,230.61[6] (plus all interest, default interest, costs, fees and expenses) |
| | | The Royal Bank of Scotland plc | 15,205,731.64 (plus all interest, default interest, costs, fees and expenses) |

---

[4] 13,266,664.20 (outstanding principal) + 576,093.96 (close-out amount, swap closed out on September 9, 2009).
[5] 3,228,882.90 (outstanding principal) + 390,418.89 (close-out amount, swap closed out on October 15, 2009).
[6] 15,205,732.42 (outstanding principal) + 658,498.19 (close-out amount, swap closed out on October 19, 2009).

| Chapter 11 Debtor | Class No. | Holder of Claim | Allowed Amount (USD) |
|---|---|---|---|
| HSH Delaware GP LLC | 3E | | |
| HSH Delaware L.P. | 3F | Commerzbank AG | 5,305,107.07 (plus all interest, default interest, costs, fees and expenses) |
| | | Credit Agricole Corporate and Investment Bank | 4,479,868.21 (plus all interest, default interest, costs, fees and expenses) |
| | | Landsbanki Islands hf | 2,475,716.54 (plus all interest, default interest, costs, fees and expenses) |
| | | Lloyds TSB Bank plc | 5,575,787.21[7] (plus all interest, default interest, costs, fees and expenses) |
| | | The Royal Bank of Scotland N.V. | 4,479,868.35 (plus all interest, default interest, costs, fees and expenses) |
| | | The Royal Bank of Scotland plc | 4,479,868.12 (plus all interest, default interest, costs, fees and expenses) |
| HSH Luxembourg Coinvest S.à r.l. | 3G | Commerzbank AG | 8,954,125.86 (plus all interest, default interest, costs, fees and expenses) |
| | | Credit Agricole Corporate and Investment Bank | 7,561,261.87 (plus all interest, default interest, costs, fees and expenses) |
| | | Landsbanki Islands hf | 4,178,591.91 (plus all interest, default interest, costs, fees and expenses) |
| | | Lloyds TSB Bank plc | 8,954,125.86 (plus all interest, default interest, costs, fees and expenses) |
| | | The Royal Bank of Scotland N.V. | 7,888,709.44[8] (plus all interest, default interest, costs, fees and expenses) |
| | | The Royal Bank of Scotland plc | 7,561,261.72 (plus all interest, default interest, costs, fees and expenses) |
| HSH Luxembourg S.à r.l. | 3H | Commerzbank AG | 17,014,350.54 (plus all interest, default interest, costs, fees and expenses) |

---

[7] 5,305,107.07 (outstanding principal) + 270,680.14 (close-out amount, swap closed out on September 8, 2009).
[8] 7,561,262.11 (outstanding principal) + 327,447.33 (close-out amount, swap closed out on October 19, 2009).

| Chapter 11 Debtor | Class No. | Holder of Claim | Allowed Amount (USD) |
|---|---|---|---|
| HSH Luxembourg S.à r.l. (cont.) | 3H | Credit Agricole Corporate and Investment Bank | 14,367,673.85 (plus all interest, default interest, costs, fees and expenses) |
| | | Landsbanki Islands hf | 7,940,029.95 (plus all interest, default interest, costs, fees and expenses) |
| | | Lloyds TSB Bank plc | 17,882,464.92[9] (plus all interest, default interest, costs, fees and expenses) |
| | | The Royal Bank of Scotland N.V. | 14,367,674.30 (plus all interest, default interest, costs, fees and expenses) |
| | | The Royal Bank of Scotland plc | 14,367,673.57 (plus all interest, default interest, costs, fees and expenses) |
| JCF HSH (DE) GP LP | 3I | | |

---

[9] 17,014,350.54 (outstanding principal) + 868,114.38 (close-out amount, swap closed out on September 8, 2009).

# Plan Exhibit B4

Class 4 Claims
(General Unsecured Claims)

| Chapter 11 Debtor | Class No. | Holder of Claim | Allowed Amount (USD) |
|---|---|---|---|
| HSH Alberta I L.P. | 4A | Deloitte & Touche LLP | $7,481 |
|  |  | HSH Cayman I GP Ltd. | Unknown |
| HSH Alberta II L.P. | 4B | Deloitte & Touche LLP | $6,578 |
|  |  | HSH Cayman II GP Ltd. | Unknown |
| HSH Alberta V L.P. | 4C | Deloitte & Touche LLP | $6,398 |
|  |  | HSH Cayman V GP Ltd. | Unknown |
| HSH Coinvest (Alberta) L.P. | 4D | Deloitte & Touche LLP | $6,321 |
|  |  | HSH Coinvest (Cayman) GP Ltd. | Unknown |
| HSH Delaware GP LLC | 4E | None |  |
| HSH Delaware L.P. | 4F | Deloitte & Touche LLP | $1,585 |
|  |  | McCarthy Tetrault LLP | $4,447 |
|  |  | Barlow Lyde & Gilbert LLP | $21,609 |
| HSH Luxembourg Coinvest S.à r.l. | 4G | Deloitte S.A. | $1,771 |
|  |  | Administration des Contributions Directes | $1,215 |
| HSH Luxembourg S.à r.l. | 4H | Fortis A.G. | $2,450 |
|  |  | Administration des Contributions Directes | $591 |
| JCF HSH (DE) GP LP | 4I | None |  |

**Plan Exhibit B5**

Class 5 Claims
(YFCPEC Claims)

| Chapter 11 Debtor | Class No. | Holder of Claim | Allowed Amount |
|---|---|---|---|
| HSH Luxembourg S.à r.l. | 5 | | |

## **Plan Exhibit B6**

Class 6 Interests

## HSH Structure Chart (November 2009)

* U.S. investors (other than U.S. tax exempt investors who chose to co-invest through an entity treated as a corporation for U.S. federal income tax purposes in connection with the initial investment) and non-U.S. investors that are domiciled in a jurisdiction that does have a tax treaty with Germany.

** U.S. tax exempt investors who chose to co-invest through an entity treated as a corporation for U.S. federal income tax purposes in connection with the initial investment and non-U.S. investors that are domiciled in a jurisdiction that does not have a tax treaty with Germany.



**<u>Plan Exhibit C</u>**

Term Sheet

**PROJECT SAIL RESTRUCTURING PROPOSAL– DETAILED SUMMARY OF TERMS FOR AN AGREED RESTRUCTURING**

| | | | |
|---|---|---|---|
| **1.** | **Debtors:** | 1. | HSH ALBERTA I L.P. (an **Alberta Debtor**) |
| | | 2. | HSH ALBERTA II L.P. (an **Alberta Debtor**) |
| | | 3. | HSH ALBERTA V L.P. (an **Alberta Debtor**) |
| | | 4. | HSH DELAWARE L.P. (a **Delaware Debtor**) |
| | | 5. | HSH LUXEMBOURG S.à r.l. (the **Luxembourg Fund II Debtor**) |
| | | 6. | HSH COINVEST (ALBERTA) L.P. (an **Alberta Debtor**) |
| | | 7. | HSH LUXEMBOURG COINVEST S.à r.l. (the **Luxembourg Co-Invest Debtor**) |

Debtors 1 to 5 inclusive are the **Fund II Debtors**. Debtors 6 and 7 are the **Co-Invest Debtors**.

| | | |
|---|---|---|
| **2.** | **Trusts:** | HSH COINVEST (CAYMAN) TRUST-A (a **Cayman Trust**) |
| | | HSH COINVEST (CAYMAN) TRUST-B |
| | | HSH AIV 1 TRUST (a **Cayman Trust**) |
| | | HSH AIV 2 TRUST (a **Cayman Trust**) |
| | | HSH AIV 3 TRUST |
| | | HSH AIV 4 TRUST |
| | | HSH AIV 5 TRUST (a **Cayman Trust**), |
| | | and each a **Trust**. |
| **3.** | **Cayman GPs:** | HSH Cayman I GP Limited (in liquidation) |
| | | HSH Cayman II GP Limited (in liquidation) |
| | | HSH Cayman V GP Limited (in liquidation) |
| | | HSH Coinvest (Cayman) GP Limited (in liquidation) |
| **4.** | **Credit Agreements:** | 7 separate term and revolving credit facilities agreements |

dated 19 October 2006 (and as amended) between a Debtor, the Lenders (as a result of various transfer certificates) and the Facility Agent.

A Credit Agreement entered into by a Fund II Debtor is a **Fund II Credit Agreement**. A Credit Agreement entered into by a Co-Invest Debtor is a **Co-Invest Credit Agreement**.

| 5. | **Lenders:** | Commerzbank AG, Crédit Agricole Corporate and Investment Bank, Landsbanki Islands hf, Lloyds TSB Bank plc, The Royal Bank of Scotland, N.V. and The Royal Bank of Scotland plc. |
|---|---|---|
| 6. | **Facility Agent and Security Trustee:** | The Royal Bank of Scotland, N.V., London Branch. |
| 7. | **PlanCo SPV:** | One SPV incorporated (in a jurisdiction to be determined) for the purposes of holding certain equity interests in the general partners of any Debtor which is a limited partnership and in the Luxembourg Fund II Debtor and to be managed in a manner consistent with the Plan and the Restructuring Documents for the purposes of implementing the Plan. |
| 8. | **Restructuring Effective Date:** | The date on which the Facility Agent confirms that it has received all of the documents and evidence in form and substance satisfactory to it and set out in "Documentary Conditions Precedent" below. |
| | | The terms of each Credit Agreement will, unless amended in accordance with this summary of terms, otherwise continue in full force and effect until the occurrence of the Restructuring Effective Date |
| 9. | **HSH Shares:** | All shares and other interests of any nature (including, without limitation, any silent participations) held by the Debtors in HSH Nordbank AG (**HSH**). |
| 10. | **Relevant Equity Interests:** | The shares, partnership interests or other equity interests in the Alberta Debtors, the Luxembourg Debtors and the Delaware Debtor, but excluding (i) the partnership interests held by the Cayman GPs in the Alberta Debtors, (ii) the partnership interest held by the Delaware LLC in the Delaware Debtor, and (iii) any shares, partnership interests or other equity interests held by PlanCo SPV. |
| 11. | **HSH Constitutional Documents:** | The articles of association of HSH and any other operative documents and/or arrangements in place between the Debtors and/or the Trusts, HSH and/or any other |

shareholder of HSH (including, without limitation, the **Principle Agreement** between the Debtors and the other shareholders of HSH) in respect of their respective investments in HSH.

| 12. | HSH Share Title Documents: | ***Prior to the completion of an IPO of the HSH Shares:*** |

(a) All original notarial deeds held by the Debtors, the Trusts or JC Flowers & Co LLC or its affiliates (**JC Flowers**) issued to The HSH AIV 1 Trust, The HSH AIV 2 Trust, The HSH AIV 3 Trust, The HSH AIV 4 Trust, The HSH AIV 5 Trust and Close Trustees (Cayman) Limited containing the sale and purchase agreement under which the the HSH Shares were acquired;

(b) all original agreements held by the Debtors, the Trusts or JC Flowers transferring shares in HSH from WestLB Beteiligungsholding GmbH to any of the Debtors;

(c) notarial protocol of general meeting and copies of the subscription certificates held by the Debtors, the Trusts or JC Flowers relating to the subscription of shares issued by HSH after 30 August 2006 by any of the Debtors; and

(d) all original documents relating to the silent participations in HSH held by the Debtors, the Trusts or JC Flowers.

***Following the completion of an IPO of the HSH Shares:*** any documents of title or access to securities accounts which evidence title to the listed HSH Shares.

| 13. | Liquidators: | David Walker and Ian Stokoe of PwC Corporate Finance and Recovery (Cayman) Ltd, each in their capacity as joint official liquidator of each of the Cayman GPs pursuant to orders of the Grand Court of the Cayman Islands (Financial Services Division) dated 12 February 2010 and any additional or successor liquidator appointed by the Cayman court or otherwise. |

**ALBERTA DEBTOR STRUCTURE**

| | | |
|---|---|---|
| **14.**    **Alberta Debtors:** | (a) | The Alberta Debtors are Alberta limited partnerships. The general partner of each Alberta Debtor is a Cayman GP (each being a Cayman Islands incorporated limited company). In October 2009 a second general partner JCF HSH (DE) GP LP, a Delaware limited partnership, (the **New GP**) was appointed to each Alberta Debtor; |
| | (b) | the Liquidators will remain in place and, prior to a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, through their control of the Cayman GPs, manage the Alberta Debtors; |
| | (c) | the New GP will withdraw from each of the Alberta Debtors and provide such releases and waivers, acknowledgements and confirmations as required by the Facility Agent; |
| | (d) | the limited partnership agreements of the Alberta Debtors will be amended as set out in "Alberta Partnership Agreement Amendments" below; |
| | (e) | applications will be made to the Cayman court for directions in respect of the Plan as set out in "Cayman GP Court Applications " below; and |
| | (f) | PlanCo SPV, will take a full transfer of the shares in each Cayman GP as set out in "Cayman GPs" below. |
| **15.**    **Alberta Partnership Agreement Amendments:** | | Each Alberta limited partnership agreement will be amended by the filing of a Notice to Amend with the Personal Property Registry in Alberta outlining the following (non-exhaustive) amendments to each Alberta limited partnership certificate in respect of each Alberta Debtor: |
| | (a) | the amendments made in October 2009 will, to the extent necessary, be reversed to, among other things, reflect the withdrawal of the New GP; |
| | (b) | the purpose of the Alberta Debtor will be amended to be, prior to a Voluntary Prepayment in full and/or a discharge in full of the Secured |

Obligations, to hold the HSH Shares and to sell the HSH Shares (or Relevant Equity Interests) in accordance with the Agreed Sale Conditions in order to meet the Alberta Debtor's obligations under the Restructuring Documents and to expressly provide that the Alberta Debtor must be managed in accordance with the Restructuring Documents;

(c)     the Cayman GP will be authorised to implement all matters contemplated by the Restructuring Documents;

(d)     subject to paragraph (s) below the Relevant Equity Interests and the HSH Shares may not be encumbered other than in favour of the Security Trustee;

(e)     the Cayman GP cannot be removed and/or a new general partner cannot be appointed without the consent of the Cayman GP and the Chapter 11 Committee and the Relevant Equity Interests cannot be transferred nor any new limited partner be admitted without the consent of the Cayman GP;

(f)     amendments to or restatements of the limited partnership agreement in respect of the Alberta Debtor cannot be made without the consent of the Cayman GP;

(g)     commencement or initiation of bankruptcy, dissolution or other insolvency proceedings in any jurisdiction in relation to the Alberta Debtor requires the consent of the Cayman GP and the prior consent of the Chapter 11 Committee;

(h)     until a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations the HSH Shares and the Relevant Equity Interests can only be sold in accordance with the Agreed Sale Conditions;

(i)     a sale of the HSH Shares and the Relevant Equity Interests in accordance with the Agreed Sale Conditions complies with any and all duties the Alberta Debtor and/or the Cayman GP owe to the Cayman Trust;

(j)     subject to paragraph (s) below, no loans or other

liabilities are outstanding or may be made by the Cayman Trust or any other person (other than the Lenders) to the Alberta Debtor and no management or consulting contracts may be in place (or put in place) between the Cayman Trust or any other person and the Alberta Debtor, in each case without the consent of the Cayman GP;

(k)     the priorities for distributing partnership assets will be set out and, in particular, will provide that no distributions may be made by the Alberta Debtor to any partner until the Facility Agent provides written notice that the Secured Obligations have been satisfied in full (which the Facility Agent will deliver promptly upon being so satisfied);

(l)     no declarations of capital contributions may be made without the prior written consent of the Cayman GP;

(m)     if the Relevant Equity Interests in the Alberta Debtor (or the Relevant Equity Interests in any other Debtor) are to be sold in accordance with the Agreed Sale Conditions, the Cayman Trust (in the case of the Relevant Equity Interests in any other Debtor, if required by that Debtor) is obliged to transfer its Relevant Equity Interests, cooperate with the sale and confirm that the proceeds of sale are to be applied in accordance with "Proceeds of Sale and Cash Received" below;

(n)     if the HSH Shares of any other Debtor are to be sold in accordance with the Agreed Sale Conditions the Alberta Debtor is obliged, if required by that other Debtor, to transfer its HSH Shares to the same transferee as that other Debtor;

(o)     following a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, the management of the Alberta Debtor will be capable of being changed in accordance with "Control of the Debtors after a Voluntary Prepayment" below;

(p)     other than to the extent covered in a Security Power of Attorney, a general power of attorney from the Cayman LP in favour of the Cayman GP to take any action required to implement the

obligations of the Cayman Trust under the partnership agreement (which will be required to be renewed at least two months prior to its expiry in order to satisfy matters of Cayman law);

(q) the Cayman Trust acknowledges and agrees that, upon notice from the Security Trustee that the security over the Relevant Equity Interests has become enforceable, the Cayman GP may, and shall upon notice from the Security Trustee, register the relevant partnership interests in the name of any transferee required by the Cayman GP (provided such transfer is made in accordance with the Agreed Sale Conditions) and the Cayman GP can do so using any power of attorney granted by the Cayman Trust in its favour;

(r) if the Cayman Trust is wound up (through termination of the trust or otherwise), any transferee of or successor to the limited partnership interest held by the Cayman Trust will be bound by the terms of the limited partnership agreement; and

(s) until a disposal of the Relevant Equity Interests or HSH Shares (as the case may be) has been completed and any Upside Amount due to the Lenders has been distributed to the Lenders in full, the Alberta Debtor may not grant any security over any assets of the Alberta Debtor and the Trust may not grant any security over the Relevant Equity Interests to any third party financier of the Alberta Debtor or the Trust where the secured obligations (in aggregate) exceed the Par Amount with respect to the facilities borrowed by the Alberta Debtor or Trust.

Additionally the Plan will be appended to the amended limited partnership agreements and filed at the Personal Property Registry in Alberta as part of the limited partnership certificate of each Alberta Debtor.

16. **Cayman GPs:**      All of the shares in the Cayman GPs will be transferred to PlanCo SPV.

*Security Power of Attorney:* Each Cayman Trust will provide a security power of attorney for a period of twelve months (a **Security Power of Attorney**) in favour of the Cayman GP and the Security Trustee to allow the Cayman GP and/or the Security Trustee to transfer the Relevant

Equity Interests if they are to be sold in accordance with the Agreed Sale Conditions. Until a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations each Security Power of Attorney will be required to be renewed by the Cayman Trust at least two months prior to the expiry of the Security Power of Attorney in effect at the time of renewal in order to satisfy matters of Cayman law.

17. **Cayman GP Court Applications:** The Liquidators will apply to the Cayman Court for the following directions and/or orders and the Cayman Trusts, the shareholders of the Cayman GPs, PlanCo SPV and the New GP (as applicable) will support, in the Cayman Grand Court, these applications:

(a) confirmation that:

    (i) the Liquidators be at liberty to appear by counsel at the Plan confirmation hearing to agree to the Plan and enter into (in their personal capacity and on behalf of the Cayman GPs) each relevant Settlement Agreement and any other Restructuring Documents;

    (ii) each Restructuring Document is approved; and

    (iii) the Liquidators are at liberty, in discharging other duties as liquidators, to exercise their discretion in the manner set out in the relevant Settlement Agreement and the other Restructuring Documents;

(b) a direction that the liquidations of the Cayman GPs continue pending the satisfaction of the Secured Obligations; and

(c) sanction of the transfer of all of the shares in the Cayman GPs to PlanCo SPV as contemplated in "Cayman GPs" above,

each being a **Cayman Court Application**.

**DELAWARE DEBTOR STRUCTURE**

18. **Delaware Debtor:**

(a) The Delaware Debtor is a Delaware limited partnership. The general partner of the Delaware Debtor is HSH Delaware GP LLC (the **Delaware LLC**) which is a Delaware limited liability company;

(b) prior to a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, Ian Stokoe and David Walker (or such other managers as may be determined by the Facility Agent) will be appointed as managers of and engaged to provide consultancy services to the Delaware LLC in order to manage and control the Delaware Debtor in accordance with the Plan and the members of the Delaware LLC will consent to such appointment/engagement and approve its terms;

(c) the operating agreement of the Delaware LLC will be amended as set out in "Delaware LLC" below and the limited partnership agreement of the Delaware Debtor will be amended as set out in "Delaware Partnership Agreement Amendments" below; and

(d) in order to have the power to appoint professional managers of the Delaware LLC without the co-operation of the Trusts and to restrict amendments to the operating agreement or constitutional documents of the Delaware LLC and the Delaware Debtor, PlanCo SPV will be admitted as a member of the Delaware LLC with power to control the appointment and removal of the managers of the Delaware LLC and to prevent amendments to the operating agreement of the Delaware LLC without the consent of PlanCo SPV.

19. **Delaware Partnership Agreement Amendments:**

The limited partnership agreement of the Delaware Debtor will be amended by the execution of an amendment agreement between the Delaware LLC and the limited partner of the Delaware Debtor (the **Delaware Limited Partner**) and the filing of that amendment agreement in any relevant registry outlining the following (non-exhaustive) amendments:

(a)     the purpose of the Delaware Debtor will be amended to be, prior to a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, to hold the HSH Shares and to sell the HSH Shares (or Relevant Equity Interests) in accordance with the Agreed Sale Conditions to meet the Delaware Debtor's obligations under the Restructuring Documents and to expressly provide that the Delaware Debtor must be managed in accordance with the Restructuring Documents;

(b)     the management of the Delaware LLC will be conducted in accordance with the Restructuring Documents;

(c)     the Delaware LLC will be authorised to implement all matters contemplated by the Restructuring Documents;

(d)     subject to paragraph (r) below, the Relevant Equity Interests and the HSH Shares may not be encumbered other than in favour of the Security Trustee;

(e)     a prohibition on the removal of the Delaware LLC as the general partner of the Delaware Debtor or the appointment of any new general partner without the prior consent of the Delaware LLC and the Chapter 11 Committee and that the Relevant Equity Interests cannot be transferred nor any new limited partner be admitted without the consent of the Delaware LLC and the Chapter 11 Committee;

(f)     amendments to or restatements of the limited partnership agreement of the Delaware Debtor will be restricted both by prohibition and specific denial of power and authority unless made with the consent of the Delaware LLC and the Chapter 11 Committee;

(g)     commencement or initiation of bankruptcy, merger, consolidation, transfer, conversion, dissolution or other insolvency proceedings in any jurisdiction in relation to the Delaware LLC or the Delaware Debtor, whether voluntary or involuntary, requires the consent of the Delaware LLC and the Chapter 11 Committee and

otherwise can be initiated only by the Delaware LLC;

(h)   until a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations the HSH Shares and the Relevant Equity Interests can only be sold in accordance with the Agreed Sale Conditions;

(i)   a sale of its HSH Shares and the Relevant Equity Interests in accordance with the Agreed Sale Conditions complies with any and all duties the Delaware Debtor and/or the Delaware LLC (or its members) owe to the Delaware Limited Partner;

(j)   subject to paragraph (r) below, no loans or other liabilities are outstanding or may be made by the Delaware Limited Partner or any other person (other than the Lenders) to the Delaware Debtor and no management or consulting contracts may be in place (or put in place) between the Delaware Limited Partner or any other person and the Delaware Debtor, in each case without the consent of the Delaware LLC;

(k)   the priorities for distributing partnership assets will be set out and, in particular, will provide that no distributions may be made by the Delaware Debtor to any partner until the Facility Agent provides written notice that the Secured Obligations have been satisfied in full (which the Facility Agent will deliver promptly upon being so satisfied);

(l)   if the Relevant Equity Interests in the Delaware Debtor (or the Relevant Equity Interests in any other Debtor) are to be sold in accordance with the Agreed Sale Conditions, the Delaware Limited Partner (in the case of the Relevant Equity Interests in any other Debtor, if required by that Debtor) is obliged to transfer the Relevant Equity Interests, cooperate with the sale and confirm that the proceeds of sale are to be applied in accordance with "Proceeds of Sale and Cash Received" below;

(m)   if the HSH Shares of any other Debtor are to be sold in accordance with the Agreed Sale Conditions the Delaware Debtor is obliged, if required by that other Debtor, to transfer its HSH

Shares to the same transferee as that other Debtor;

(n)    following a Voluntary Prepayment in full and/or a discharge of the Secured Obligations in full, the management of the Delaware Debtor will be capable of being changed in accordance with "Control of the Debtors after a Voluntary Prepayment" below;

(o)    other than to the extent covered by a Security Power of Attorney, a general power of attorney from the Delaware Limited Partner in favour of the Delaware LLC to take any action required to implement the obligations of the Delaware Limited Partner under the partnership agreement;

(p)    the Delaware Limited Partner acknowledges and agrees that, upon notice from the Security Trustee that the security over the Relevant Equity Interests has become enforceable, the Delaware LLC may, and shall upon notice from the Security Trustee, register the relevant partnership interests in the name of any transferee required by the Delaware LLC (provided such transfer is made in accordance with the Agreed Sale Conditions) and the Delaware LLC can do so using any power of attorney granted by the Delaware Limited Partner in its favour;

(q)    language specifying that the limited partnership interests in the Delaware Debtor are governed by Article 8 of the UCC; and

(r)    until a disposal of the Relevant Equity Interests or HSH Shares (as the case may be) has been completed and any Upside Amount due to the Lenders has been distributed to the Lenders in full, the Delaware Debtor may not grant any security over any assets of the Delaware Debtor and the Trust may not grant any security over the Relevant Equity Interests to any third party financier of the Delaware Debtor or the Trust where the secured obligations (in aggregate) exceed the Par Amount with respect to the facilities borrowed by the Delaware Debtor or Trust.

**20.    Delaware LLC:**    The Delaware LLC's operating agreement will be amended as follows (and the below is a non-exhaustive list):

(a)     to admit PlanCo SPV as a new member of the Delaware LLC holding a "golden share";

(b)     to prevent the appointment of any new manager or the removal of any existing manager without the consent of PlanCo SPV;

(c)     to prevent the removal of PlanCo SPV as a member of the Delaware LLC without the consent of the Chapter 11 Committee;

(d)     to restrict the duties owed by PlanCo SPV, the managers of the Delaware LLC and the Delaware LLC itself to the Trust which is a member of the Delaware LLC;

(e)     to specify that the interests in the Delaware LLC are governed by Article 8 of the UCC;

(f)     to grant PlanCo SPV pursuant to its golden share the sole power to appoint and remove the managers of the Delaware LLC;

(g)     to provide that the commencement or initiation of bankruptcy, merger, consolidation, transfer, conversion, dissolution or other insolvency proceedings in any jurisdiction in relation to the Delaware LLC, whether voluntary or involuntary, requires the consent of PlanCo SPV and the Chapter 11 Committee;

(h)     to provide that the managers must manage the Delaware LLC, and the Delaware LLC must manage the Delaware Debtor in accordance with the Restructuring Documents; and

(i)     to prevent amendments to or restatements of the operating agreement without the consent of PlanCo SPV.

***Security Power of Attorney:*** The Delaware Limited Partner will provide a security power of attorney (together with the power of attorney referred to above, each a **Security Power of Attorney**) in favour of the Delaware LLC and the Security Trustee to allow the Delaware LLC and the Security Trustee to transfer the Relevant Equity Interests if they are to be sold in accordance with the Agreed Sale Conditions.

**LUXEMBOURG FUND II DEBTOR STRUCTURE**

| | | |
|---|---|---|
| **21.** | **Luxembourg Debtors:** | (a) The Luxembourg Debtors are Luxembourg private limited companies; |

(b) the Luxembourg Co-Invest Debtor will be dealt with in accordance with "Luxembourg Co-Invest Debtor Structure" below and the following provisions of this "Luxembourg Fund II Debtor Structure" section of this summary of terms will not apply to the Luxembourg Co-Invest Debtor;

(c) prior to a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, Ian Stokoe and David Walker (or such other managers as may be determined by the Facility Agent) will be appointed as managers of and engaged to provide consultancy services to the Luxembourg Fund II Debtor to manage and control the Luxembourg Fund II Debtor in accordance with the Plan and the shareholders of the Luxembourg Fund II Debtor will consent to such appointment/engagement and approve its terms;

(d) the articles of association of the Luxembourg Fund II Debtor will be amended as set out in "Luxembourg Constitutional Amendments and PlanCo SPV" below; and

(e) in order to have the power to veto any changes to the managers of the Luxembourg Fund II Debtor or any changes to the constitutional documents of the Luxembourg Fund II Debtor, PlanCo SPV will hold a limited "blocking" equity interest in the Luxembourg Fund II Debtor.

**22. Luxembourg Constitutional Amendments and PlanCo SPV:**

The articles of association of the Luxembourg Fund II Debtor will be amended as follows and/or a shareholders' agreement will be implemented to deal with the matters that follow (and the below is a non-exhaustive list):

(a) the purpose of the Luxembourg Fund II Debtor will be to, prior to a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, hold the HSH Shares and to sell the HSH Shares in accordance with the Agreed Sale

Conditions to meet the Luxembourg Fund II Debtor's obligations under the Restructuring Documents;

(b)    an additional class of shares in the Luxembourg Fund II Debtor (the **B Shares**) will be created. The B Shares of the Luxembourg Fund II Debtor will be allocated to PlanCo SPV and will grant PlanCo SPV the exclusive right to propose to the general shareholders meeting of the Luxembourg Fund II Debtor candidates to be appointed as manager at board level;

(c)    any amendments to the articles of association of the Luxembourg Fund II Debtor will require the unanimous consent of the shareholders of the Luxembourg Fund II Debtor (and therefore include PlanCo SPV);

(d)    until a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, no transfer of the Relevant Equity Interests in the Luxembourg Fund II Debtor or the HSH Shares held by the Luxembourg Fund II Debtor other than in accordance with the Agreed Sale Conditions;

(e)    the managers of the Luxembourg Fund II Debtor to manage the business of the Luxembourg Fund II Debtor in accordance with the Restructuring Documents;

(f)    the Luxembourg Fund II Debtor will be authorised to implement all matters contemplated by the Restructuring Documents;

(g)    subject to paragraph (r) below, the Relevant Equity Interests and the HSH Shares may not be encumbered other than in favour of the Security Trustee;

(h)    a sale of the HSH Shares of the Luxembourg Fund II Debtor will be effected by the managers of the Luxembourg Fund II Debtor without any requirement to consult with or obtain the approval of the shareholders of the Luxembourg Fund II Debtor;

(i)    a sale of the HSH Shares or the Relevant Equity Interests in respect of the Luxembourg Fund II

Debtor in accordance with the Agreed Sale Conditions complies with any and all duties in respect of that disposal that the managers owe to the Luxembourg Fund II Debtor and the shareholders of the Luxembourg Fund II Debtor;

(j)     the Relevant Equity Interests in the Luxembourg Fund II Debtor held by the Trust will be "dragged" along when PlanCo SPV sells its shares in accordance with the Agreed Sale Conditions;

(k)     subject to paragraph (p) below, no loans or other liabilities (other than under the YFCPECs) are outstanding or may be made by the Trust or any other person (other than the Lenders) to the Luxembourg Fund II Debtor and no management or consulting contracts may be in place (or put in place) between the Trust or any other person and the Luxembourg Fund II Debtor without the consent of PlanCo SPV;

(l)     no distributions may be made by the Luxembourg Fund II Debtor to the Trust until the Facility Agent provides written notice that the Secured Obligations have been satisfied in full (which the Facility Agent will deliver promptly upon being so satisfied);

(m)     if the Relevant Equity Interests in the Luxembourg Fund II Debtor (or the Relevant Equity Interests in any other Debtor) are to be sold in accordance with the Agreed Sale Conditions, the Trusts (in the case of the Relevant Equity Interests in any other Debtor, if required by that Debtor) are obliged to transfer their Relevant Equity Interests in the Luxembourg Fund II Debtor, cooperate with the sale and confirm that the proceeds of sale are to be applied in accordance with "Proceeds of Sale and Cash Received" below;

(n)     if the HSH Shares of any other Debtor are to be sold in accordance with the Agreed Sale Conditions the Luxembourg Fund II Debtor is obliged, if required by that other Debtor, to transfer its HSH Shares to the same transferee as that other Debtor;

(o)     following a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, the

management of the Luxembourg Fund II Debtor will be capable of being changed in accordance with "Control of the Debtors after a Voluntary Prepayment" below; and

(p)     until a disposal of the Relevant Equity Interests or HSH Shares (as the case may be) has been completed and any Upside Amount due to the Lenders has been distributed to the Lenders in full, the Luxembourg Fund II Debtor may not grant any security over any assets of the Luxembourg Fund II Debtor and the Trust may not grant any security over the Relevant Equity Interests to any third party financier of the Luxembourg Fund II Debtor or the Trust where the secured obligations (in aggregate) exceed the Par Amount with respect to the facilities borrowed by the Luxembourg Fund II Debtor or Trust.

23.     **Other Luxembourg Debtor matters:**          *Security Power of Attorney:* the shareholder Trust of the Luxembourg Fund II Debtor will provide a security power of attorney for a period of twelve months (**Security Power of Attorney**) in favour of PlanCo SPV and the Security Trustee to allow PlanCo SPV and the Security Trustee to transfer the Relevant Equity Interests if they are to be sold in accordance with the Agreed Sale Conditions. Until a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations each Security Power of Attorney will be required to be renewed by the shareholder Trust of the Luxembourg Fund II Debtor at least two months prior to the expiry of the relevant Power of Attorney in effect at the time of renewal in order to satisfy matters of Cayman law.

*Voting Agreement:* The shareholder Trust of the Luxembourg Fund II Debtor will enter into a voting agreement with PlanCo SPV under which it will agree:

(a)     to vote in favour of any managers proposed to the board of the Luxembourg Fund II Debtor by PlanCo SPV and to approve the terms of their engagement;

(b)     to vote in favour of any decisions required for the Luxembourg Fund II Debtor to comply with the terms of the Plan; and

(c)     not to commence or initiate bankruptcy or other insolvency proceedings in any jurisdiction in

relation to the Luxembourg Fund II Debtor.

## LUXEMBOURG CO-INVEST DEBTOR STRUCTURE

| | | |
|---|---|---|
| 24. | **Luxembourg Co-Invest Debtor:** | ❖ The Luxembourg Co-Invest Debtor will not be subject to any changes to its constitution or management or have any of its equity held by PlanCo SPV in each case as may be contemplated in respect of the Luxembourg Fund II Debtor in this summary of terms. |
| | | ❖ The following elements described in this section of this summary of terms will therefore be implemented either contractually in relevant the Restructuring Documents or by way of security arrangements in each case in respect of the Luxembourg Co-Invest Debtor and its Trust shareholder. |
| 25. | **Terms to be included contractually where relevant in the Restructuring Documents:** | (a) The Trust will agree not to commence or initiate bankruptcy or other insolvency proceedings in any jurisdiction in relation to the Luxembourg Co-Invest Debtor and to otherwise comply with the terms of the Plan; |
| | | (b) subject to paragraph (g) below, the Relevant Equity Interests may not be encumbered other than in favour of the Security Trustee; |
| | | (c) no loans or other liabilities (other than under the YFCPECs) are outstanding or may be made by the Trust or any other person (other than the Lenders) to the Luxembourg Co-Invest Debtor and no management or consulting contracts may be in place (or put in place) between the Trust or any other person and the Luxembourg Co-Invest Debtor without the consent of the Facility Agent; |
| | | (d) no distributions may be made by the Luxembourg Co-Invest Debtor to the relevant Trust until the Facility Agent provides written notice that the Secured Obligations have been satisfied in full (which the Facility Agent will deliver promptly upon being so satisfied); |
| | | (e) if the Relevant Equity Interests in the Luxembourg Co-Invest Debtor (or the Relevant Equity Interests in any other Debtor) are to be |

sold in accordance with the Agreed Sale Conditions, the Trusts (in the case of the Relevant Equity Interests in any other Debtor, if required by that Debtor) are obliged to transfer their Relevant Equity Interests in the Luxembourg Co-Invest Debtor, cooperate with the sale and confirm that the proceeds of sale are to be applied in accordance with "Proceeds of Sale and Cash Received" below;

(f)     if the HSH Shares of any other Debtor are to be sold in accordance with the Agreed Sale Conditions the Luxembourg Co-Invest Debtor is obliged, if required by that other Debtor, to transfer its HSH Shares to the same transferee as that other Debtor; and

(g)     until a disposal of the Relevant Equity Interests or HSH Shares (as the case may be) has been completed and any Upside Amount due to the Lenders has been distributed to the Lenders in full, the Luxembourg Co-Invest Debtor may not grant any security over any assets of the Luxembourg Co-Invest Debtor and the Trust may not grant any security over the Relevant Equity Interests to any third party financier of the Luxembourg Co-Invest Debtor or the Trust where the secured obligations (in aggregate) exceed the Par Amount with respect to the facilities borrowed by the Luxembourg Co-Invest Debtor or Trust.

| 26. | Security, Security Power of Attorney and other documents: | ***Security Power of Attorney:*** the shareholder Trust of the Luxembourg Co-Invest Debtor will provide a security power of attorney for a period of twelve months (**Security Power of Attorney**) in favour of the Security Trustee to allow the Security Trustee to transfer the Relevant Equity Interests if they are to be sold in accordance with the Agreed Sale Conditions. Until a Voluntary Prepayment in full each Security Power of Attorney will be required to be renewed by the shareholder Trust of the Luxembourg Co-Invest Debtor at least two months prior to the expiry of the relevant Power of Attorney in effect at the time of renewal in order to satisfy matters of Cayman law.

***Security:*** security will be granted in respect of the Luxembourg Co-Invest Debtor as contemplated for all Debtors under "Security and Secured Obligations" below and the HSH Share Title Documents in respect of the HSH Shares held by the Luxembourg Co-Invest Debtor |

will be subject to the custodian arrangements contemplated by this summary of terms.

***Settlement Agreement and Upside Amount:*** for the avoidance of doubt the Luxembourg Co-Invest Debtor will be subject to a Settlement Agreement and the Upside Amount as contemplated for all Debtors in this summary of terms.


### SEVEN SINGLE TERM LOAN FACILITIES AND REPAYMENT OPTIONS


27.  **7 Single Term Loan Facilities:**  Each Credit Agreement will continue with a single term loan facility (each a **Facility**) and the due date for amounts currently due and payable under each Credit Agreement will be amended in accordance with "Ability to terminate the Lock-Up Period and/or put the Facilities On Demand" below. The Credit Agreements will otherwise be amended and restated to ensure that their terms and conditions are consistent with this summary of terms. The current revolving facilities under the Credit Agreements were cancelled on 8 September 2009. All amounts currently due under each current revolving facility under a Credit Agreement will be consolidated into the single term loan facility that will continue under that Credit Agreement.

28.  **Ability to terminate the Lock-Up Period and/or put the Facilities On Demand:**  ***Amounts outstanding:*** the amounts outstanding under the Facilities and the Hedging Arrangements (as defined below) will remain outstanding until they are put on demand by the Facility Agent at which time they will become immediately due and payable.

***Right to put the Facilities and the Hedging Arrangements on demand:*** the Facility Agent will have the right to put the Facilities and the Hedging Arrangements on demand only in the following circumstances:

(a)      at any time on and from 31 December 2014 provided that the relevant Debtor has received not less than 30 days prior written notice from the Facility Agent (such that the first date that the Facility Agent can put the Facilities on demand under this paragraph (a) is 31 December 2014 if prior notice has been given in accordance with this paragraph (a));

(b)  immediately on the occurrence of a Termination Event; or

(c)  simultaneously with the completion of any sale or transfer of all of the HSH Shares or Relevant Equity Interests.

***Right to terminate the Lock-Up Period:*** if a Termination Event occurs the Facility Agent will be entitled, by written notice to the Trusts, to immediately terminate the Lock-Up Period and, thereafter, subject to the prior consent of the Facility Agent under the terms of the Credit Agreements, the Debtors may effect a disposal of the HSH Shares (or the holders of powers of attorney from the Trusts may effect a disposal of the Relevant Equity Interests) without the consent of the Trusts at any time, for any price and on any terms that the Debtors (or the attorneys) see fit and the Trusts will take all actions reasonably required by the Debtors, the attorneys and the Facility Agent in order to effect any such disposal.

| | | |
|---|---|---|
| **29.** | **Repayment of indebtedness upon a sale of the HSH Shares or Relevant Equity Interests:** | In accordance with "Agreed Sale Conditions" below and subject to the consent of the Facility Agent under the Credit Agreements, the Debtors (or any attorneys appointed by the Trusts under powers of attorney) can ensure, without any further reference to the Trusts, that a sale of the HSH Shares or the Relevant Equity Interests is effected: |

(a)  at any time for not less than the Par Amount; or

(b)  after the end of the Lock-Up Period, for any amount,

subject, in any such case, to compliance with the Agreed Sale Conditions and otherwise on any terms that the Debtors (or the attorneys-in-fact) see fit and the Trusts will take all actions reasonably required by the Debtors, the attorneys and the Facility Agent in each case in order to effect a full or, as the case may be, partial repayment or prepayment of all amounts outstanding under the Finance Documents.

| | | |
|---|---|---|
| **30.** | **Mandatory prepayment on receipt of cash and/or dividends:** | Any dividends or other distributions from the HSH Shares or any other cash of any nature received by the Debtors after the Restructuring Effective Date must be applied, on receipt, by the Debtors in accordance with the waterfall set out in "Proceeds of Sale and Cash Received" below. |

**31. Agreed Sale Conditions:**

*Right to effect a disposal:* until a Voluntary Prepayment in full and/or the discharge in full of the Secured Obligations, subject to each of the following:

(a)    the terms of the HSH Constitutional Documents;

(b)    the consent of the Facility Agent under the Credit Agreements; and

(c)    the balance of the provisions of this section 31 (Agreed Sale Conditions),

the Debtors (or any attorneys appointed by the Trusts under powers of attorney) will have the absolute and unfettered right to effect a disposal of the HSH Shares or of the Relevant Equity Interests for any price at any time and on any terms and the Trusts will take all actions reasonably required by the Debtors, the attorneys and the Facility Agent in order to effect any such disposal.

*Lock-Up Period:* the Debtors (or any attorneys appointed by the Trusts under powers of attorney) may not effect a disposal of the HSH Shares or the Relevant Equity Interests without the consent of the Trusts at any time before and including 30 June 2013 (subject to "Termination Events" below, the **Lock-Up Period**) unless:

(a)    the Debtors are required to do so by any law, regulation or binding order of a judicial or governmental authority; or

(b)    the aggregate net proceeds that will be received by the Debtors or the attorneys on behalf of the Trusts (as the case may be) in respect of the HSH Shares or the Relevant Equity Interests are at least equal to the Par Amount at that time.

*No sale to a related party:* the Debtors (or any attorneys appointed by the Trusts under powers of attorney) may not effect a sale or transfer of the HSH Shares or the Relevant Equity Interests to the Lenders or a related party of the Lenders. For the avoidance of doubt, if, following the Restructuring Effective Date, the Debtors are put into an insolvency procedure in any jurisdiction by any person (including by the Facility Agent if done so once a demand has been made in accordance with "Ability to terminate the Lock-Up Period and/or put the Facilities On Demand" above) this restriction will not apply to any sale of the

HSH Shares or Relevant Equity Interests made out of that insolvency process if that sale is made to the Lenders (or any related party of the Lenders) in accordance with the proper procedures of the relevant insolvency process.

***Sale process and right of first refusal if the HSH Shares are not listed on a recognised stock exchange at the time of completion of a sale or, if they are listed, as a result of an unsolicited approach from a third party:***

(a)      unless a Termination Event has occurred and is outstanding, prior to the listing of the HSH Shares on a recognised stock exchange or, if the shares are listed, following an unsolicited approach from a third party, the Trusts or any affiliate of JC Flowers nominated by JC Flowers will have the right of first refusal on a sale or transfer of the HSH Shares or the Relevant Equity Interests as follows:

(b)      if the Debtors (or any attorneys appointed by the Trusts under powers of attorney) determine to sell (or have exchanged contracts for sale subject to the right of first refusal outlined in the following paragraphs (a) to (e)) the HSH Shares or the Relevant Equity Interests pursuant to a bona fide written offer received from a proposed third party purchaser, prior to the completion of (but not exchange of contracts in relation to) that sale, the Debtors must give 30 days written notice of that offer to JC Flowers (and in that notice, the Debtors would also be required to specify the terms and conditions of the offer and, to the extent permitted by the offeror, the identity of the offeror);

(c)      the Trusts or another affiliate of JC Flowers would have the option to purchase the HSH Shares or Relevant Equity Interests (as the case may be) for which the offer was made at the price and upon the terms and conditions set forth in the offer (or at the election of the Trusts or another affiliate of JC Flowers) a better price or terms and conditions) provided that such offer also includes a full reimbursement of the reasonable costs and expenses actually incurred by the purchaser notified to JC Flowers under paragraph (a) above (but not including, for the avoidance of doubt, any break fee or similar cost);

(d)     alternatively, prior to the date of the completion of the proposed sale and before the expiry of the 30 day period referred to in paragraph (a) above (as set out in the written notice), the Trusts or another affiliate of JC Flowers may propose a bona fide written offer from another proposed purchaser for the HSH Shares or Relevant Equity Interests (as the case may be) on the basis of at least the same purchase price and upon the same (or better) terms and conditions as the offer presented to JC Flowers by the Debtors provided that such offer also includes a full reimbursement of the reasonable and reimbursable costs and expenses actually incurred by the purchaser notified to JC Flowers under paragraph (a) above (but not including, for the avoidance of doubt, any break fee or similar cost);

(e)     if prior to the expiry of the 30 day period referred to in paragraph (a) above, the Trusts or another affiliate of JC Flowers have made a bona fide written offer to purchase the HSH Shares or the Relevant Equity Interests (as the case may be), or if JC Flowers presents to the Lenders a bona fide written offer from another purchaser of the HSH Shares or Relevant Equity Interests (as the case may be) having at least the same purchase price as the offer presented to JC Flowers by the Debtors and being on the same or better terms and conditions (provided that such offer also includes a full reimbursement of the reasonable and reimbursable costs and expenses actually incurred by the purchaser notified to JC Flowers under paragraph (a) above (but not including, for the avoidance of doubt, any break fee or similar cost)), such transaction would (subject to the Debtors' pre-emption obligations in the Principle Agreement referred to below) be consummated in lieu of any transaction proposed by the Debtors or the attorneys; and

(f)     if JC Flowers does not exercise its option to purchase the HSH Shares or Relevant Equity Interests (as the case may be) or to find another purchaser of the HSH Shares or Relevant Equity Interests (as the case may be) within the period described above, the Debtors or the attorneys have the right, for a period of 90 days thereafter, to complete the sale of the HSH Shares or Relevant

Equity Interests (as the case may be) to the original offeror and on terms and conditions no less favourable to the Debtors than the terms of the original offer. If at the end of such 90-day period the sale of the HSH Shares or Relevant Equity Interests (as the case may be) has not been completed then the HSH Shares or Relevant Equity Interests (as the case may be) will be subject once again to right of first refusal set out above.

Nothing in paragraphs (a) to (e) above will prevent the Debtors, once a sale and purchase agreement has been exchanged with a third party, simultaneously during the right of first refusal process outlined in paragraphs (a) to (e) above, from complying with their pre-emption obligations to the other shareholders of HSH outlined in the Principle Agreement (if any) in respect of a sale of the HSH Shares or Relevant Equity Interests (to the extent applicable) and the Trusts acknowledge and agree that the right of first refusal set out in these summary of terms is subject to the Debtors' pre-emption obligations to the other shareholders of HSH in the Principle Agreement.

***Sale process and right of first refusal if the HSH Shares are listed on a recognised stock exchange at the time of completion of the sale and the sale constitutes a Block Sale:***

(a) unless a Termination Event has occurred and is outstanding, if the HSH Shares have been listed on a recognised stock exchange and the Debtors determine to sell a block of the HSH Shares which is equal to or in excess of 1 per cent. of the total share capital in HSH (a **Block Sale**), the Debtors must give JC Flowers 5 business days prior notice before instructing any professionals to commence marketing for a Block Sale (each such professional being a **Bookbuilder**). Such notice must identify the size of the block of HSH shares which the Bookbuilder will commence marketing (the **Block Size**). For the purposes of this paragraph, **Block Range** means the relevant Block Size plus or minus 0.5% of the total share capital in HSH. If the Trusts or affiliates of JC Flowers do not bind themselves to purchase an amount of the HSH Shares which is within the Block Range, (the terms of which must provide for completion of the sale within 15 business days of such binding agreement) prior to the date on

which the Debtors are entitled to instruct the Bookbuilder(s) to commence marketing the Block Sale, then the Debtors will have the right to sell an amount of HSH Shares which is within the Block Range during the next following 10 business days without the need to offer the HSH Shares to the Trusts or other affiliate of JC Flowers. At the end of the 10 business day period the HSH Shares will be subject once again to the right of first refusal set out in this paragraph;

(b)     if the Debtors are approached on an unsolicited basis by a third party purchaser with an offer to purchase any of the HSH Shares at a time when the HSH Shares have been listed on a recognised stock exchange and the Debtors determine to sell such HSH Shares pursuant to the offer from such third party purchaser, unless a Termination Event has occurred and is outstanding, the Debtors will comply the right of first refusal process set out in "***Sale process and right of first refusal if the HSH Shares are not listed on a recognised stock exchange at the time of completion of a sale***" above. For the avoidance of doubt, if the Debtors determine not to sell the HSH Shares pursuant to the offer from such third party purchaser, the Debtors are under no obligation to notify JC Flowers of such offer and the Debtors may continue to sell the HSH Shares in accordance with paragraph (a) above and/or "***Sale process if the HSH Shares are listed on a recognised stock exchange at the time of completion of the sale and the sale does not constitute a Block Sale***" below.

***Sale process if the HSH Shares are listed on a recognised stock exchange at the time of completion of the sale and the sale does not constitute a Block Sale***: unless a Termination Event has occurred and is outstanding, if the HSH Shares have been listed on a recognised stock exchange and the Debtors determine to instruct one or more professional(s) to sell the HSH Shares in blocks that do not constitute a Block Sale(s), the Debtors must give JC Flowers 5 business days prior notice before any professional(s) are instructed by the Debtors to conduct any such sales. In that notice the Debtors must state how many HSH Shares they are intending to instruct the professional(s) to sell (the Intended HSH Shares). During that 5 business day period, if the Trusts, JC Flowers or its affiliates do not bind themselves to

purchase any or all of the Intended HSH Shares at the listed price for such Intended HSH Shares (the terms of which must provide for completion of the sale within 15 business days of such binding agreement) the Debtors will be entitled to sell any remaining Intended HSH Shares at the listed price without any further obligation to offer the Intended HSH Shares to the Trusts or JC Flowers or its affiliates prior to completing any such sales. If the Debtors decide not to sell the HSH Shares during the relevant 5 business day period to the Trusts, JC Flowers or its affiliates at the listed price for any reason (a Rejected or Withdrawn Sale) then the then current right of first refusal process will cease and, before any further sale can be made by the Debtors under this paragraph the Debtors must offer again (and must continue to offer each time there is a Rejected or Withdrawn Sale) the HSH Shares to the Trusts, JC Flowers or its affiliates using the process set out in this paragraph.

***Sale process if the HSH Shares are to be sold at the time that the HSH Shares are listed on a recognised stock exchange (in other words, at the time the HSH Shares are IPO'd):*** prior to committing to sell the HSH Shares in connection with any IPO process, the Debtors will discuss in good faith with JC Flowers the terms upon which the Debtors may be willing to transfer and sell the HSH Shares to the Trusts, JC Flowers or its affiliates. If no agreement on the purchase price for the HSH Shares is signed with the Trusts or JC Flowers or its affiliates prior to the deadline for the Debtors to commit the HSH Shares to the IPO process, provided that the Agreed Sale Conditions are complied with, the Debtors will be under no obligation to offer the HSH Shares to the Trusts or JC Flowers or its affiliates if the Debtors complete the sale of the HSH Shares as part of the IPO process on the date that the HSH Shares are admitted to listing on a recognised stock exchange. The terms of any agreement for the purchase of the HSH Shares by the Trusts or JC Flowers or its affiliates executed in connection with the provisions of this paragraph shall require that an amount equal to the total purchase price for the HSH Shares will be provided to the Debtors by the Trusts or JC Flowers or its affiliates within 15 business days to be applied in accordance with the "Proceeds of Sale and Cash Received".

| | |
|---|---|
| **32.** **Proceeds of Sale and Cash Received:** | The proceeds of any sale of the HSH Shares or the Relevant Equity Interests (as the case may be) and any other cash of any nature received by any of the Debtors will be applied, *pro rata*, as follows: |

(a) **first** in or towards the payment of all reasonable out-of-pocket costs and expenses of the Lenders and the Facility Agent and Security Trustee (including, without limitation, all legal and other professional costs and expenses (including, without limitation, those of the Liquidators including without limitation, such Liquidators' legal and other professional costs and expenses (together with any default interest accrued to date)));

(b) **secondly**, in or towards the payment of the Exit Fee;

(c) **thirdly**, in or towards the payment of all accrued but uncapitalised interest under the Credit Agreements and under any interest hedging arrangements entered into in connection with the Credit Agreements and which were terminated on or before 19 October 2009 (the **Hedging Arrangements**);

(d) **fourthly**, in or towards the repayment or all principal or close out amounts outstanding under the Credit Agreement and the Hedging Arrangements (including, without limitation, any capitalised interest) and all amounts outstanding under any ;

(e) **fifthly**, in or towards the payment of any Upside Amount owed to the Lenders; and

(f) **sixthly**, to any other person entitled thereto.

Upon a sale of the HSH Shares, and provided that the Secured Obligations are not repaid in full as a result of such sale, the Debtors will be liquidated in a manner determined by the Chapter 11 Committee (in its sole discretion).

33. **Par Amount:**

The **Par Amount** is, at any time, an amount equal to the following payment obligations of the Debtors and/or the Trusts to the Lenders and the Facility Agent at that time:

(a) the aggregate amount of all costs and expenses of the Lenders and the Facility Agent and Security Trustee (including, without limitation, all legal and other professional costs and expenses (including, without limitation, those of the

Liquidators including without limitation, such Liquidators' legal and other professional costs and expenses (together with any default interest accrued to date))) which the Facility Agent has determined (in its sole discretion) should be added to the Par Amount;

(b)    the aggregate amount of any accrued but uncapitalised interest under the Credit Agreements and any Hedging Arrangements;

(c)    the aggregate amount of any outstanding principal or close out amounts under the Credit Agreements and the Hedging Arrangements (including, without limitation, any capitalised interest); and

(d)    the aggregate of any Exit Fees payable.

**34.    Voluntary Prepayment:**    The 7 Debtors can prepay all (but not part) of the Facilities and the Hedging Arrangements by prepaying an amount equal to the Par Amount at any time (and at the same time for each Facility) prior to the end of the Lock-Up Period on not less than 10 business days notice.

Following a Voluntary Prepayment in full and/or the discharge in full of the Secured Obligations the Agreed Sale Conditions will no longer be applicable to the Debtors and, for the avoidance of doubt, the terms of the Credit Agreements and the Hedging Arrangements will no longer be binding on the Debtors.

On a subsequent sale or transfer of:

(a)    the HSH Shares by the Debtors; or

(b)    the Relevant Equity Interests,

the Lenders will receive Upside Amount as per "Upside Amount" below and the terms of the Upside Agreements documenting the Upside Amount will be binding on the Debtors and the Trusts.

**35.    After a Voluntary Prepayment**    After a Voluntary Prepayment of the Par Amount and/or a discharge in full of the Secured Obligations:

(a)    the Trusts will be entitled to appoint and remove their own managers or general partners of the Debtors (as more particularly described in "Control of the Debtors after a Voluntary Prepayment" below);

(b) the Security Trustee will release any security that it holds over the HSH Shares or the Relevant Equity Interests (or any interests in, or assets of, the Debtors) but, for the avoidance of doubt, the HSH Title Documents will remain subject to the custodian arrangements referred to in "HSH Shares Custodian" below;

(c) simultaneously with a sale or disposal of the HSH Shares or the Relevant Equity Interests (as the case may be) to a third party purchaser:

    (i) the Lenders will receive any Upside Amount due to them as a result of the sale or disposal; and

    (ii) the HSH Shares Custodian will, in accordance with the custodian agreement in respect of the HSH Shares, release the HSH Share Title Documents to the relevant third party purchaser; and

(d) the Debtors and the Trusts may only dispose of the HSH Shares or the Relevant Equity Interests:

    (i) to a related party of the Debtors, Trusts or JC Flowers (or any further related party of that related party) provided that such party agrees to be bound by the terms of the Restructuring Documents that relate to Upside Amount to the satisfaction of the Facility Agent; or

    (ii) to:

        (A) an unrelated party of the Debtors, Trusts or JC Flowers; or

        (B) any unrelated party of any related party to whom the HSH Shares or Relevant Equity Interests have previously been transferred to,

if, in each case, such transfer is made on arm's length terms and for market value (unless the Facility Agent has otherwise given its prior written consent on the basis of a full disclosure (to the satisfaction of the Facility Agent) as to all of the commercial terms of the transfer).

**36. Control of the Debtors after a Voluntary Prepayment:**

Following a Voluntary Prepayment:

(a) in respect of any Alberta Debtor, the management duties of the relevant Cayman GP (and any partnership interest held by such Cayman GP) shall be transferred (on terms satisfactory to such Cayman GP) to a newly appointed general partner of that Alberta Debtor appointed by the relevant Trust (or JC Flowers) and the relevant Cayman GP in accordance with the terms of the relevant limited partnership agreement. In such event, the relevant Cayman GP will withdraw from the Alberta Debtor and the Chapter 11 Committee and the Facility Agent will thereafter retain the following two rights (as well as the right to veto or disapprove, any amendment, waiver, limitation or termination of such rights):

 (i) withhold consent to the sale of the HSH Shares and a sale of the Relevant Equity Interests only if they are not reasonably satisfied that the total sale proceeds will be paid to a bank account of a third party agent appointed by both the Debtors and the Lenders who has unconditional instructions from the Debtors and/or the Trusts to pay any Upside Amount due to the Lenders directly to the Lenders before any remaining proceeds are paid to the Debtors or the Trusts; and

 (ii) consent to the granting of security over any assets of any Alberta Debtor (and the Trust may not grant any security over the Relevant Equity Interests to any third party financier of any Alberta Debtor or the Trust where the secured obligations (in aggregate) exceed the Par Amount with respect to the facilities borrowed by the relevant Alberta Debtor or Trust).

Additionally a limited partnership agreement may not be amended to the extent that the relevant amendment changes or is inconsistent with any of the consent rights referred to in this paragraph;

(b) in respect of the Delaware Debtor, The HSH AIV 4 Trust will have the ability to replace the management of the Delaware LLC but PlanCo

SPV, the Chapter 11 Committee and the Facility Agent will thereafter retain the following two rights (as well as the right to veto or disapprove, any amendment, waiver, limitation or termination of such rights):

(i)    withhold consent to the sale of the HSH Shares and a sale of the Relevant Equity Interests only if they are not reasonably satisfied that the total sale proceeds will be paid to a bank account of a third party agent appointed by both the Debtors and the Lenders who has unconditional instructions from the Debtors and/or the Trusts to pay any Upside Amount due to the Lenders directly to the Lenders before any remaining proceeds are paid to the Debtors or the Trusts; and

(ii)    consent to the granting of security over any assets of the Delaware Debtor and the Trust may not grant any security over the Relevant Equity Interests to any third party financier of the Delaware Debtor or the Trust where the secured obligations (in aggregate) exceed the Par Amount with respect to the facilities borrowed by the Delaware Debtor or Trust.

Additionally a limited partnership agreement may not be amended to the extent that the relevant amendment changes or is inconsistent with any of the consent rights referred to in this paragraph; and

(c)    in respect of the Luxembourg Debtors, the Trust will have the ability to replace the management of the Luxembourg Fund II Debtor but the Facility Agent and, in the case of the Luxembourg Fund II Debtor, PlanCo SPV, will thereafter retain the following two rights (as well as the right to veto or disapprove, any amendment, waiver, limitation or termination of such rights):

(i)    withhold consent to the sale of the HSH Shares and a sale of the Relevant Equity Interests only if they are not reasonably satisfied that the total sale proceeds will be paid to a bank account of a third party agent appointed by both the Debtors and

the Lenders who has unconditional instructions from the Debtors and/or the Trusts to pay any Upside Amount due to the Lenders directly to the Lenders before any remaining proceeds are paid to the Debtors or the Trusts; and

(ii)    consent to the granting of security over any assets of the Luxembourg Fund II Debtor and the Trust may not grant any security over the Relevant Equity Interests to any third party financier of the Luxembourg Fund II Debtor or the Trust where the secured obligations (in aggregate) exceed the Par Amount with respect to the facilities borrowed by the Luxembourg Fund II Debtor or Trust.

Additionally the constitutional documents of the Luxembourg Fund II Debtor may not be amended to the extent that the relevant amendment changes or is inconsistent with any of the consent rights referred to in this paragraph.

| 37. | HSH Shares Custodian: | *Prior to a Voluntary Prepayment:* if the Security Trustee is not granted security over the HSH Shares following an approach to the other shareholders of HSH in accordance with the settlement terms, all HSH Share Title Documents will be physically deposited with a third party custodian (the **HSH Shares Custodian**). |

The HSH Shares Custodian will be bound by the terms of a custodian agreement which will only allow for the HSH Share Title Documents to be released to a party on a sale or transfer of the HSH Shares in accordance with the Agreed Sale Conditions. If the Security Trustee is granted security over the HSH Shares then there will be no need for a physical custodian arrangement as the Security Trustee will hold the HSH Share Title Documents.

*Following a Voluntary Prepayment:* following a Voluntary Prepayment in full and/or the discharge in full of the Secured Obligations, the custodian agreement will not allow for the HSH Share Title Documents to be released to a party on a sale or transfer of the HSH Shares unless the total proceeds will be paid to a bank account of a third party agent appointed by both the Debtors and the Lenders who has unconditional instructions from the Debtors and/or the Trusts to pay any Upside Amount due to the Lenders directly to the Lenders before any

remaining proceeds are paid to the Debtors or the Trusts.

The custodian agreement will also contemplate that subject to the consent of the Facility Agent, security may be granted to a third party financier(s) of the Debtors.

**PRICING AND UPSIDE**

| | | |
|---|---|---|
| **1.** | **Facility Agent's Fee:** | To be agreed. |

**2.**   **Exit Fee:**

An amount equal to 2.50 per cent. of the aggregate amounts referred to in paragraphs (b) and (c) of the definition of Par Amount and payable on the earlier to occur of:

(a)     a Voluntary Prepayment; and

(b)     a sale or other disposal of the HSH Shares or Relevant Equity Interests or a liquidation or merger (including, without limitation, as a result of any law, regulation or other binding judicial or governmental order or action) which results in a Debtor or Trust receiving cash in connection with such sale, disposal, liquidation or merger.

**3.**   **Margin:**

The Margin will increase to 6.00 per cent. per annum. This increase will apply retrospectively on and from 1 February 2009 as though applied in accordance with "Interest Capitalisation" below.

**4.**   **Upside Amount:**

*Prior to a Voluntary Prepayment:* on a sale or other disposal of the HSH Shares and/or the Relevant Equity Interests prior to a Voluntary Prepayment the Lenders will be entitled to receive an amount equal to 50 per cent. of the net proceeds received from that sale or other disposal which exceeds the aggregate of the Par Amount.

*After a Voluntary Prepayment:* on a sale or other disposal of the HSH Shares and/or the Relevant Equity Interests after a Voluntary Prepayment the Lenders will be entitled to receive:

(a)     if contracts for that sale or disposal exchange within 6 months of the Voluntary Repayment, an amount equal to 50 per cent. of the net proceeds received from that sale or other disposal which exceeds the aggregate of the Par Amount; or

(b)      if contracts for that sale or disposal exchange on any day falling after 6 months of the Voluntary Prepayment, an amount equal to 25 per cent. of the net proceeds received from that sale or other disposal which exceeds the Par Amount.

The Upside Amount obligations will be documented contractually between the Debtors, the Trusts and the Lenders.

**5.**      **Interest Capitalisation:**      The rate of interest payable on the indebtedness outstanding under each Credit Agreement for each Interest Period will be the aggregate of:

(a)      the Margin; and

(b)      EURIBOR.

Each Interest Period will be 6 months with the first Interest Period commencing retrospectively on 1 February 2009 and each subsequent Interest Period commencing on the first day after the end of the previous Interest Period. On the last day of each Interest Period accrued interest will be capitalised and added to the principal amounts outstanding under each Credit Agreement.

**6.**      **Mandatory costs:**      As is the case in the current Credit Agreements the rate of interest payable will be increased to reflect the cost of complying with any applicable regulatory requirements of the Bank of England, the Financial Services Authority, the European Central Bank or any other relevant regulatory authority.

**7.**      **Hedging Arrangements:**      The documents in respect of the Hedging Arrangements will be amended to provide:

(a)      that, except as set out below, the terms are consistent with this summary of terms;

(b)      that the close out amounts become payable in a manner consistent with the payment of amounts payable under the Credit Agreements; and

(c)      that (i) the amounts of interest accruing on the close out amounts under the Hedging Arrangements, from the date that such Hedging Arrangements were closed out up to the Restructuring Effective Date, will be determined in a manner consistent with such Hedging

Arrangements as in effect prior to the Restructuring Effective Date; and (ii) the amount of interest accruing on the close out amounts under the Hedging Arrangements, from and after the Restructuring Effective Date, will be the same as that accruing on amounts outstanding under the Credit Agreements (and will accrue in the same manner).

## FINANCE DOCUMENTS, SECURITY AND CONDITIONS TO THE RESTRUCTURING EFFECTIVE DATE

**1.** **Finance Documents:** The terms of each Credit Agreement will be amended to the extent necessary or desirable in order to reflect the terms of this summary of terms (including, without limitation and as required by the Facility Agent, in order to include contractual provisions in each Credit Agreement to reflect the structure of each Debtor outlined in this summary of terms).

Each Credit Agreement will be amended and restated by way of a supplemental agreement.

A list of all documentation required to be entered into in order to effect the terms set out in this summary of terms is attached as Annex 2 (Documentation Summary).

**2.** **Provision of support to the Co-Invest Debtors:**

(a) Each Fund II Debtor will provide a shortfall guarantee in respect of the obligations of each Co-Invest Debtor such that to the extent that the proceeds of sale in respect of the HSH Shares held by the Co-Invest Debtors or the Relevant Equity Interests in the Co-Invest Debtors are insufficient to discharge the Secured Obligations of the Co-Invest Debtors (a **Shortfall**) the Fund II Debtors will be jointly and severally liable for that Shortfall. Shortfall must be paid prior to any calculation of Upside Amount.

(b) Payment of the Shortfall will constitute a Secured Obligation of the Fund II Debtors.

(c) To the extent that the HSH Shares held by the Fund II Debtors or the Relevant Equity Interests in any Fund II Debtors are disposed of prior to the HSH Shares held by the Co-Invest Debtors or the Relevant Equity Interests in the Co-Invest Debtors, any excess proceeds from such disposal

will be held in an account of the Security Trustee and charged in favour of the Security Trustee pending the disposal of the Co-Invest Debtor interests referred to above following which a determination of whether a Shortfall has arisen and the amount of the Upside Amount can be made.

(d)   Following such determination to the satisfaction of the Security Trustee, the excess proceeds will be applied in accordance with "Proceeds of Sale and Cash Received" above.

**3.   Termination Events:**   From the Restructuring Effective Date the Facility Agent will be entitled to immediately terminate the Lock-Up Period and/or put the Facilities and the Hedging Arrangements on demand if any of the following occur:

(a)   subject to a 10 business day grace period for any remediable failure to comply (if prior to the expiry of the 10th business day the Facility Agent is reasonably satisfied that the relevant Trust is acting in good faith to remedy the failure, such grace period shall be extended for a further 5 business days), any Trust fails to comply in any respect with any term or any of its undertakings, agreements or obligations under (i) the Plan; (ii) any contractual agreements entered into in order to document any conditions set out in this summary terms (including, without limitation, any document listed in Annex 2 (Documentation Summary)); (iii) any Settlement Agreement; (iv) the amended limited partnership agreements; or (v) any amended articles of association or equivalent of any Debtor or the Delaware LLC (together the **Restructuring Documents**);

(b)   subject to a 10 business day grace period for any circumstances that give rise to a remediable misrepresentation (if prior to the expiry of the 10th business day the Facility Agent is reasonably satisfied that the relevant Trust is acting in good faith to remedy the circumstances that give rise to such remediable misrepresentation, such grace period shall be extended for a further 5 business days), where a representation, warranty, certification or statement made or repeated by any Trust in or in connection with the Restructuring Documents, or in any document delivered by or on behalf of the relevant Trust under or in

connection with the Restructuring Documents is incorrect in any respect when made or deemed to be made or repeated;

(c)     it is or becomes unlawful for any Debtor or Trust to perform any of its obligations under any Restructuring Document;

(d)     any Restructuring Document is not effective in accordance with its terms or is alleged by any Trust to be ineffective in accordance with its terms for any reason provided that:

   (i)     in respect of any ineffective Restructuring Document that can be remedied without the co-operation of the Lenders and/or the Trusts, there will be a 10 business day grace period to remedy such ineffectiveness (if prior to the expiry of the 10th business day the Facility Agent is reasonably satisfied that the relevant Trust is acting in good faith to remedy the ineffectiveness, such grace period shall be extended for a further 5 business days); and

   (ii)    in respect of any other ineffective Restructuring Document no Termination Event will occur if such ineffective Restructuring Document can be remedied with the co-operation of the Lenders and/or the Debtors and the Lenders and/or the Debtors fail to provide such co-operation in order to remedy such ineffectiveness (but, for the avoidance of doubt, if the Trusts fail to co-operate in a timely and reasonable manner a Termination Event will occur);

(e)     any Trust repudiates a Restructuring Document;

(f)     by the mutual written consent of the Lenders, the Trusts and the Debtors;

(g)     upon an application by, or any step is taken by any of the Trusts or any other person (other than a Debtor or a Lender except where the Lenders are entitled to do so as a result of the exercise of any right to put the Facilities on demand) for the dissolution of any of the Debtors or with a view to

commencing any liquidation, administration, receivership or any other insolvency related proceeding (or analogous proceedings in any other jurisdiction), whether voluntary or involuntary;

(h)    unless otherwise consented to by the Facility Agent, upon the taking of any steps by the Trusts or JC Flowers (or any affiliate of JC Flowers or the Trusts) with a view to commencing any litigation or court proceedings against the Debtors, the Lenders, the general partners, the Liquidators, any director or manager of any Debtor or any of their respective professional advisers in respect of any of the matters contemplated by the Plan, the Restructuring Documents or this summary of terms or the negotiation or documentation thereof.

**4.    Restructuring Document covenants and/or terms:**    In addition to the current obligations of the Debtors in the Credit Agreements, the Restructuring Documents will include the following (non-exhaustive) list of covenants and/or terms in the appropriate places in the appropriate Restructuring Documents:

(a)    other than as permitted after a Voluntary Prepayment and/or a discharge in full of the Secured Obligations, no changes to the managers of any Debtor will be permitted without the consent of the Facility Agent;

(b)    other than as permitted after a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, the Plan will state that the Alberta Debtors will be managed by the Cayman GPs and that the other Debtors will be managed by professional managers appointed in accordance with the constitutional documents (as amended) of the relevant Debtor;

(c)    no Trust, Debtor, JC Flowers (or any affiliate thereof) may make take any steps with a view to dissolving or commencing any liquidation, administration, receivership or other insolvency related proceeding (or analogous proceedings in any jurisdiction) whether voluntary or involuntary in respect of any Debtor without the approval of the Chapter 11 Committee;

(d)    unless otherwise consented to by the Facility

Agent, no Trust, Debtor, JC Flowers (or any affiliate thereof) may take any steps with a view to commencing any litigation or court proceedings against the Debtors, the Lenders, the general partners of the Debtors, the Liquidators, any director or manager of any Debtor or any of their respective professional advisers in respect of any of the matters contemplated by the Plan, the Restructuring Documents or this summary of terms or the negotiation or documentation thereof;

(e)     each Trust must, at least 2 months before the date of expiry of any Security Power of Attorney or any other power of attorney provide the Facility Agent and any attorneys appointed thereunder with an original executed replacement of that Security Power of Attorney or any other power of attorney;

(f)     no Trust may make any application to, or take any steps to, stay the liquidation of any Cayman GP or remove the Liquidators from office;

(g)     no Trust, or beneficiary of the Trust, may make any application to, or take any steps to, terminate any Trust;

(h)     each limited partner in each Debtor which is a limited partnership will agree that specific performance and/or an injunction to compel performance are the appropriate remedies for any breach by that limited partner of any term of any limited partnership agreement, that it will not oppose any claim for specific performance brought by another partner in that limited partnership as a result of any such breach and that damages are an inadequate and inappropriate remedy;

(i)     the Liquidators remain at liberty to seek directions from the Cayman Court in respect of a discharge of their duties (and nothing in the Restructuring Documents is intended to supersede any authorisations/statutory compliance required of the Liquidators) and obligation of the Liquidators to act subject to the consent rights of the Chapter 11 Committee is subject to the liquidation committee of the relevant Cayman GP providing this same consent;

(j)  the relevant parties (including, without limitation, the Trusts and the shareholder of HSH Cayman I GP Ltd) will support and consent to the Cayman Court Applications;

(k)  the Cayman Trusts will not seek dissolution of the Alberta Debtors and acknowledge that dissolution would not be in the best interests of the Alberta Debtors and would impair compliance with the Restructuring Documents;

(l)  prior to a Voluntary Prepayment in full and/or the discharge of the Secured Obligations in full, no disposal by the Trusts of the Relevant Equity Interests without the consent of the Lenders;

(m)  at any time when David Morgan (or any other employee or partner of JC Flowers (or any of its affiliates)) is on the supervisory board of HSH, each Trust will provide to the Facility Agent:

(i)  without violating David Morgan's confidentiality obligations as a member of the supervisory board of HSH, a written monthly update in respect of the investment of each Debtor in HSH and in particular any matters discussed at supervisory board level (including, without limitation, any plans for an IPO of HSH and/or any other views and/or plans that JC Flowers may have in respect of a disposal of the HSH Shares or Relevant Equity Interests); and

(ii)  if requested by the Facility Agent, no more often than every three months, a conference call between David Morgan (or any replacement who is a partner or employee of JC Flowers or any of its affiliates) and the Lenders to discuss matters in respect of HSH generally; and

(n)  no amounts recoverable by the Lenders from any Alberta Debtor under any Restructuring Document shall exceed the maximum amount permitted under section 347 of the Federal Criminal Code in Canada and amounts recoverable will be reduced to the extent necessary to comply with section 347; and

(o)     the Debtors will, at the request of the Trusts, consider whether they can vote positively to discharge any of Ravi Sinha, James Christopher Flowers or David Morgan in respect of their duties as members of the supervisory board of HSH to the extent such a motion is presented at any general meeting of the shareholders of HSH but the Debtors will be under no obligation to vote positively in respect of such motion, and, to the extent that they chose not to do so, will not vote in respect of any such motion.

The Facility Agent may, in its absolute discretion, waive compliance with any of the above covenants and/or terms.

5.    **Chapter 11 Committee:**    The Plan will provide that a Chapter 11 Committee will be put in place to oversee the Plan. Details of the Chapter 11 Committee are set out in Annex 1 (Chapter 11 Committee).

6.    **Settlement Agreements:**    Each Luxembourg Debtor and its relevant Trust shareholder and each Cayman GP and its equity holder will enter into a contractual settlement agreement with the Lenders and, to the extent relevant, PlanCo SPV (as applicable) which will append the Plan and under which the relevant parties will agree (among other things) to implement the terms of the Plan and to grant the releases set out in the Plan.

7.    **Available Cash:**    **Available Cash** is, in respect of each Debtor, the aggregate of the following amounts of cash and cash equivalents:

(a)     the aggregate amount held in each bank account of that Debtor; and

(b)     the aggregate amount (if any) distributed by that Debtor to any Trust since the date that the last payment of interest was made to the Facility Agent under a Credit Agreement during the course of 2008.

On the Restructuring Effective Date all Available Cash of a Debtor will be applied against the following obligations:

(a)     **first**, in payment of that Debtor's pro rata share of all fees, costs and expenses of the Lenders, Facility Agent and The Royal Bank of Scotland plc (as co-ordinator) incurred in connection with

the enforcement by the Lenders and the Facility Agent of their rights under the Credit Agreements and the implementation of the terms and conditions contemplated by this summary terms (including, without limitation, all legal fees of counsel to the Lenders and the Facility Agent, the Liquidators (and the fees of their legal counsel) and the fees of Ernst & Young, appointed by the co-ordinator as a professional expert, together in each case with any accrued default interest);

(b)     **secondly**, to pay all amounts owed to third party creditors of the Debtors who are not Lenders;

(c)     **thirdly**, to fund a reserve for the purposes of:

(i)     meeting any claims on the indemnities under the Credit Agreements, including, without limitation, the Facility Agent's claim to be reimbursed the costs of the Liquidators remaining in office together with their advisors and the Alberta Debtors and the relevant Trusts acknowledge and accept that such costs and expenses of the Liquidators are covered by the indemnities in the Credit Agreement ; and

(ii)     funding the general day-to-day costs and expenses of maintaining all of the Debtors, PlanCo SPV and the Delaware LLC (including, without limitation, for the purposes of paying the fees, costs and expenses of any professional managers appointed to manage any Debtor, PlanCo SPV and Delaware LLC); and

in each case for a period of 6 years from the Restructuring Effective Date;

(d)     **fourthly**, towards payment of accrued and capitalised interest of that Debtor under the Credit Agreement of that Debtor; and

(e)     **fifthly**, towards repayment of principal amounts outstanding under the Credit Agreement of that Debtor.

Prior to the restructuring contemplated by this summary terms being implemented, the Facility Agent will have the

right to have independent professionals audit the accounts of each Trust and Debtor to verify cash and cash equivalent positions. The reasonable costs actually incurred by the Facility Agent in connection with such audit shall be reimbursed to the Facility Agent by the Debtors under "first" as set out in paragraph (a) above.

8. **Security and Secured Obligations:**

The Lenders, via the Security Trustee, will have the benefit of the security over the following assets (the **Security**) for the purposes of securing the Secured Obligations:

(a) all shares in each Luxembourg Debtor and each general partner of each other Debtor;

(b) all YFCPECs issued by each Luxembourg Debtor;

(c) all limited partnership interests in each Debtor which is a limited partnership; and

(d) to the extent possible following the reasonable commercial efforts of the Trusts and JC Flowers, the HSH Shares held by each Debtor (or, following a listing of the HSH Shares on a recognised stock exchange, in any event).

The **Secured Obligations** are all present and future obligations and liabilities (whether actual or contingent and whether owed jointly or severally or in any other capacity whatsoever) of the Debtors and the Trusts to any Lender under any Restructuring Document (other than, after a Voluntary Repayment in full, in respect of any Upside Amount).

*German circumvention:* the Security over the shares in each Luxembourg Debtor and each general partner and over each limited partnership interest will be expressed to only be enforceable if it is done in compliance with the articles of association of HSH.

*Delaware UCC recognition:* The interests in the Delaware LLC and the Delaware Debtor will become certificated securities for the purposes of the Delaware UCC Article 8.

9. **Supervisory Board of HSH:**

The Facility Agent will determine whether representatives of JC Flowers will continue to sit on the supervisory board of HSH. Until the Lenders are "in situ" they are unable to determine what is best for the HSH Shares. In the interim David Morgan will stay on the supervisory board of HSH.

To this end each other shareholder of HSH which is managed directly or indirectly by JC Flowers will enter into an agreement with the Debtors and the The HSH AIV I Trust under which they will each agree to support and/or propose as may be required any person who the Debtors propose to sit on the supervisory board of HSH in lieu of David Morgan (the **Supervisory Board Seat Agreement**).

| 10. | **Documentary conditions precedent:** | Conditions precedent must be completed to the satisfaction of the Facility Agent in order for the Restructuring Effective Date to occur and will include the following documents and evidence: |

(a)    copies of relevant constitutional documents and corporate authorities approving the terms of the Restructuring Documents and, in particular, the Agreed Sale Conditions and, in the case of the constitutional documents, amended in accordance with the provisions related to Debtor structure set out above;

(b)    specimen signatures of authorised signatories;

(c)    evidence of the appointment of any process agents required;

(d)    all relevant capacity opinions from lawyers in the jurisdiction of incorporation of the Debtors and the Trusts and, to the extent relevant, the governing law of each Restructuring Document and all relevant enforceability opinions in relation to the Finance Documents;

(e)    evidence that all Available Cash has been applied in accordance with "Available Cash" above;

(f)    certification of copy documents;

(g)    an original copy of each Restructuring Document;

(h)    evidence that the Debtors and the Trusts have used their reasonable commercial efforts with the other shareholders in HSH to get their consent to the granting of security over the HSH Shares in favour of the Security Trustee;

(i)    if no security is granted by the Debtors directly over the HSH Shares, receipt by the HSH Shares

Custodian of all HSH Share Title Documents;

(j)     receipt by the Security Trustee of:

(i)     if security is granted by the Debtors directly over the HSH Shares, of all HSH Share Title Documents; and

(ii)    all original title documents held by JC Flowers/the Debtors/the Trusts in respect of the Relevant Equity Interests (including, without limitation, all originals of all documents that may be required in order to effect a transfer of the Relevant Equity Interests and a certification of the partner interests in the Delaware Debtor explicitly reflecting the "opt-in" to the UCC together with stock powers) (the **Relevant Equity Interest Title Documents**);

(k)     receipt by the Security Trustee of all original Security Powers of Attorney;

(l)     to the extent permitted by applicable law, the originals of all books and records and other management and correspondence files of each Debtor;

(m)     no regulatory authority or body (including, without limitation, BaFin) has objected to the transaction contemplated by this summary terms;

(n)     confirmation that the Facility Agent is satisfied with any independent professional audit of the accounts of each Trust, and/or Debtor requested by the Lenders in order to verify the cash and cash equivalent positions of the Trusts and/or Debtors and the nature of any transfers of cash and cash equivalents by the Debtors in the 2 years prior to the filing of the voluntary chapter 11 bankruptcies or conversion into chapter 11 bankruptcies by the Debtors;

(o)     copies of all HSH Constitutional Documents;

(p)     confirmation from counsel acting for the Lenders and/or the Liquidators in Alberta, Canada that the New GP, has withdrawn from each such Debtor and has been removed from the partnership

certificate of each Alberta Debtor together with a copy of a search of the Alberta limited partnership register showing that the New GP has been removed from each Alberta Debtor;

(q)     an original copy of an agreement signed by JCF HSH (DE) GP LP confirming that it has no present or future claim of any nature against, and releasing any claim of any nature against, any Debtor, Trust, Liquidator, Lender or the Facility Agent, renouncing any future claim of any nature that it may have against any Debtor, Trust, Liquidator, Lender or the Facility Agent, covenanting not to commence any proceedings against any of the foregoing, acknowledging the importance of the release and confirming that it has obtained or had access to independent legal advice in respect of both the Plan and the releases contemplated under this paragraph (q);

(r)     a copy of the directions/orders of the Cayman Grand Court following the making of each Cayman Court Application;

(s)     a copy of an order of the Alberta court recognising the Plan and the Chapter 11 Committee;

(t)     the appointment of Ian Stokoe and David Walker (or such other managers as may be determined by the Facility Agent) as professional managers of the Luxembourg Fund II Debtor and the Delaware LLC;

(u)     evidence that PlanCo SPV owns the relevant equity interests to be transferred/issued to it in accordance with the Debtor structure above;

(v)     evidence that all other creditors of the Debtors have been (or will be, on the Restructuring Effective Date) paid out of the Available Cash or otherwise;

(w)     bank mandates giving the new professional managers of the Debtors / Liquidators sole signing rights to all bank accounts of the Debtors, confirmation that the only banks accounts of the Debtors are those held by the Debtors with JP Morgan in Delaware and confirmation from JP Morgan as account bank to the Debtors that no

other person has signatory rights to any bank account of the Debtors held at JP Morgan; and

(x) such amendments to the YFCPEC documents and any consequent subordination agreements determined as necessary or desirable following a review of the YFCPEC documents;

(y) removal of all current court actions in respect of the Alberta Debtors in Alberta, Canada;

(z) to the extent required, evidence that any consents to any actions required under the Restructuring Documents or to enter into the Restructuring Documents have been provided by the Trusts and/or their beneficiaries;

(aa) an executed copy of the Supervisory Board Seat Agreement; and.

(bb) releases and exculpations of liability which reflect those agreed in the Plan (including those set out in section 10.3 of the Plan) will be included in the relevant Restructuring Agreements.

| | |
|---|---|
| **11. Information, further assurances and co-operation undertakings:** | The Debtors, the Trusts and JC Flowers will co-operate and work collaboratively and in good faith with the Facility Agent, the Lenders and the Liquidators in order to (1) put in place the provisions contemplated by this summary of terms; (2) for the purposes of (1) above and also to the extent required by the Lenders for the purposes of any subsequent sale or transfer of the HSH Shares or any Relevant Equity Interests, assist in discussions with (a) HSH itself; (b) the other shareholders of HSH; (c) the EU in connection with any and all on-going or future investigations; (d) the German financial regulators (and any other relevant financial regulators); and (e) and any other stakeholders the Lenders deem relevant. Additionally if the Debtors (or the attorneys under any powers of attorney) choose to effect a sale or transfer of the HSH Shares or any Relevant Equity Interests in accordance with the Agreed Sale Conditions each of the Trusts and JC Flowers will undertake not to disrupt that process in any way. |

The Debtors, the Trusts and JC Flowers will also, subject to confidentiality constraints (and the Debtors, the Trusts and JC Flowers will use their reasonable endeavours to overcome any relevant confidentiality constraints), provide full visibility on all relevant information

regarding the Debtors and the Trusts and JC Flowers' role in respect of the Debtors and the Trusts so far as it is relevant to the HSH Shares..

| | | |
|---|---|---|
| **12.** | **Expenses:** | All legal and other expenses (including, without limitation, other professional expenses) incurred by the Facility Agent, the Lenders and the Liquidators in connection with the negotiation, preparation, printing, execution, enforcement and any amendment of the Restructuring Documents will be for the relevant Debtor's account, whether or not the Restructuring Effective Date occurs. |

## ANNEX 1

## CHAPTER 11 COMMITTEE

(a)      The key terms in relation to the Chapter 11 Committee are summarized below.

(b)      <u>Creation and dissolution</u>

      (i)      The Plan will provide for the creation and subsequent termination of the Chapter 11 Committee.

      (ii)      The Chapter 11 Committee will stay in place not only until the Secured Obligations have been satisfied and any Upside Amount paid but until the expiry of any period within which the payments to the Lenders could be challenged.

(c)      <u>Membership</u>

      (i)      The Lenders will be the members of the Chapter 11 Committee.

      (ii)      The Plan will explain how the members of the Chapter 11 Committee are selected, removed and replaced.

(d)      <u>Governance</u>

      The provisions dealing with the governance of the Chapter 11 Committee will be dealt with by way of a private co-ordination agreement between the Lenders.

(e)      <u>Scope/Powers</u>

      These will be set out in the Plan and will include:

      (i)      consent rights in respect of the matters expressly referred to in this summary of terms;

      (ii)      oversight to ensure that, prior to a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, any sale of the HSH Shares or Relevant Equity Interests pursuant to the Plan is made in accordance with the Agreed Sale Conditions;

      (iii)      oversight of the implementation of the Plan to ensure that the Debtors are performing their obligations in accordance with the Plan and that the Debtors are being managed in accordance with the Plan;

      (iv)      prior to a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, a veto right in respect of any person proposed by the relevant Debtor to be that Debtor's representation on the supervisory board of HSH;

      (v)      an independent standing to appear and be heard in the Delaware bankruptcy court as to any matter relating to the Plan, the estates or the Debtors, including any matter as to which the Delaware bankruptcy court has retained jurisdiction pursuant to the Plan; and

(vi)    the power to perform such additional functions as may be agreed to by the Debtors or contemplated in the any Confirmation Order or any other order entered into in connection with the Plan; and

(vii)    prior to a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations a veto right in respect of the appointment, removal or replacement of any manager of any Debtor or the Delaware LLC.

(f)    <u>Expenses and compensation</u>

We do not expect that the Chapter 11 Committee will have any costs and expenses as a result of the existence of the Chapter 11 Committee. Any costs and expenses it would have will fall under the costs and expenses provisions in the Finance Documents.

(g)    <u>Liability</u>

Liability of the Chapter 11 Committee members will be limited to gross negligence, wilful misconduct, bad faith or fraud which has been finally determined by a court of competent jurisdiction.

(h)    <u>Indemnity</u>

The Debtors' estates will indemnify and hold harmless the Chapter 11 Committee, its members, and its professionals and agents from and against any and all liabilities, expenses, claims, damages or losses incurred by them as a direct result of acts or omissions taken by them in good faith in their capacities as members of, or professionals or agents for, the Chapter 11 Committee (excepting those resulting from gross negligence, wilful misconduct, bad faith or fraud).

**ANNEX 2**

**DOCUMENTATION SUMMARY**

Capitalized terms not otherwise defined in Schedule 1 to this Documentation Summary shall have the meanings given to such terms in the Term Sheet. This Documentation Summary is not an exhaustive or exclusive list of all documents contemplated to be entered into, issued or delivered pursuant to the Term Sheet.

**CONTENTS**

A :             Key Finance / Restructuring Documents ............................................. C-54

B :             Common Control Structure Documents ................................................ C-58

C :             Specific Control Structure Documents ................................................ C-63

D :             Regulatory / Equitable Subordination Documents ............................... C-84

E :             Taxation ............................................................................................. C-85

F :             PlanCo Incorporation Process.............................................................. C-86

Schedule 1:    Definitions........................................................................................... C-88

**A:**     **KEY FINANCE / RESTRUCTURING DOCUMENTS**

| | DOCUMENT | PARTIES |
|---|---|---|
| 1. | Alberta I Amended and Restated Facilities Agreement | (1) Alberta I<br><br>(2) Lenders<br><br>(3) Facility Agent<br><br>(4) Security Trustee<br><br>(5) Arranger |
| 2. | Alberta II Amended and Restated Facilities Agreement | (1) Alberta II<br><br>(2) Lenders<br><br>(3) Facility Agent<br><br>(4) Security Trustee<br><br>(5) Arranger |
| 3. | Alberta V Amended and Restated Facilities Agreement | (1) Alberta V<br><br>(2) Lenders<br><br>(3) Facility Agent<br><br>(4) Security Trustee<br><br>(5) Arranger |

| | DOCUMENT | PARTIES |
|---|---|---|
| | | (6) Fund II Debtors in their capacities as guarantors |
| 4. | Alberta Coinvest Amended and Restated Facilities Agreement (to include shortfall guarantee in favour of the Finance Parties in relation to the obligations of Alberta Coinvest) | (1) Alberta Coinvest <br><br> (2) Lenders <br><br> (3) Facility Agent <br><br> (4) Security Trustee <br><br> (5) Arranger |
| 5. | Delaware Debtor Amended and Restated Facilities Agreement | (1) Delaware Debtor <br><br> (2) Lenders <br><br> (3) Facility Agent <br><br> (4) Security Trustee <br><br> (5) Arranger |
| 6. | Luxembourg Fund II Debtor Amended and Restated Facilities Agreement | (1) Luxembourg Fund II Debtor <br><br> (2) Lenders <br><br> (3) Facility Agent <br><br> (4) Security Trustee <br><br> (5) Arranger |

|  | DOCUMENT | PARTIES |
|---|---|---|
| 7. | Luxembourg Co-Invest Debtor Amended and Restated Facilities Agreement (to include shortfall guarantee in favour of the Finance Parties in relation to the obligations of Luxembourg FundII Debtor) | (1) Luxembourg Co-Invest Debtor<br><br>(2) Lenders<br><br>(3) Facility Agent<br><br>(4) Security Trustee<br><br>(5) Arranger<br><br>(6) Fund II Debtors in their capacities as guarantors |
| 8. | Upside Sharing Agreement | (1) Lenders<br><br>(2) Facility Agent<br><br>(3) Alberta Debtors<br><br>(4) Delaware Debtor<br><br>(5) Luxembourg Debtors<br><br>(6) Cayman Trusts<br><br>(7) Delaware Limited Partner<br><br>(8) Luxco Shareholders<br><br>(9) PlanCo SPV |
| 9. | Amendment agreements to the interest rate swap agreements | (1) The relevant Lenders<br><br>(2) Alberta Debtors |

| | DOCUMENT | PARTIES |
|---|---|---|
| | | (3) Delaware Debtor |
| | | (4) Luxembourg Debtors |

**B:     COMMON CONTROL STRUCTURE DOCUMENTS**

| | DOCUMENT | PARTIES |
|---|---|---|
| ❖ **Complementary Safeguard Measures** | | |
| 1. | Complementary Safeguard Measures Agreement/Custodian Agreement in relation to the deposit of all HSH Share Title Documents | (1) Custodian<br><br>(2) Lenders<br><br>(3) Facility Agent<br><br>(4) Security Trustee<br><br>(5) Alberta Debtors<br><br>(6) Delaware Debtor<br><br>(7) Luxembourg Debtors<br><br>(8) Cayman Trusts<br><br>(9) Delaware Limited Partner<br><br>(10) Luxco Shareholders<br><br>(11) PlanCo SPV |
| 2. | To the extent applicable under the settlement terms of the Term Sheet, creation of two global notes (*Globalurkunden*) to replace the existing single global note in respect of all the shares in HSH.  The first | N/A |

| | | DOCUMENT | PARTIES |
|---|---|---|---|
| | | global note to represent/certify the HSH Shares to be pledged, the second global note to represent/certify the remaining shares in HSH | |
| ❖ | **Establishment of Chapter 11 Committee** | | |
| 3. | | Chapter 11 Committee by-laws | Chapter 11 Committee |
| ❖ | **Recognition Documents / Settlement Agreements** | | |
| 4. | • | Order from the Alberta court appending the Plan recognising the US Bankruptcy Court order approving the Plan and the Chapter 11 Committee | N/A |
| | • | Certified copy of instrument commencing US proceedings | |
| | • | Certified copy of instrument appointing foreign representative | |
| | • | Statement identifying all foreign proceedings | |
| | • | Affidavit providing facts confirming US proceeding is a main proceeding | |
| 5. | | Direction from the Cayman Grand Court stating that the Liquidators are at liberty, in discharging their other duties as joint official liquidators, to exercise their | Application for directions made by the Liquidators, with the Cayman GP Shareholders and the New GP appearing by counsel in support |

| | DOCUMENT | PARTIES |
|---|---|---|
| | discretion in the manner set out in the Plan, the Cayman Settlement Agreement and any other Restructuring Document<br><br>• Documents required for this direction include a summons and supporting affidavit from the Liquidators (appending the Plan and the Cayman Settlement Agreement) | |
| 6. | Direction from the Cayman Grand Court approving the Liquidators' proposed course of action and their signing of the Cayman Settlement Agreement and any other Restructuring Document<br><br>• Documents required for this direction will be incorporated in the summons and supporting affidavit referred to at B5 above. | Application for directions made by the Liquidators, with the Cayman GP Shareholders and the New GP appearing by counsel in support |
| 7. | Direction from the Cayman Grand Court stating that the Liquidators are at liberty to appear by counsel at the Plan confirmation hearing to agree the Plan<br><br>• Documents required for this direction will be incorporated in the summons and supporting affidavit referred to at B5 above. | Application for directions made by the Liquidators, with the Cayman GP Shareholders and the New GP appearing by counsel in support |
| 8. | Cayman Settlement Agreement | (1) Cayman GPs<br><br>(2) Lenders<br><br>(3) Facility Agent<br><br>(4) Cayman Trusts |

| | DOCUMENT | PARTIES |
|---|---|---|
| | | (5) Cayman GP Shareholders |
| | | (6) PlanCo SPV |
| | | (7) Liquidators |
| 9. | Luxembourg Settlement Agreement | (1) Luxembourg Debtors |
| | | (2) Luxco Shareholders |
| | | (3) Lenders |
| | | (4) Facility Agent |
| | | (5) PlanCo SPV |
| | | (6) Any other holders of the YFCPECs (other than the Luxco Shareholders at (2) above) |

❖ **Consent of beneficiaries of the Trusts to the granting of security and powers of attorney (if applicable) and entry into the Restructuring Documents and any related agreement**

| | DOCUMENT | PARTIES |
|---|---|---|
| 10. | Letter of consent from the trustee of The HSH AIV 1 Trust to the beneficiaries of The HSH AIV 1 Trust and acknowledgement by the beneficiaries | (1) Trustee of The HSH AIV 1 Trust (2) Beneficiaries of The HSH AIV 1 Trust |
| 11. | Letter of consent from the trustee of The HSH AIV 2 Trust to the beneficiaries of The HSH AIV 2 Trust and acknowledgement by the beneficiaries | (1) Trustee of The HSH AIV 2 Trust (2) Beneficiaries of The HSH AIV 2 Trust |
| 12. | Letter of consent from the trustee of The HSH AIV 5 Trust to the beneficiaries of The HSH AIV 5 Trust and acknowledgement by the beneficiaries | (1) Trustee of The HSH AIV 5 Trust (2) Beneficiaries of The HSH AIV 5 Trust |

| | DOCUMENT | PARTIES |
|---|---|---|
| 13. | Letter of consent from the trustee of The HSH Coinvest (Cayman) Trust-A to the beneficiaries of The HSH Coinvest (Cayman) Trust-A and acknowledgement by the beneficiaries | (1) Trustee of The HSH Coinvest (Cayman) Trust-A<br><br>(2) Beneficiaries of The HSH Coinvest (Cayman) Trust-A |
| 14. | Letter of consent from the trustee of The HSH Coinvest (Cayman) Trust-B to the beneficiaries of The HSH Coinvest (Cayman) Trust-B and acknowledgement by the beneficiaries | (1) Trustee of The HSH Coinvest (Cayman) Trust-B<br><br>(2) Beneficiaries of The HSH Coinvest (Cayman) Trust-B |
| 15. | Letter of consent from the trustee of The HSH AIV 3 Trust to the beneficiaries of The HSH AIV 3 Trust and acknowledgement by the beneficiaries | (1) Trustee of The HSH AIV 3 Trust<br><br>(2) Beneficiaries of The HSH AIV 3 Trust |
| 16. | Letter of consent from the trustee of The HSH AIV 4 Trust to the beneficiaries of The HSH AIV 4 Trust and acknowledgement by the beneficiaries | (1) Trustee of The HSH AIV 4 Trust<br><br>(2) Beneficiaries of The HSH AIV 4 Trust |

**C:**     **SPECIFIC CONTROL STRUCTURE DOCUMENTS**

| | DOCUMENT | PARTIES |
|---|---|---|
| ❖ **Alberta Debtors** | | |
| | *Liquidators to remain in office* | |
| 1. | Order from the Cayman Grand Court that the liquidations of the Cayman GPs continue pending final implementation of the restructuring on the terms set out in the Plan and the satisfaction of all the Secured Obligations<br><br>   •    Documents required for this order will be incorporated in the summons and supporting affidavit referred to at B5 above. | Application for order made by the Liquidators, with the Cayman GP Shareholders and the New GP appearing by counsel in support |
| | *Withdrawal of the New GP* | |
| 2. | Alberta law governed agreement providing for the withdrawal of New GP from Alberta I, to include the following:<br><br>   •    New GP's release and waiver of any present or future claims against the relevant parties; and<br><br>   •    confirmation that New GP has no rights, contracts, receivables or other | (1) New GP<br><br>(2) Cayman I<br><br>(3) Alberta I<br><br>(4) Security Trustee<br><br>(5) Lenders |

| | DOCUMENT | PARTIES |
|---|---|---|
| | entitlements in respect of the Alberta Debtors, the Cayman Trusts or the Cayman GPs and will not commence any proceedings with respect to any existing claims | (6) Facility Agent<br><br>(7) The HSH AIV 1 Trust |
| 3. | Alberta law governed agreement providing for the withdrawal of New GP from Alberta II, to include the bullet point items listed at C2 above | (1) New GP<br><br>(2) Cayman II<br><br>(3) Alberta II<br><br>(4) Security Trustee<br><br>(5) Lenders<br><br>(6) Facility Agent<br><br>(7) The HSH AIV 2 Trust |
| 4. | Alberta law governed agreement providing for the withdrawal of New GP from Alberta V, to include the bullet point items listed at C2 above | (1) New GP<br><br>(2) Cayman V<br><br>(3) Alberta V<br><br>(4) Security Trustee<br><br>(5) Lenders<br><br>(6) Facility Agent |

| | DOCUMENT | PARTIES |
|---|---|---|
| | | (7) The HSH AIV 5 Trust |
| 5. | Alberta law governed agreement providing for the withdrawal of New GP from Alberta Coinvest, to include the bullet point items listed at C2 above | (1) New GP |
| | | (2) Cayman Coinvest |
| | | (3) Alberta Coinvest |
| | | (4) Security Trustee |
| | | (5) Lenders |
| | | (6) Facility Agent |
| | | (7) The HSH Coinvest (Cayman) Trust-A |
| | *Amendments to the Partnership Agreements* | |
| 6. | Alberta I Restructured Partnership Agreement  • Limited partnership interest transfer form appended | (1) Cayman I  (2) The HSH AIV 1 Trust |
| 7. | Alberta II Restructured Partnership Agreement  • Limited partnership interest transfer form appended | (1) Cayman II  (2) The HSH AIV 2 Trust |
| 8. | Alberta V Restructured Partnership Agreement  • Limited partnership interest transfer form appended | (1) Cayman V  (2) The HSH AIV 5 Trust |

| | DOCUMENT | PARTIES |
|---|---|---|
| 9. | Alberta Coinvest Restructured Partnership Agreement<br><br>• Limited partnership interest transfer form appended | (1) Cayman Coinvest<br><br>(2) The HSH Coinvest (Cayman) Trust-A |
| 10. | Signed, undated transfer form in the form appended to the Alberta I Restructured Partnership Agreement | The HSH AIV 1 Trust |
| 11. | Signed, undated transfer form in the form appended to the Alberta II Restructured Partnership Agreement | The HSH AIV 2 Trust |
| 12. | Signed, undated transfer form in the form appended to the Alberta V Restructured Partnership Agreement | The HSH AIV 5 Trust |
| 13. | Signed, undated transfer form in the form appended to the Alberta Coinvest Restructured Partnership Agreement | The HSH Coinvest (Cayman) Trust-A |
| 14. | Alberta I Notice to Amend (to be filed with Alberta Personal Property Registry) | (1) Cayman I<br><br>(2) The HSH AIV 1 Trust |
| 15. | Alberta II Notice to Amend (to be filed with Alberta Personal Property Registry) | (1) Cayman II<br><br>(2) The HSH AIV 2 Trust |
| 16. | Alberta V Notice to Amend (to be filed with Alberta Personal Property Registry) | (1) Cayman V |

| | DOCUMENT | PARTIES |
|---|---|---|
| | | (2) The HSH AIV 5 Trust |
| 17. | Alberta Coinvest Notice to Amend (to be filed with Alberta Personal Property Registry) | (1) Cayman Coinvest<br><br>(2) The HSH Coinvest (Cayman) Trust-A |
| 18. | Cayman I resolution, on behalf of Alberta I, authorising the execution and delivery of the Restructuring Documents (including the relevant Amended and Restated Facilities Agreement and the granting of security) to which Alberta I is a party | Cayman I |
| 19. | Cayman II resolution, on behalf of Alberta II, authorising the execution and delivery of the Restructuring Documents (including the relevant Amended and Restated Facilities Agreement and the granting of security) to which Alberta II is a party | Cayman II |
| 20. | Cayman V resolution, on behalf of Alberta V, authorising the execution and delivery of the Restructuring Documents (including the relevant Amended and Restated Facilities Agreement and the granting of security) to which Alberta V is a party | Cayman V |
| 21. | Cayman Coinvest resolution, on behalf of Alberta Coinvest, authorising the execution and delivery of the Restructuring Documents (including the relevant Amended and Restated Facilities Agreement and the granting of security) to which | Cayman Coinvest |

| | DOCUMENT | PARTIES |
|---|---|---|
| | Alberta Coinvest is a party | |
| | *Transfer of shares in Cayman GPs* | |
| 22. | Order from the Cayman Grand Court sanctioning the share transfers of the shares in the Cayman GPs held by the Cayman GP Shareholders to PlanCo SPV<br><br>• Documents required for this order will be incorporated in the summons and supporting affidavit referred to at B5 above | Application for order made by the Liquidators, with PlanCo SPV the Cayman GP Shareholders and the New GP appearing by counsel in support |
| 23. | Share transfer form in respect of all the shares in Cayman I | (1) The HSH GP I Limited<br><br>(2) PlanCo SPV |
| 24. | Share transfer form in respect of all the shares in Cayman II | (1) The HSH AIV 2 Trust<br><br>(2) PlanCo SPV |
| 25. | Share transfer form in respect of all the shares in Cayman V | (1) The HSH AIV 2 Trust<br><br>(2) PlanCo SPV |
| 26. | Share transfer form in respect of all the shares in Cayman Coinvest | (1) The HSH Coinvest (Cayman) Trust-A<br><br>(2) PlanCo SPV |
| 27. | Original share certificates in respect of all of the shares in Cayman I together with the updated register of shareholders | N/A |

| | DOCUMENT | PARTIES |
|---|---|---|
| 28. | Original share certificates in respect of all of the shares in Cayman II together with the updated register of shareholders | N/A |
| 29. | Original share certificates in respect of all of the shares in Cayman V together with the updated register of shareholders | N/A |
| 30. | Original share certificates in respect of all of the shares in Cayman Coinvest together with the updated register of shareholders | N/A |
| | *Security* | |
| | • *Over HSH Shares held by the Alberta Debtors* | |
| 31. | To the extent applicable under the settlement terms of the Term Sheet, share pledge over the HSH Shares held by Alberta I including the agreed form of notification and acknowledgment of pledge | (1) Alberta I<br><br>(2) Security Trustee |
| 32. | To the extent applicable under the settlement terms of the Term Sheet, share pledge over the HSH Shares held by Alberta II including the agreed form of notification and acknowledgment of pledge | (1) Alberta II<br><br>(2) Security Trustee |
| 33. | To the extent applicable under the settlement terms | (1) Alberta V |

| | DOCUMENT | PARTIES |
|---|---|---|
| | of the Term Sheet, share pledge over the HSH Shares held by Alberta V including the agreed form of notification and acknowledgment of pledge | (2) Security Trustee |
| 34. | To the extent applicable under the settlement terms of the Term Sheet, share pledge over the HSH Shares held by Alberta Coinvest including the agreed form of notification and acknowledgment of pledge | (1) Alberta Coinvest<br><br>(2) Security Trustee |
| 35. | To the extent applicable under the settlement terms of the Term Sheet, notification and acknowledgment of share pledge by Alberta I referred to at C31 above | (1) Alberta I<br><br>(2) HSH |
| 36. | To the extent applicable under the settlement terms of the Term Sheet, notification and acknowledgment of share pledge by Alberta II referred to at C32 above | (1) Alberta II<br><br>(2) HSH |
| 37. | To the extent applicable under the settlement terms of the Term Sheet, notification and acknowledgment of share pledge by Alberta V referred to at C33 above | (1) Alberta V<br><br>(2) HSH |
| 38. | To the extent applicable under the settlement terms of the Term Sheet, notification and acknowledgment of share pledge by Alberta | (1) Alberta Coinvest<br><br>(2) HSH |

| | DOCUMENT | PARTIES |
|---|---|---|
| | Coinvest referred to at C34 above | |
| 39. | Registration of financing statement pursuant to the Personal Property Security Act (Alberta) in respect of the share pledge of Alberta I in respect of its HSH Shares referred to at C31 above | Security Trustee |
| 40. | Registration of financing statement pursuant to the Personal Property Security Act (Alberta) in respect of the share pledge of Alberta II in respect of its HSH Shares referred to at C32 above | Security Trustee |
| 41. | Registration of financing statement pursuant to the Personal Property Security Act (Alberta) in respect of the share pledge of Alberta V in respect of its HSH Shares referred to at C33 above | Security Trustee |
| 42. | Registration of financing statement pursuant to the Personal Property Security Act (Alberta) in respect of the share pledge of Alberta Coinvest in respect of its HSH Shares referred to at C34 above | Security Trustee |
| | • *Over Relevant Equity Interests of Cayman Trusts* | |
| 43. | Security Agreement securing the Relevant Equity Interests held by The HSH AIV 1 Trust in Alberta I | (1) The HSH AIV I Trust  (2) Security Trustee |
| 44. | Security Agreement securing the Relevant Equity Interests held by The HSH AIV 2 Trust in Alberta II | (1) The HSH AIV 2 Trust  (2) Security Trustee |
| 45. | Security Agreement securing the Relevant Equity | (1) The HSH AIV 5 Trust |

| | DOCUMENT | PARTIES |
|---|---|---|
| | Interests held by The HSH AIV 5 Trust in Alberta V | (2) Security Trustee |
| 46. | Security Agreement securing the Relevant Equity Interests held by The HSH Coinvest (Cayman) Trust-A in Alberta Coinvest | (1) The HSH Coinvest (Cayman) Trust-A<br><br>(2) Security Trustee |
| 47. | Direction and acknowledgement from The HSH AIV 1 Trust to Cayman I to transfer the Relevant Equity Interests to a third party at the Security Trustee's direction upon the security over The HSH AIV 1 Trust's Relevant Equity Interests becoming enforceable | (1) The HSH AIV 1 Trust<br><br>(2) Cayman I<br><br>(3) Security Trustee |
| 48. | Direction and acknowledgement from The HSH AIV 2 Trust to Cayman II to transfer the Relevant Equity Interests to a third party at the Security Trustee's direction upon the security over The HSH AIV 2 Trust's Relevant Equity Interests becoming enforceable | (1) The HSH AIV 2 Trust<br><br>(2) Cayman II<br><br>(3) Security Trustee |
| 49. | Direction and acknowledgement from The HSH AIV 5 Trust to Cayman V to transfer the Relevant Equity Interests to a third party at the Security Trustee's direction upon the security over The HSH AIV 5 Trust's Relevant Equity Interests becoming enforceable | (1) The HSH AIV 5 Trust<br><br>(2) Cayman V<br><br>(3) Security Trustee |
| 50. | Direction and acknowledgement from The HSH Coinvest (Cayman) Trust-A to Cayman Coinvest to transfer the Relevant Equity Interests to a third party at the Security Trustee's direction upon security over The HSH Coinvest (Cayman) Trust- | (1) The HSH Coinvest (Cayman) Trust-A<br><br>(2) Cayman Coinvest<br><br>(3) Security Trustee |

| | DOCUMENT | PARTIES |
|---|---|---|
| | A's Relevant Equity Interests becoming enforceable | |
| 51. | Registration of a financing statement pursuant to the Personal Property Security Act (Alberta) against The HSH AIV 1 Trust | Security Trustee |
| 52. | Registration of a financing statement pursuant to the Personal Property Security Act (Alberta) against The HSH AIV 2 Trust | Security Trustee |
| 53. | Registration of a financing statement pursuant to the Personal Property Security Act (Alberta) against The HSH AIV 5 Trust | Security Trustee |
| 54. | Registration of a financing statement pursuant to the Personal Property Security Act (Alberta) against The HSH Coinvest (Cayman) Trust-A | Security Trustee |
| | *Security Powers of Attorney* | |
| 55. | The HSH AIV 1 Trust Security Power of Attorney | (1) The HSH AIV 1 Trust

(2) Security Trustee

(3) Cayman I |
| 56. | The HSH AIV 2 Trust Security Power of Attorney | (1) The HSH AIV 2 Trust

(2) Security Trustee

(3) Cayman II |

| | DOCUMENT | PARTIES |
|---|---|---|
| 57. | The HSH AIV 5 Trust Security Power of Attorney | (1) The HSH AIV 5 Trust<br><br>(2) Security Trustee<br><br>(3) Cayman V |
| 58. | The HSH Coinvest (Cayman) Trust-A Security Power of Attorney | (1) The HSH Coinvest (Cayman) Trust-A<br><br>(2) Security Trustee<br><br>(3) Cayman Coinvest |
| ❖ **Delaware Debtor** | | |
| | *Professional Managers appointed to the Delaware LLC* | |
| 59. | Management Agreement | (1) Delaware LLC<br><br>(2) Professional Managers |
| 60. | Consultancy Services Agreement | (1) Professional Managers<br><br>(2) Delaware LLC |
| 61. | Resolution of the Professional Managers of the Delaware LLC approving, among other things, the Delaware Debtor's entry into the Restructuring – Documents to which the Delaware Debtor is a party and granting security over the Delaware Debtor's HSH Shares | Delaware LLC |
| 62. | Amendments to the Delaware LLC's certificate of | Delaware LLC |

| | DOCUMENT | PARTIES |
|---|---|---|
| | formation | |
| 63. | Member(s) consent to and approval of the appointment of the Professional Managers, the terms of the Consultancy Services Agreement and the Delaware LLC entering into the Consultancy Services Agreement | Delaware Limited Partner |
| | ***Amendments to the Partnership Agreement and the LLC Agreement*** | |
| 64. | Delaware Debtor Amended Partnership Agreement | (1) Delaware LLC<br><br>(2) Delaware Limited Partner |
| 65. | Delaware LLC Amended LLC Agreement | (1) Delaware Limited Partner<br><br>(2) PlanCo SPV |
| | ***Security*** | |
| | • ***Over HSH Shares held by Delaware Debtor*** | |
| 66. | Share pledge over HSH Shares held by Delaware Debtor including the agreed form of notification and acknowledgment of pledge | (1) Delaware Debtor<br><br>(2) Security Trustee |
| 67. | Notification and acknowledgment of the share pledge by Delaware Debtor referred to at C66 above | (1) Delaware Debtors<br><br>(2) HSH |
| 68. | UCC-1 Financing Statement in respect of the share | N/A |

| | DOCUMENT | PARTIES |
|---|---|---|
| | pledge by the Delaware Debtor referred to at C66 above | |
| | • *Over Relevant Equity Interests of Delaware LIMITED PARTNER* | |
| 69. | Security Agreement securing the Relevant Equity Interests held by Delaware Limited Partner in Delaware Debtor | (1) Delaware Limited Partner<br><br>(2) Security Trustee |
| 70. | Certificates of the limited partnership interests in Delaware Debtor | N/A |
| 71. | UCC-1 Financing Statement in respect of the security agreement referred to at C69 above | N/A |
| 72. | Blank stock power from Delaware Limited Partner in relation to its Relevant Equity Interests in Delaware Debtor | Delaware Limited Partner |
| | • *Over the LLC interests in Delaware LLC* | |
| 73. | Security Agreement over the LLC interests in Delaware LLC held by The HSH AIV 4 Trust | (1) The HSH AIV 4 Trust<br><br>(2) Security Trustee |
| 74. | Certificates of LLC interests in Delaware LLC | N/A |
| 75. | UCC-1 Financing Statement in respect of the security agreement referred to at C73 above | N/A |
| 76. | Blank stock power from The Delaware Limited Partner in relation to its LLC interests in Delaware LLC | Delaware Limited Partner |

| | DOCUMENT | PARTIES |
|---|---|---|
| | *Security Powers of Attorney* | |
| 77. | Delaware Limited Partner Security Power of Attorney in relation to its Relevant Equity Interests in the Delaware Debtor | (1) Delaware Limited Partner<br><br>(2) Delaware LLC<br><br>(3) Security Trustee |
| 78. | The HSH AIV 4 Trust Security Power of Attorney in relation to LLC interests in the Delaware LLC | (1) The HSH AIV 4 Trust<br><br>(2) Security Trustee |
| ❖ **Luxembourg Debtors** | | |
| | *Professional Managers appointed as managers of the Luxembourg Fund II Debtor* | |
| 79. | Luxembourg Fund II Debtor Management Agreement | (1) Luxembourg Fund II Debtor<br><br>(2) Professional Managers |
| 80. | Resignation letter of current manager(s) of Luxembourg Fund II Debtor | Current managers of Luxembourg Fund II Debtor |
| 81. | Consultancy Services Agreement | (1) Professional Managers<br><br>(2) Luxembourg Fund II Debtor |
| 82. | Notarial deed recording the following shareholders resolutions to be passed at a shareholders meeting of Luxembourg Fund II Debtor:<br><br>• Approval of the removal of the current | N/A |

| | DOCUMENT | PARTIES |
|---|---|---|
| | managers and appointment of the Professional Managers<br><br>• Approval of the terms of the Consultancy Services Agreement and the Luxembourg Fund II Debtor Management Agreement<br><br>• Approval of the amendments to the articles of association<br><br>• Approval of the issue of B Shares to PlanCo SPV | |
| 83. | Power of attorney for The HSH AIV 3 Trust to be represented at the shareholders meeting of Luxembourg Fund II Debtor referred to at C82 above | (1) The HSH AIV 3 Trust<br><br>(2) Attorney |
| 84. | Notarial Deed to be filed with the Luxembourg Trade and Companies Register in connection with (i) the change of managers in Luxembourg Fund II Debtor (ii) the amendments to the Luxembourg Fund II Debtor's articles of association and (iii) the issuance of the B Shares to PlanCo SPV | N/A |
| | ***Corporate approvals of the Luxembourg Debtors*** | |
| 85. | Board resolutions of Luxembourg Fund II Debtor approving, among other things, the restructuring and entry into the Restructuring Documents to which it is a party | Luxembourg Fund II Debtor |
| 86. | Board resolutions of the Luxembourg Co-Invest | Luxembourg Co-Invest Debtor |

| | DOCUMENT | PARTIES |
|---|---|---|
| | Debtor approving, among other things, the restructuring and entry into the Restructuring Documents to which it is a party | |
| | *Amendments to the Articles of Association* | |
| 87. | Luxembourg Fund II Debtor Amended Articles of Association | N/A |
| 88. | Notarial deed recording the shareholders resolutions of Luxembourg Fund II Debtor referred to at C82 above | See above |
| 89. | KYC documents to be provided to the Luxembourg notary in connection with the resolutions passed at the shareholders meeting of Luxembourg Fund II Debtor, referred to at C82 above to include without limitation:<br><br>• a certified copy or original of the trade register's excerpt or certificate of good standing in respect of HSH AIV 3 Trust (if applicable)<br><br>• a copy of the articles of association or other constitutional documents of HSH AIV 3 Trust<br><br>• beneficial owner certificate in connection with the amendments to the articles of association of Luxembourg Fund II Debtor | Ultimate beneficial owners of Luxembourg Fund II Debtor |

| | DOCUMENT | PARTIES |
|---|---|---|
| | | |
| | *Creation and issue of B Shares* | |
| 90. | Blocking certificate from the Luxembourg Fund II Debtor's bank evidencing transfer and availability of the subscription funds for the new B Shares to be subscribed for in Luxembourg Fund II Debtor | Luxembourg Fund II Debtor's bank |
| 91. | Power of attorney for Plan Co SPV to be represented at the shareholders meeting of Luxembourg Fund II Debtor referred to at C82 above and to subscribe to B Shares of Luxembourg Fund II Debtor | Plan Co SPV |
| 92. | Shareholder register of Luxembourg Fund II Debtor to be updated to reflect (i) the conversion of existing ordinary shares into class A shares and (ii) the issue of B Shares to PlanCo SPV | Luxembourg Fund II Debtor |
| 93. | KYC documents to be provided to the Luxembourg notary in connection with the resolutions passed at the shareholders meeting of Luxembourg Fund II Debtor referred to at C82 above, to include without limitation:<br><br>• certified copies or originals of the trade register excerpts in respect of PlanCo SPV<br><br>• copies of the articles of association and other constitutional documents of PlanCo | Ultimate beneficial owners of PlanCo SPV |

| | DOCUMENT | PARTIES |
|---|---|---|
| | SPV<br><br>• beneficial owner certificate in connection with the subscription by PlanCo SPV to B Shares in the Luxembourg Fund II Debtor | |
| 94. | Luxembourg Fund II Debtor Shareholders Agreement including, among other things, agreements relating to voting | (1) PlanCo SPV<br><br>(2) The HSH AIV 3 Trust<br><br>(3) Luxembourg Fund Debtor II |
| | *Security* | |
| | • *Over HSH Shares held by Luxembourg Debtors* | |
| 95. | To the extent applicable under the settlement terms of the Term Sheet, share pledge over the HSH Shares held by Luxembourg Fund II Debtor including the agreed form of notification and acknowledgment of pledge | (1) Luxembourg Fund II Debtor<br><br>(2) Security Trustee |
| 96. | To the extent applicable under the settlement terms of the Term Sheet, share pledge over the HSH Shares held by Luxembourg Co-Invest Debtor including the agreed form of notification and acknowledgment of pledge | (1) Luxembourg Co-Invest Debtor<br><br>(2) Security Trustee |

| | DOCUMENT | PARTIES |
|---|---|---|
| 97. | To the extent applicable under the settlement terms of the Term Sheet, notification and acknowledgment of share pledge by Luxembourg Fund II Debtor referred to at C95 above | (1) Luxembourg Fund II Debtor<br><br>(2) HSH |
| 98. | To the extent applicable under the settlement terms of the Term Sheet, notification and acknowledgment of share pledge by Luxembourg Co-Invest Debtor referred to at C96 above | (1) Luxembourg Co-Invest Debtor<br><br>(2) HSH |
| | • *Over Relevant Equity Interests of Luxco Shareholders* | |
| 99. | Share pledge securing the shares held by The HSH AIV 3 Trust in Luxembourg Fund II Debtor. | (1) The HSH AIV 3 Trust<br><br>(2) Security Trustee |
| 100. | Share pledge securing the shares held by The HSH Coinvest (Cayman) Trust-B in Luxembourg Co-Invest Debtor | (1) The HSH Coinvest (Cayman) Trust-B<br><br>(2) Security Trustee |
| 101. | Registration of the share pledges referred to at C99 above and C100 above in the share registers of Luxembourg Fund II Debtor and Luxembourg Co-Invest Debtor respectively | (i) Authorised signatory of Luxembourg Fund II Debtor in respect of the share pledge referred to at C99 above<br><br>(ii) Authorised signatory of the Luxembourg Co-Invest Debtor in respect of the share pledge referred to at C100 above |
| | *Security Power of Attorney* | |
| 102. | The HSH AIV 3 Trust Security Power of Attorney | (1) The HSH AIV 3 Trust<br><br>(2) Security Trustee |

| | DOCUMENT | PARTIES |
|---|---|---|
| | | (3) PlanCo SPV |
| 103. | The HSH Coinvest (Cayman) Trust-B Security Power of Attorney | (1) The HSH Coinvest (Cayman) Trust-B <br><br> (2) Security Trustee |
| 104. | Subordination Agreement | (1) YFCPEC holders <br><br> (2) Lenders <br><br> (3) Facility Agent <br><br> (4) Security Trustee <br><br> (5) Luxembourg Fund II Debtor |
| 105. | YFCPEC pledge agreement | (1) YFCPEC holders <br><br> (2) Luxembourg Fund II Debtor <br><br> (3) Security Trustee |
| 106. | Amended terms and conditions of the YFCPECS | (1) YFCPEC holders <br><br> (2) Luxembourg Fund II Debtor |

**D:     REGULATORY / EQUITABLE SUBORDINATION DOCUMENTS**

|  | DOCUMENT | PARTIES |
|---|---|---|
| 1. | HSH Supervisory Board Appointment Agreement | (1) Lenders |
|  |  | (2) Facility Agent |
|  |  | (3) Security Trustee |
|  |  | (4) Alberta Debtors |
|  |  | (5) Delaware Debtor |
|  |  | (6) Luxembourg Debtors |
|  |  | (7) The HSH AIV 1 Trust |
|  |  | (8) HSH Investment Holdings Coinvest –C S.à r.l. |
|  |  | (9) HSH Investment Holdings FSO S.à r.l. |

**E:** **TAXATION**

| | DOCUMENT | PARTIES |
|---|---|---|
| 1. | Advance tax agreement (if in existence) to be updated to (i) reflect the restructuring and (ii) confirm the Luxembourg tax position of the Lenders. | Issued by the Luxembourg tax authorities |

**F:      PLANCO INCORPORATION PROCESS**

| | DOCUMENT | PARTIES |
|---|---|---|
| 1. | Incorporation application form detailing SPV name, directors and shareholders and to include KYC in respect of PlanCo SPV | PlanCo SPV directors and shareholders |
| 2. | Affidavit of Subscriber (exempted company) in relation to PlanCo SPV | Subscriber |
| 3. | Memorandum and Articles of Association of PlanCo SPV | Subscriber |
| 4. | Appointment of First Directors of PlanCo SPV | Subscriber |
| 5. | Share Transfer Form (transferring the Subscriber's shares in PlanCo SPV) | (1) Subscriber<br><br>(2) Trustee of the STAR Trust |
| 6. | Directors' organisational resolutions of PlanCo SPV | PlanCo SPV directors |
| 7. | Register of Directors and Officers, Register of Members and Register of Mortgages and Charges of PlanCo SPV | N/A |
| 8. | Corporate Services Agreement | PlanCo SPV directors and shareholders |

| | DOCUMENT | PARTIES |
|---|---|---|
| 9. | Declaration of Trust (establishing STAR Trust) | Trustee of the STAR Trust |
| 10. | Enforcer Agreement (or enforcer letter of consent to act) | (1) PlanCo SPV<br><br>(2) Facility Agent (as enforcer) |
| 11. | Trustee Fee Agreement | (1) Trustee of the STAR Trust<br><br>(2) Entity responsible for paying the fees of trustee of the STAR Trust |

**SCHEDULE 1: DEFINITIONS**

| | |
|---|---|
| Alberta I: | HSH Alberta I L.P. |
| Alberta II: | HSH Alberta II L.P. |
| Alberta V: | HSH Alberta V L.P. |
| Alberta Coinvest: | HSH Coinvest (Alberta) L.P. |
| Arranger: | The Royal Bank of Scotland, N.V., London Branch |
| Cayman GP Shareholders: | The shareholders of the Cayman GPs |
| Cayman I: | HSH Cayman I GP Limited (in liquidation) |
| Cayman II: | HSH Cayman II GP Limited (in liquidation) |
| Cayman V: | HSH Cayman V GP Limited (in liquidation) |
| Cayman Coinvest: | HSH Coinvest (Cayman) GP Limited (in liquidation) |
| Custodian: | A commercial entity providing custodian services as selected by the Lenders |
| Luxco Shareholders: | The HSH AIV 3 Trust and The HSH Coinvest (Cayman) Trust-B |
| Professional Managers: | Ian Stokoe and David Walker or such other professional managers as selected by the Lenders |
| Subscriber: | Appleby Service Company |
| Term Sheet: | The Detailed Summary of Terms for an Agreed Restructuring to which this Documentation Summary is appended |