# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **HSH DELAWARE GP LLC, *et al.*,[1]** | ) | **Case No. 10-10187 (MFW)** |
| | ) | |
| Debtors. | ) | **Jointly Administered** |
| | ) | |

## DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Dated:  August ~~13~~27, 2010
        Wilmington, Delaware

Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Michael J. Merchant (No. 3854)
Marcos A. Ramos (No. 4450)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

*Attorneys for the Debtors and Debtors-in-Possession*

---

[1]  The Debtors in these cases, along with the last four (4) digits of each Debtor's federal tax identification number (if applicable), are:  HSH Delaware GP LLC, HSH Alberta I L.P. (No. 6492), HSH Alberta II L.P. (No. 1821), HSH Alberta V L.P. (No. 6854), HSH Coinvest (Alberta) L.P. (No. 1592), JCF HSH (DE) GP LP, HSH Luxembourg S.à r.l. (No. 6862), HSH Delaware L.P. (No. 9336), and HSH Luxembourg Coinvest S.à r.l. (No. 6826).

**TABLE OF CONTENTS**

I.   INTRODUCTION AND SUMMARY OF THE PLAN ..................................................... ~~2~~3

     A.   PURPOSE AND EFFECT OF THE PLAN ............................................. ~~3~~4

     B.   OVERVIEW OF CHAPTER 11 ................................................................ ~~5~~6

     C.   SUMMARY OF TREATMENT OF CLAIMS AND EQUITY
          INTERESTS UNDER THE PLAN ........................................................... ~~5~~7

     D.   VOTING AND CONFIRMATION PROCEDURES ............................. ~~6~~9

          1.   Claims Bar Date ..................................................................... ~~6~~9

          2.   Entities Entitled to Vote on the Plan ............................................ ~~6~~9

          3.   Acceptance or Rejection of the Plan .......................................... ~~7~~10

     E.   CONFIRMATION HEARING .................................................................. ~~7~~10

          1.   Confirmation Hearing Date ...................................................... ~~7~~11

          2.   Plan Objection Deadline ........................................................... ~~8~~11

II.  BACKGROUND TO THE CHAPTER 11 CASES .................................................. ~~8~~12

     A.   THE DEBTORS ....................................................................................... ~~8~~12

     B.   THE DEBTORS' CAPITAL STRUCTURE ...................................... ~~11~~15

     C.   NEGOTIATIONS TO RESTRUCTURE CREDIT AGREEMENTS . ~~11~~16

     D.   THE CAYMAN PROCEEDINGS ...................................................... ~~11~~16

     E.   THE INVOLUNTARY CHAPTER 7 CASES .................................... ~~12~~17

     F.   THE FILING OF THE CHAPTER 11 CASES ................................... ~~12~~17

     G.   FOREIGN RECOGNITION IN CANADA ......................................... ~~12~~17

III. ADMINISTRATION OF THE CHAPTER 11 CASES ........................................... ~~12~~17

     A.   RELIEF OBTAINED AT THE OUTSET OF THE CHAPTER 11
          CASES ..................................................................................................... ~~12~~17

          1.   Motion for Joint Administration .............................................. ~~13~~18

          2.   Motion to Maintain Bank Accounts and Business Forms ....... ~~13~~18

3. Motion to Act as Foreign Representatives ................................ ~~13~~18

B. EMPLOYMENT AND COMPENSATION OF ADVISORS ............ ~~13~~18

C. DISPUTED MOTIONS ...................................................................... ~~13~~19

    1. Motion for Authority to Obtain Debtor in Possession Financing ........................................................................................... ~~13~~19

    2. Motion to Employ a Chief Restructuring Officer ................... ~~14~~19

    3. Motion to Appoint a Chapter 11 Trustee or Terminate Exclusivity ................................................................................ ~~14~~19

    4. Motion to Appoint an Examiner .............................................. ~~14~~19

    5. Motion to Extend Exclusivity ................................................. ~~14~~20

D. UNSECURED CREDITORS ............................................................... ~~15~~20

    1. Committee Formation Meeting ............................................... ~~15~~20

    2. Meeting of Creditors ............................................................... ~~15~~20

E. SCHEDULES ................................................................................... ~~15~~21

IV. SUMMARY OF THE PLAN .................................................................. ~~15~~21

A. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS ............. ~~15~~21

    1. Administrative Claims ............................................................ ~~15~~21

    2. Professional Compensation Claims ........................................ ~~15~~21

    3. Priority Tax Claims ................................................................. ~~16~~22

B. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ............................................................ ~~16~~22

    1. Summary .................................................................................. ~~16~~22

    2. Classification and Treatment of Claims and Interests ............. ~~16~~23

C. SPECIAL PROVISIONS GOVERNING UNIMPAIRED CLAIMS .. ~~19~~26

D. ACCEPTANCE OR REJECTION OF THE PLAN ........................... ~~19~~26

    1. Voting Classes ........................................................................ ~~19~~26

2.  Presumed Acceptance of the Plan ............................................. ~~19~~26

E.  Controversy Concerning Impairment ................................................. ~~19~~26

V. MEANS FOR IMPLEMENTATION OF THE PLAN AND  POSTPETITION
GOVERNANCE OF REORGANIZED DEBTORS ................................................. ~~20~~26

A.  OVERVIEW ...................................................................... ~~20~~26

B.  DISTRIBUTION OF AVAILABLE CASH ........................................ ~~21~~29

C.  CONTINUED EXISTENCE OF THE DEBTORS ............................. ~~21~~29

D.  IMPLEMENTATION TRANSACTIONS .......................................... ~~21~~29

E.  REORGANIZED DEBTORS; RESTRUCTURING TRANSACTIONS
AND DOCUMENTS ............................................................. ~~21~~29

F.  POST-EFFECTIVE DATE MANAGEMENT .................................... ~~22~~30

G.  EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS .. ~~22~~30

H.  ENTITY ACTION .............................................................. ~~22~~30

I.  LIQUIDATION/DISSOLUTION OF THE REORGANIZED
DEBTORS .......................................................................... ~~23~~31

J.  CONTROL OF THE DEBTORS AFTER VOLUNTARY
PREPAYMENT ................................................................... ~~23~~31

K.  POST-EFFECTIVE DATE COMMITTEE ........................................ ~~23~~31

1.  Creation and Dissolution ........................................... ~~23~~31

2.  Membership ............................................................ ~~23~~31

3.  Governance ............................................................ ~~23~~31

4.  Responsibilities and Powers .................................... ~~23~~32

5.  Limitation of Liability .............................................. ~~24~~32

6.  Indemnity .............................................................. ~~24~~33

7.  Co-operation .......................................................... ~~24~~33

L.  VESTING OF ASSETS IN THE REORGANIZED DEBTORS ........ ~~24~~33

M.  EXEMPTION FROM CERTAIN TAXES AND FEES ..................... ~~25~~33

RLF1 3593748v. 5

VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................................................................................... ~~25~~34

VII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............. ~~25~~34

    A.    REVESTING OF ASSETS .................................................................. ~~25~~34

    B.    DISCHARGE ..................................................................................... ~~25~~34

        1.    Discharge of Claims Against the Debtors and the Reorganized Debtors ................................................................................. ~~25~~34

        2.    Injunction Related to the Discharge ........................................ ~~26~~35

    C.    RELEASES ........................................................................................ ~~26~~35

        1.    Releases by the Debtors. ......................................................... ~~26~~35

        2.    Releases by Holders of Claims and Interests ........................... ~~26~~36

        3.    Exculpation ............................................................................. ~~27~~36

        4.    Injunction Related to Releases and Exculpation ..................... ~~27~~37

        5.    Injunctions in Furtherance of the Plan .................................... ~~28~~38

        6.    Consent to Injunctions ............................................................ ~~28~~38

    D.    INTEGRAL TO PLAN ..................................................................... ~~28~~38

    E.    NO SUCCESSOR LIABILITY ........................................................ ~~28~~38

    F.    RELEASE OF LIENS ...................................................................... ~~29~~39

    G.    WITHDRAWAL OF MOTIONS ..................................................... ~~29~~39

VIII. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................................. ~~29~~39

    A.    CONDITIONS PRECEDENT TO CONFIRMATION ...................... ~~29~~39

    B.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ........... ~~29~~39

    C.    WAIVER OF CONDITIONS ........................................................... ~~30~~40

    D.    NOTICE OF EFFECTIVE DATE .................................................... ~~30~~40

    E.    ORDER DENYING CONFIRMATION ........................................... ~~30~~40

F.     RETENTION OF JURISDICTION .................................................... ~~30~~41

IX. MISCELLANEOUS PROVISIONS ............................................................. ~~31~~42

    A.     TERMS BINDING .......................................................... ~~31~~42

    B.     GOVERNING LAW .......................................................... ~~31~~42

    C.     SEVERABILITY ............................................................... ~~32~~43

    D.     CONFIRMATION OF THE PLAN FOR A SINGLE DEBTOR ........ ~~32~~43

    E.     CONFIRMATION ORDER AND PLAN CONTROL ...................... ~~32~~43

    F.     INCORPORATION BY REFERENCE ............................................ ~~32~~43

    G.     PLAN SUPPLEMENTS ................................................................. ~~32~~43

    H.     MODIFICATIONS TO THE PLAN .............................................. ~~32~~43

    I.     REVOCATION, WITHDRAWAL OR NON-CONSUMMATION ... ~~32~~43

    J.     PAYMENT OF STATUTORY FEES ................................................ ~~33~~44

    K.     NOTICE ............................................................................. ~~33~~44

    L.     NO WAIVER .................................................................. ~~35~~46

X. SOLICITATION AND VOTING PROCEDURES ............................................. ~~35~~47

    A.     THE SOLICITATION PACKAGE ...................................... ~~35~~47

    B.     VOTING INSTRUCTIONS .................................................. ~~35~~47

    C.     VOTING TABULATION ................................................. ~~36~~48

XI. CONFIRMATION PROCEDURES ............................................................. ~~37~~49

    A.     CONFIRMATION HEARING ............................................ ~~37~~49

    B.     STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ....................................................................... ~~37~~50

        1.     Best Interests of Creditors Test/Liquidation Analysis ............. ~~38~~51

        2.     Feasibility ................................................................. ~~39~~51

        3.     Acceptance by Impaired Classes ............................... ~~39~~52

XII. PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .................................................................... 4053

    A.    RISKS RELATED TO CONFIRMATION, EFFECTIVENESS AND IMPLEMENTATION .......................................................................... 4053

        1.    Parties in Interest May Object to the Debtors' Classification of Claims and Interests ................................................................. 4053

        2.    Failure to Satisfy Vote Requirement ........................................ 4053

        3.    Debtors May Not Be Able to Secure Confirmation of the Plan 4053

        4.    Nonconsensual Confirmation ..................................................... 4154

        5.    Debtors May Object to the Amount or Classification of a Claim ............................................................................................. 4154

        6.    Risk of Non-Occurrence of the Effective Date ........................ 4155

    B.    DISCLOSURE STATEMENT DISCLAIMER .................................. 4155

        1.    Information Contained Herein Is for Soliciting Votes ............. 4155

        2.    No Legal or Tax Advice Is Provided to You by this Disclosure Statement ................................................................................... 4155

        3.    No Admissions Made .................................................................. 4155

        4.    Failure to Identify Litigation Claims or Projected Objections. 4155

        5.    Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Recover Transfers and Assets. ............................... 4255

        6.    No Waiver of Right to Object or Right to Recover Transfers and Assets ................................................................................ 4256

        7.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors ....................................................... 4256

        8.    Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update ................................................................................ 4256

        9.    No Representations Outside this Disclosure Statement Are Authorized ................................................................................ 4256

    C.    LIQUIDATION UNDER CHAPTER 7 .............................................. 4256

XIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES .................................. 4357

XIV.CONCLUSION AND RECOMMENDATION................................................................ ~~44~~58

## EXHIBITS

EXHIBIT A    The Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

EXHIBIT B    Term Sheet

EXHIBIT C    Schedule of Administrative Expense Claims

EXHIBIT D    Schedule of Priority Tax Claims

> **THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

# DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THIS "<u>DISCLOSURE STATEMENT</u>") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (THE "<u>PLAN</u>") OF HSH DELAWARE GP LLC AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION (COLLECTIVELY, THE "<u>DEBTORS</u>") AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS (COLLECTIVELY, "<u>ACTIONS</u>"), THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS IN CONNECTION WITH THE ACTIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING OR, SHOULD THE PLAN NOT BE CONFIRMED, IN ANY ACTIONS, AND IT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS OR ANY OF THEIR AFFILIATES.

THE DEBTORS PRESENTLY INTEND TO SEEK TO CONSUMMATE THE PLAN AND TO CAUSE THE EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR.

THE PLAN HAS BEEN APPROVED BY THE MANAGEMENT OF EACH OF THE DEBTORS, AND THE DEBTORS RECOMMEND THAT THE HOLDERS OF CLASSES 3, 5 AND 6 VOTE TO ACCEPT IT.

WITHOUT THE RESTRUCTURING OF INDEBTEDNESS CONTEMPLATED BY THE PLAN, THERE CAN BE NO ASSURANCE THAT THE DEBTORS WILL BE ABLE TO EFFECTUATE AN ALTERNATIVE FINANCIAL RESTRUCTURING OR SUCCESSFULLY EMERGE FROM THEIR CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND THE DEBTORS MAY BE FORCED INTO A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. THE DEBTORS BELIEVE THAT IF THEY ARE LIQUIDATED UNDER CHAPTER 7, THE VALUE OF THE ASSETS AVAILABLE FOR PAYMENT OF CREDITORS WOULD BE SIGNIFICANTLY LOWER THAN THE VALUE OF THE DISTRIBUTIONS CONTEMPLATED BY AND UNDER THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE NEW CLASS OF SHARES IN HSH LUXEMBOURG S.À R.L. TO BE ISSUED ON THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

IN THIS DISCLOSURE STATEMENT, THE DEBTORS RELY ON AND REFER TO INFORMATION AND PROJECTIONS REGARDING THE FUTURE FINANCIAL PERFORMANCE OF HSH. THE DEBTORS OBTAINED THIS DATA FROM CERTAIN PUBLICLY AVAILABLE INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SOURCES ARE RELIABLE, THE DEBTORS HAVE NOT INDEPENDENTLY VERIFIED AND DO NOT GUARANTEE THE ACCURACY AND COMPLETENESS OF THIS INFORMATION. THE DEBTORS AND THEIR ADVISORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE ANY INFORMATION DISCLOSED HEREIN TO REFLECT ANY CHANGES ARISING AFTER THE DATE HEREOF OR TO REFLECT FUTURE EVENTS, EVEN IF ANY ASSUMPTIONS CONTAINED HEREIN ARE SHOWN TO BE IN ERROR. FORWARD-LOOKING

STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

## I.  INTRODUCTION AND SUMMARY OF THE PLAN

The Debtors submit this Disclosure Statement, pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), to Holders of Claims and Interests in connection with: (a) the solicitation of votes to accept or reject the *Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, which was filed by the Debtors with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and (b) the confirmation hearing (the "Confirmation Hearing"), which is scheduled for October 19, 2010 at 9:30 a.m. (Eastern Daylight Time) (the "Confirmation Hearing Date").  A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

On September 8, 2009, involuntary petitions for relief under chapter 7 of the Bankruptcy Code (the "Chapter 7 Cases") were filed in the Bankruptcy Court with respect to HSH Luxembourg S.à r.l. ("Luxembourg Fund II Debtor"), HSH Delaware L.P. ("Delaware Debtor"), and HSH Luxembourg Coinvest S.à r.l. ("Luxembourg Co-Invest Debtor", and together with the Luxembourg Fund II Debtor and the Delaware Debtor, the "Involuntary Debtors").  On January 21, 2010 (the "Commencement Date"), each of HSH Alberta I L.P. ("Alberta I"), HSH Alberta II L.P. ("Alberta II"), HSH Alberta V L.P. ("Alberta V"), HSH Coinvest (Alberta) L.P. ("Alberta Coinvest" and, collectively with Alberta I, Alberta II and Alberta V, the "Alberta Debtors"), JCF HSH (DE) GP LP (the "New GP"), and HSH Delaware GP LLC ("Delaware LLC", and together with the Alberta Debtors and the New GP, the "Voluntary Debtors"), filed a voluntary petition for relief with the Bankruptcy Court under chapter 11 of the Bankruptcy Code.  On the Commencement Date, the Involuntary Debtors filed, among other pleadings, a motion to convert the Chapter 7 Cases to cases under chapter 11 of the Bankruptcy Code (the "Conversion Motion").  On January 22, 2010, the Bankruptcy Court entered an order approving the relief requested in the Conversion Motion, and entered a further order [Docket No. 14] jointly administering the Chapter 11 Cases of each of the Debtors.  Each of the Debtors is authorized to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or official committee of unsecured creditors has been appointed in the Chapter 11 Cases.

As discussed in greater detail below, on September 8, 2009, the Lenders delivered acceleration notices to the Shareholder Debtors (as defined in section II.A below) regarding amounts outstanding under such Debtors' prepetition Credit Agreements, demanding immediate repayment of all amounts outstanding under the Credit Agreements.  Through the Commencement Date, the Debtors negotiated in good faith with the Lenders in an attempt to restructure the terms of the Credit Agreements; however, despite numerous discussions and settlement proposals, the parties could not reach agreement.  Consequently, the Debtors commenced the Chapter 11 Cases in order to maximize the value of the Debtors' assets for the benefit of all stakeholders.

RLF1 3593748v. 5

A.      **PURPOSE AND EFFECT OF THE PLAN**

The Plan contemplates the reorganization of the Debtors upon consummation of the Plan and the resolution of the outstanding Claims against and Interests in the Debtors pursuant to sections 1123, 1129 and 1141 of the Bankruptcy Code, including, among other things, all outstanding disputes with the Lenders regarding the Credit Agreements. The Plan provides for, among other things, the capitalization of all outstanding and unpaid interest and costs under the Credit Agreements as of the Record Date, the amendment and restatement of the Credit Agreements and the extension of the maturities thereunder, the terms under which the Debtors' primary assets - the HSH Shares - or certain equity interests in the Debtors can be disposed of (in accordance with the Agreed Sale Conditions), and the rights of the Lenders to share in any Upside Amount recovered pursuant to any such sale, on the terms described in the Term Sheet and the Restructuring Documents. A copy of the complete Term Sheet is attached hereto as Exhibit B. The organizational documents of certain Debtors will be amended to ensure that they are managed in accordance, and in compliance, with the Restructuring Documents, and a Post-Effective Date Committee will be appointed to oversee the compliance by the Reorganized Debtors with the provisions of the Plan and the Restructuring Documents. The key terms of the Restructuring include, without limitation, the following:

(a)      Subject to the terms of the Amended and Restated Credit Agreements, the amounts outstanding under the Facilities and the Hedging Arrangements will remain outstanding until they are put on demand by the Facility Agent, at which time they will become immediately due and payable. The Facility Agent will have the ability to put the Facilities and the Hedging Arrangements on demand (i) at any time on and from December 31, 2014, provided that the relevant Reorganized Debtor has received not less than 30 days prior written notice from the Facility Agent (such that the first date that the Facility Agent can put the Facilities on demand is December 31, 2014 if prior notice has been given in accordance with this paragraph (a)); or (ii) immediately on the occurrence of a Termination Event; or (iii) simultaneously with the completion of any sale or transfer of all of the HSH Shares or Relevant Equity Interests. During the Lock Up Period only, the Reorganized Debtors will have the ability to prepay all (but not part) of the Facilities and the Hedging Arrangements by prepaying an amount equal to the Par Amount at that time (and at the same time for each Facility) on 10 Business Days notice ("Voluntary Prepayment"). For the avoidance of doubt, a Voluntary Prepayment must be in respect of all the Facilities and the Hedging Arrangements.

(b)      Until the Facilities are repaid in full, the Reorganized Debtors will, provided that they do so in accordance with the terms of the Amended and Restated Credit Agreements and the Agreed Sale Conditions, have the ability to effect a sale of the HSH Shares or the Relevant Equity Interests at any time (subject to a right of first refusal or consultation, as applicable, as set out in the Restructuring Documents), in order to effect a full or, as the case may be, partial repayment or prepayment of the Par Amount (provided that, during the Lock Up Period, the Reorganized Debtors will not effect a disposal of the HSH Shares or the Relevant Equity Interests below the Par Amount without the consent of the Trusts). Any excess amount over and above the Par Amount received on a sale or other disposal of the HSH Shares and/or the Relevant Equity Interests ("Upside Amount") will be split between the Lenders and the relevant Debtors or the Trusts, as applicable, on a 50/50 basis; provided that if contracts for the sale or disposal of the HSH Shares and/or the Relevant Equity Interests are executed on a date which is

later than 6 months after a Voluntary Prepayment, any Upside Amount will be split between the Lenders and the relevant Debtors or the Trusts, as applicable, on a 25/75 basis.

(c)      To ensure compliance by the Debtors with the agreed terms of the Restructuring and the Plan, certain modifications and amendments will be made to the corporate structure and organizational documents of the Alberta Debtors, the Delaware Debtor, the Delaware LLC and the Luxembourg Fund II Debtor. In particular (but without limitation): (i) the New GP will withdraw as a general partner of each of the Alberta Debtors and the Alberta Debtors will be managed solely by the Cayman GPs; (ii) PlanCo SPV will be admitted as a member of the Delaware LLC with sole power to control the appointment and removal of the managers of the Delaware LLC; (iii) an additional class of shares in the Luxembourg Fund II Debtor (the "B Shares") will be created and allocated to PlanCo SPV (which shares will grant PlanCo SPV the exclusive right to propose to the general shareholders meeting of the Luxembourg Fund II Debtor candidates to be appointed at board level); and (iv) all of the shares in the Cayman GPs will be transferred to PlanCo SPV. The New Organizational Documents will, among other things, prohibit any sale or transfer of the HSH Shares or the Relevant Equity Interests other than in accordance with the Agreed Sale Conditions and in accordance with the terms of the Amended and Restated Credit Agreements.

(d)      The Luxembourg Co-Invest Debtor will not be subject to any changes to its constitution, management or corporate structure. The Luxembourg Co-Invest Debtor and the Trust which is its shareholder will enter into certain contractual arrangements described in the Term Sheet and the Restructuring Documents which will bind the Luxembourg Co-Invest Debtor and its shareholder Trust to the arrangements contemplated by the Term Sheet and the Plan, including, without limitation, the sale of the HSH Shares and/or the Relevant Equity Interests in accordance with the Agreed Sale Conditions, the granting of security for the Secured Obligations and the sharing of any Upside Amount.

(e)      To secure the Secured Obligations, the Reorganized Debtors and the Trusts will provide to the Lenders security over the YFCPEC Claims, the Relevant Equity Interests, the LLC Interest and, to the extent possible, the HSH Shares, together with certain powers of attorney, stock powers and other applicable instruments in order to enable the Lenders to enforce their security and effect a sale of the YFCPEC Claims, the Relevant Equity Interests, the LLC Interest and/or the HSH Shares in accordance with the terms of the Restructuring Documents. The applicable Debtors and the Trusts will use their commercially reasonable efforts to obtain the consent of HSH to enable the applicable Debtors to provide direct security over the HSH Shares held by the Debtors to the Lenders. If the Lenders are not granted security over the HSH Shares, all HSH Share Title Documents will be physically deposited with the HSH Shares Custodian on the Effective Date and held pursuant to the terms of the Custodian Agreement. If the Lenders are granted security over the HSH Shares, all HSH Share Title Documents will be physically deposited with the Security Trustee on the Effective Date; provided that, following a Voluntary Prepayment, such documents will be transferred to the HSH Shares Custodian and held pursuant to the terms of the Custodian Agreement, pending payment of any Upside Amount.

5

(f)     The Post-Effective Date Committee established pursuant to Article VIII of the Plan will oversee the implementation of the Plan in accordance with the Plan and the New Organizational Documents.

(g)     The Liquidators will remain in office and will continue to manage the Cayman GPs, provided that, for the avoidance of doubt, nothing in the Plan is intended to, nor shall it, supersede any authorizations and/or statutory compliance required of the Liquidators under the law of the Cayman Islands.

The Plan also contemplates that, unless the Holder of such Claim and the Debtors agree to different treatment :  (i) each Holder of an Allowed Priority Non-Tax Claim will be paid in full in Cash on the Effective Date; (ii) each Holder of an Allowed Secured Claim shall have its Claim Reinstated on the Effective Date; (iii) each Holder of an Allowed General Unsecured Claim will be paid in full in Cash on the Effective Date (provided that, the Cayman GP Indemnity Claims will be Reinstated); (iv) each Holder of an Allowed YFCPEC Claim shall be entitled to retain such YFCPEC Claim, *provided that* the rights attaching to such YFCPEC Claim shall be modified in accordance with the Amended YFCPEC Documents, the Plan and any other applicable Restructuring Document; and (v) each Holder of an Allowed Interest shall be entitled to retain such Interest, *provided that* the rights attaching to such Interest shall be modified in accordance with the New Organizational Documents, the Plan and any other applicable Restructuring Document.

The Debtors believe that the above transactions contemplated by the Plan are in the best interests of the Debtors, their estates, and all relevant stakeholders.  The transactions contemplated by the Plan will settle all outstanding disputes with the Lenders regarding the Credit Agreements, and the Debtors and their management believe that the proposed Restructuring will maximize the value of the Debtors' assets for the benefit of all stakeholders. The Debtors believe that any alternative to Confirmation of the Plan, such as conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or any attempt by another party in interest to file a plan, would result in significant delays, litigation and additional costs and, ultimately, would reduce the value of the Debtors' assets and lower the recoveries for Holders of Allowed Claims and Interests.

**B.      OVERVIEW OF CHAPTER 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the debtor's legal and equitable interests in property as of the commencement of the chapter 11 case. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any

holder of a claim against or equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code, to the terms and conditions of the confirmed plan. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan provides for the treatment of claims and equity interests in accordance with the terms of the confirmed plan and discharges a debtor from its prepetition obligations.

Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan. This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

**C.   SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN**

**THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS. THIS IS A SUMMARY ONLY, AND REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS. THE RECOVERIES SET FORTH BELOW ARE PROJECTED RECOVERIES AND ARE THEREFORE SUBJECT TO CHANGE. THE ALLOWANCE OF CLAIMS MAY BE SUBJECT TO LITIGATION OR OTHER ADJUSTMENTS, AND ACTUAL ALLOWED CLAIM AMOUNTS MAY DIFFER MATERIALLY FROM THESE ESTIMATED AMOUNTS.**

**SUMMARY OF EXPECTED RECOVERIES**

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|-------|---------------------------|------------------------------|-----------------------------------|
| 1 | Priority Non-Tax Claims[2] | Unless the Holder of such Claim and the Debtors agree to different treatment, on the later of the Effective Date and the date such Claim is Allowed, each Holder of an Allowed Class 1 Claim, in full satisfaction of such Claim, shall be paid in full in Cash. | 100% |
| 2 | Secured Claims[3] | Unless the Holder of such Claim and the Debtors agree to different treatment, on the Effective Date, each Holder of an Allowed Secured Claim shall have its Claim Reinstated. | 100% |

---

[2]   The Debtors currently are not aware of any Priority Non-Tax Claims; however, out of an abundance of caution, the Debtors have created a Class for Priority Non-Tax Claims in the event that they become aware of any prior to confirmation of the Plan.

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 3 | Lender Claims | Each Holder of an Allowed Lender Claim shall participate, with respect to each Debtor, for its *pro rata* share of indebtedness under the Amended and Restated Credit Agreements, on the terms and in the amounts set forth in the Amended and Restated Credit Agreements and the Upside Sharing Agreement. Additionally, as set forth in more detail in Article VII of the Plan, the organizational documents of the Reorganized Debtors will be amended to ensure that the Reorganized Debtors are managed in accordance, and in compliance, with the Restructuring Documents, and to provide for oversight by the Post-Effective Date Committee of the Reorganized Debtors' implementation of and compliance with the provisions of the Plan. Each Lender shall be entitled to participate in the Post-Effective Date Committee. | Reinstated as Modified by the Restructuring Documents |
| 4 | General Unsecured Claims | Unless the Holder of such Claim and the Debtors agree to different treatment, on the later of Effective Date and the date such Claim is Allowed, each Holder of an Allowed General Unsecured Claim, in full and final satisfaction of such Claim, shall be paid in full in Cash; *provided that*, each Holder of a Cayman GP Indemnity Claim shall have its Claim Reinstated; and *provided further that,* the Allowed Class 4 Claims of McCarthy Tetrault LLP and Barlow Lyde & Gilbert LLP shall be paid in full in Cash by the Trusts. | 100% |
| 5 | YFCPEC Claims | Each Holder of an Allowed YFCPEC Claim shall be entitled to retain such YFCPEC Claim; *provided that* the rights attaching to such YFCPEC Claim shall be modified in accordance with the Amended YFCPEC Documents, the Plan and any other applicable Restructuring Document; and *provided, further,* that no such modification or amendment to the maturity | Reinstated as Modified by the Restructuring Documents |

[Footnote continued from previous page]

   3   The Debtors currently are not aware of any Secured Claims; however, out of an abundance of caution, the Debtors have created a Class for Secured Claims in the event that they become aware of any prior to confirmation of the Plan.

RLF1 3593748v. 5

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|-------|---------------------------|------------------------------|-----------------------------------|
| | | date shall detrimentally affect the tax situation of the Luxembourg Fund II Debtor or the tax situation of the Holders of the YFCPEC Claims. | |
| 66 | Interests | Each Holder of an Allowed Interest shall be entitled to retain such Interest; *provided that* the rights attaching to such Interest shall be modified in accordance with the New Organizational Documents, the Plan and any other applicable Restructuring Document. | Reinstated as Modified by the Restructuring Documents |

**D.     VOTING AND CONFIRMATION PROCEDURES**

**1.     Claims Bar Date**

On [————]August 27, 2010, the Bankruptcy Court approved [————]September 17, 2010 at 5:00 p.m. (Eastern Daylight Time) as the general Claims Bar Date and has approved the form and manner of the notice of the Claims Bar Date [Docket No. ——]365].

**2.     Entities Entitled to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan. Holders of Claims or Interests that are not Impaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan. Holders of Claims or Interests that will not receive a distribution or retain any property under the Plan are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtors. A Claim or Interest is placed in a particular Class for purposes of voting on the Plan and of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Lender Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 5 | YFCPEC Claims | Impaired | Entitled to Vote |
| 6 | Interests | Impaired | Entitled to Vote |

The following sets forth the Classes that are entitled to vote on the Plan and the Classes that are not entitled to vote on the Plan:

- The Debtors are **NOT** seeking votes from the Holders of Claims in Classes 1, 2 and 4 because Claims in Classes 1, 2 and 4 are Unimpaired under the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Class 1, 2 and 4 Claims are conclusively presumed to have accepted the Plan.

- The Debtors **ARE** soliciting votes to accept or reject the Plan from Holders of Claims in Classes 3 and 5 and Holders of Interests in Class 6, because Claims in Classes 3 and 5 and Interests in Class 6 are Impaired under the Plan and will receive distributions under the Plan. Accordingly, Holders of Claims in Classes 3 and 5 and Holders of Interests in Class 6 have the right to vote to accept or reject the Plan.

For a detailed description of the Classes of Claims and the Classes of Interests, as well as their respective treatment under the Plan, see Article III of the Plan.

3.      **Acceptance or Rejection of the Plan**

The Bankruptcy Code defines "acceptance" of a plan by a class of claims or interests as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims or Interests in that class that cast ballots for acceptance or rejection of the plan.

E.      **CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to hold a hearing on confirmation of a plan filed under chapter 11 of the Bankruptcy Code. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

1. **Confirmation Hearing Date**

**The Confirmation Hearing will commence on October 19, 2010 at 9:30 a.m. (Eastern Daylight Time)**, before The Honorable Mary F. Walrath**, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 5th Floor, Courtroom 4, 824 North Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on all Persons who have requested notice in this Chapter 11 Case and the Persons who have filed objections to the Plan ("Plan Objections"), without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

2. **Plan Objection Deadline**

**The Plan Objection Deadline is 4:00 p.m. (Eastern Daylight Time) on ~~_____~~October 14, 2010**. All Plan Objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the order approving this Disclosure Statement (the "Disclosure Statement Order") on or before the Plan Objection Deadline. In accordance with the confirmation hearing notice filed with the Bankruptcy Court, Plan Objections or requests for modifications to the Plan, if any, must:

- be in writing;

- conform to the Bankruptcy Rules;

- state the name and address of the objecting Person and the amount and nature of the Claim or Interest of such Person;

- state with particularity the basis and nature of the Plan Objection and, if practicable, a proposed modification to the Plan that would resolve such Plan Objection; and

- be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** by the notice parties identified in the confirmation hearing notice on or prior to the Voting Deadline.

The Debtors' proposed schedule will provide Persons sufficient notice of the Plan Objection Deadline pursuant to Bankruptcy Rule 2002(b). The Debtors believe that the Plan Objection Deadline will afford the Bankruptcy Court, the Debtors and other parties-in-interest reasonable time to consider any Plan Objections prior to the Confirmation Hearing.

**THE BANKRUPTCY COURT WILL NOT CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

## II.     BACKGROUND TO THE CHAPTER 11 CASES

### A.     THE DEBTORS

In 2006, J.C. Flowers & Co. LLC ("JCF") advised seven investment vehicles in their collective acquisition from WestLB AG (the "Acquisition") of approximately 26% of the then-outstanding shares of HSH Nordbank AG ("HSH"), a large German bank with registered offices in Hamburg and Kiel, for an aggregate purchase price of approximately €1.25 billion ($1.6 billion). Each of the seven investment vehicles is an independent trust formed for the purpose of indirectly acquiring and holding HSH shares and whose beneficiaries are primarily investors in J.C. Flowers Fund II (collectively, the "Trusts"). The Trusts each formed limited partnerships or equivalent entities (the Involuntary Debtors and the Alberta Debtors (collectively, the "Shareholder Debtors") through which to acquire and hold the HSH shares. A brief discussion of the Debtors' corporate structure is set forth below:

(a)  **The Alberta Debtors** - Each of the Alberta Debtors is a limited partnership organized under the laws of Alberta, Canada. The Certificate of Limited Partnership filed in Alberta, Canada in respect of each Alberta Debtor states that each Alberta Debtor has two general partners: One a Cayman Islands entity[24] and the other the New GP. Under the Certificate of Limited Partnership of each of the Alberta Debtors, the general partners of the Alberta Debtors have the exclusive right to control and manage the business of the limited partnerships.

(b)  **The New GP –** The New GP was created in October 2009 as a limited partnership organized under the laws of the State of Delaware, to serve as a general partner of each of the Alberta Debtors.

(c)  **The Delaware LLC –** The Delaware LLC was created in September 2006 as a limited liability company organized under the laws of the State of Delaware to serve as the general partner of the Delaware Debtor.

(d)  **The Delaware Debtor –** The Delaware Debtor is a limited partnership organized under the laws of the State of Delaware. Its general partner is

---

[24]  HSH Cayman I GP Ltd (in liquidation) ("Cayman I"), HSH Cayman II GP Ltd (in liquidation) ("Cayman II"), HSH Cayman V GP Ltd (in liquidation) ("Cayman V"), and HSH Coinvest (Cayman) GP Ltd (in liquidation) ("Cayman Coinvest", and together with Cayman I, Cayman II, and Cayman V, the "Cayman GPs"), are the Cayman Islands general partners of Alberta I, Alberta II, Alberta V, and Alberta Coinvest, respectively. As discussed in more detail below, the Cayman GPs are subject to winding up proceedings in the Cayman Islands.

the Delaware LLC. Pursuant to the Delaware Debtor's limited partnership agreement and the Delaware LLC's limited liability company agreement, The HSH AIV 4 Trust, as the sole member of the Delaware LLC, manages the Delaware LLC's business and affairs.

**(e)** **The Luxembourg Fund II Debtor** – The Luxembourg Fund II Debtor is a société à responsabilité limitée organized under the laws of Luxembourg. Its sole shareholder is The HSH AIV 3 Trust (the "<u>HSH S.à r.l. Trust</u>"), a trust organized under the laws of the Cayman Islands. JCF is the advisor of, and HSH Cayman Partners L.P. is a beneficiary of, the HSH S.à r.l. Trust. HSH Cayman Partners GP Ltd., an exempted company incorporated with limited liability in the Cayman Islands, is the general partner of HSH Cayman Partners L.P., and Genesis Trust & Corporate Services ("<u>Genesis</u>"), an exempted company incorporated with limited liability in the Cayman Islands, is its director. Genesis also is the trustee of the HSH S.à r.l. Trust and has the power to, *inter alia*, appoint the advisor of the trust, pay or allow any debt or claim, and settle any debt, account, or claim relating to the trust.

**(f)** **The Luxembourg Co-Invest Debtor** – The Luxembourg Co-Invest Debtor is a société à responsabilité limitée organized under the laws of Luxembourg. Its sole shareholder is The HSH Coinvest (Cayman) Trust-B (the "<u>HSH Coinvest S.à r.l. Trust</u>"), a trust organized under the laws of the Cayman Islands. JCF is the advisor of, and HSH Coinvest Partners L.P. is a beneficiary of, the HSH Coinvest S.à r.l. Trust. HSH Coinvest GP Ltd., an exempted company incorporated with limited liability in the Cayman Islands, is the general partner of HSH Coinvest Partners L.P., and The Harbour Trust Co. Ltd. ("<u>Harbour</u>"), an exempted company incorporated with limited liability in the Cayman Islands, is its director. Harbour is also the trustee of the HSH Coinvest S.à r.l. Trust and has the power to, *inter alia*, appoint the advisor of the trust, pay or allow any debt or claim, and settle any debt, account, or claim relating to the trust.

The Shareholder Debtors' primary assets are their ordinary shares in HSH. Table 1, below, shows for each of the Shareholder Debtors: (i) the number of HSH ordinary shares owned and (ii) the percentage ownership of the total number of ordinary shares of HSH.

**TABLE 1**

| Shareholder Debtor | Number of Ordinary Shares Owned | Number of Mandatory Convertible Stock (RESPARC Securities) | Percentage Ownership of Total Number of Ordinary Shares of HSH |
|---|---|---|---|
| Alberta I | 7,961,765 | 2,303,727 | 3.24% |
| Alberta II | 3,713,811 | 1,074,588 | 1.51% |
| Alberta V | 903,878 | 261,536 | 0.37% |
| Alberta Coinvest | 3,031,170 | 0 | 1.23% |
| Luxembourg Fund II Debtor | 3,953,787 | 1,144,024 | 1.61% |
| Delaware Debtor | 1,232,799 | 356,709 | 0.50% |
| Luxembourg Co-Invest Debtor | 1,481,720 | 0 | 0.60% |

The Debtors have no day-to-day business operations, and generate revenue mainly from the payment of dividends on account of their HSH Shares. HSH pays dividends, at most, on an annual basis, but is restricted from doing so if it cannot meet certain profitability requirements. The last annual dividend paid by HSH was on May 20, 2008, pursuant to which the Debtors received a total of €32,736,936.86. HSH did not pay an annual dividend in 2009, and the Debtors do not expect HSH to pay an annual dividend in 2010. As of the Commencement Date, the Debtors had cash holdings (using then prevailing exchange rates) as reflected below in Table 2:

## TABLE 2

| Debtor | Cash Holdings |
|--------|---------------|
| Alberta I | $187,542.69 |
| Alberta II | $13,056.52 |
| Alberta V | $43,320.05 |
| Alberta Coinvest | $7,773.99 |
| Luxembourg Fund II Debtor | $2,949,207.74 |
| Delaware Debtor | $215,603.44 |
| Luxembourg Co-Invest Debtor | $1,922,387.38 |
| Delaware LLC | $0.00 |
| New GP | $0.00 |
| TOTAL | $5,338,891.81 |

As the Debtors do not expect HSH to pay an annual dividend in 2010, they do not expect to receive any income (aside from minimal interest income) in the near future.

The Debtors' Available Cash includes both (i) the cash holdings listed above, as well as (ii) the aggregate amount (if any) distributed by that Debtor to any Trust since the date that the last payment of interest was made to the Facility Agent under a Credit Agreement during the course of 2008 (such amounts to be set out in a Plan Supplement to be Filed on or before the Supplement Filing Date).

B.     **THE DEBTORS' CAPITAL STRUCTURE**

To partially finance the acquisition of the HSH Shares, the Shareholder Debtors, as "Borrowers," each entered into virtually identical unsecured Credit Agreements, dated October 19, 2006, with ABN AMRO Bank N.V., London Branch ("ABN"), as "Facility Agent" and the "Lender", to lend a total of approximately €375 million ($477 million). The balance of the $1.6 billion purchase price for the HSH Shares (plus an additional investment of $296 million in December 2007) came from investors in the Trusts, which consist of hundreds of institutional investors, financial institutions, high net worth individuals and certain pension funds (collectively, the "Trust Investors"). The Lenders have no liens on any of the Debtors' assets.

Under each Credit Agreement, there are two unsecured credit facilities. One is the term loan (the "Term Loan") that was used to partially finance the acquisition. As the Shareholder Debtors' primary source of income is dividend payments from HSH, each Credit Agreement also included revolving credit loans (the "Revolving Credit Loans") to be used as "bridge" facilities for servicing the interest accruing on the Term Loans during the period between dividend payment dates. Because the HSH dividend was paid, at most, annually, the Revolving Credit Loans were necessary to fund the interest payments on the Term Loans.

In early 2008, as a result of the worldwide credit crisis, HSH determined that a recapitalization of the bank was needed. This recapitalization occurred in July 2008 (the "July 2008 Recapitalization"), whereby HSH issued 17,490,909 mandatory convertible shares, of which Alberta I, Alberta II, Alberta V, the Delaware Debtor and the Luxembourg Fund II Debtor (the "Acquiring Debtors") purchased a combined 5,140,584 shares (the "Mandatory Convertible Shares") on or about August 7, 2008 for approximately €283 million. In addition, the Acquiring Debtors paid €281 million for the purchase of 5,114,724 ordinary shares. The total purchase price of approximately €564 million was funded entirely by the Trust Investors, thereby increasing the shareholders' aggregate investment in the Shareholder Debtors to over €1.7 billion.

## C.    NEGOTIATIONS TO RESTRUCTURE CREDIT AGREEMENTS

In connection with the July 2008 Recapitalization, the Shareholder Debtors became aware of and notified the Lenders that certain covenants in the Credit Agreements needed to be reset, including the Asset Coverage and Interest Cover covenants (in clauses 18.3 and 18.4 of the Credit Agreements). The Shareholder Debtors and the Lenders thereafter engaged in negotiations to restructure the Credit Agreements to reset the financial covenant obligations and adjust the debt service terms on a going forward basis. These negotiations, which began in November 2008, continued through January 30, 2009.

On January 30, 2009, certain interim payment obligations became due under the Credit Agreements, including payment of the principal and interest on certain Revolving Credit Loans and interest on the Term Loans These interim payment obligations were not met. During the course of 2009 through September 8, 2009, certain other interim payment obligations under the Credit Agreements were not met. On and from January 30, 2009, the Shareholder Debtors and the Lenders negotiated to see if the terms of the Credit Agreements could be adjusted. Despite these negotiations, on September 8, 2009, the Lenders delivered acceleration notices to each of the Shareholder Debtors (the "Acceleration Notices") demanding immediate repayment of all amounts outstanding under the Credit Agreements.

## D.    THE CAYMAN PROCEEDINGS

On the same day that the Lenders delivered the Acceleration Notices, they filed winding up petitions against the Cayman GPs in the Cayman Court, under the respective case numbers 425-428 of 2009 (the "Winding Up Petitions"). On November 13, 2009, the Cayman Court ordered the winding up of the Cayman GPs (the "Winding Up Order") and appointed Ian Stokoe and David Walker of PwC Corporate Finance & Recovery (Cayman) Ltd as joint official liquidators (the "Liquidators"); however, on December 9, 2009, the Cayman Islands Court of Appeal vacated the Winding Up Orders because of procedural infirmities, discharged the Liquidators (as of December 17, 2009) and remitted the matter back to the Cayman Court. On December 17, 2009, the Cayman Court granted the Lenders permission to amend the Winding Up Petitions. The Lenders subsequently amended the Winding Up Petitions, and such amended Winding Up Petitions were considered by the Cayman Court on January 26 and 27, 2010. On February 12, 2010, the Cayman Court issued its judgment (the "Cayman Judgment") ordering the winding up of the Cayman GPs and the reappointment of the Liquidators. The Cayman

Judgment was appealed to the Cayman Islands Court of Appeal by the Cayman GPs, but was upheld further to a judgment dated May 24, 2010.

### E.  THE INVOLUNTARY CHAPTER 7 CASES

On September 8, 2009, involuntary petitions for relief under chapter 7 of the Bankruptcy Code were filed in the Bankruptcy Court with respect to the Involuntary Debtors.

### F.  THE FILING OF THE CHAPTER 11 CASES

Through the Commencement Date, the Debtors negotiated in good faith with the Lenders in an attempt to restructure the terms of the Credit Agreements; however, despite numerous discussions and settlement proposals, the parties could not reach agreement.  Consequently, on the Commencement Date, (i) the Alberta Debtors, the New GP, and Delaware LLC filed petitions under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (ii) the Involuntary Debtors consented to the involuntary petitions commencing the Chapter 7 Cases and filed a motion to convert the Chapter 7 Cases to cases under chapter 11 of the Bankruptcy Code (the "Conversion Motion"), as well as a motion to shorten the notice period for such Conversion Motion so that it may be considered by the Court at the "first day" hearing in the Chapter 11 Cases.  On January 22, 2010, the Bankruptcy Court entered an order approving the relief requested in the Conversion Motion, thereby converting the Chapter 7 Cases to cases under chapter 11 of the Bankruptcy Code, and entered a further order [Docket No. 14] jointly administering the Chapter 11 Cases.  The Debtors commenced the Chapter 11 Cases in hopes of resolving their differences with the Lenders through a chapter 11 plan of reorganization, thereby maximizing the value of their assets for the benefit of all stakeholders.

### G.  FOREIGN RECOGNITION IN CANADA

On January 25, 2010, consistent with the Foreign Representatives Order (as defined herein, below), the Alberta Debtors applied to the Court of Queen's Bench of Alberta (the "Alberta Court") for a recognition order and entry of a stay protecting the Alberta Debtors' Canadian assets, pursuant to Part XIII of the Canadian Bankruptcy and Insolvency Act.  On January 25, 2010, on an *ex parte* basis in accordance with Rule 387 of the Alberta Rules of Court, the Alberta Court granted the recognition order, recognizing the Chapter 11 Cases as a "foreign main proceeding" and the Alberta Debtors as the foreign representatives of their respective estates, and staying all proceedings against the Alberta Debtors in Canada.

### III.  ADMINISTRATION OF THE CHAPTER 11 CASES

### A.  RELIEF OBTAINED AT THE OUTSET OF THE CHAPTER 11 CASES

On or shortly after the Commencement Date, the Debtors filed several motions and applications (the "First Day Motions") seeking the entry of certain orders (collectively, the "First Day Orders") which were intended to facilitate the transition between the Debtors' prepetition and postpetition business activities as well as to ease administration of the Chapter 11 Cases.  Thereafter, the Bankruptcy Court entered several First Day Orders, (i) jointly administering the Chapter 11 Cases, and (ii) granting the Debtors the authority to (a) continue to

use their existing bank accounts and business forms and (b) act as foreign representatives in Canada. A more detailed description of the First Day Motions follows:

### 1. Motion for Joint Administration

In order to avoid the preparation, replication, service, and filing of duplicative notices, applications, and orders in each of the nine Chapter 11 Cases, the Debtors sought and the Bankruptcy Court entered a First Day Order jointly administering the Chapter 11 Cases for procedural purposes only [Docket No. 14], thereby saving the Debtors' estates considerable expense and resources.

### 2. Motion to Maintain Bank Accounts and Business Forms

As part of a smooth transition into the Chapter 11 Cases and in an effort to avoid administrative inefficiencies, maintaining use of the Debtors' prepetition bank accounts and business forms was important. Thus, the Debtors sought and the Bankruptcy Court entered a First Day Order authorizing the Debtors to continue using their existing bank accounts and business forms and authorizing the Debtors to open new bank accounts. Further, the Court deemed the Debtors' bank accounts debtor-in-possession accounts and authorized the Debtors to maintain and continue using these accounts in the same manner and with the same account numbers and document forms as those employed before the Commencement Date [Docket No. 15].

### 3. Motion to Act as Foreign Representatives

The Debtors were concerned that after the Commencement Date, certain parties whose interests were at odds with the interests of the Debtors and their creditors would avail themselves of the Court of Queen's Bench of Alberta in an attempt to dissolve and liquidate the Alberta Debtors' assets. To protect against the risk of seizure, the Alberta Debtors sought, in the Alberta Court, recognition of their Chapter 11 Cases as foreign main proceedings and entry of a stay protecting the Alberta Debtors' assets. Prior to filing the necessary papers in the Alberta Court, the Alberta Debtors sought and the Bankruptcy Court entered a First Day Order allowing the Debtors to act as foreign representatives pursuant to section 1505 of the Bankruptcy Code [Docket No. 16] (the "Foreign Representatives Order").

## B. EMPLOYMENT AND COMPENSATION OF ADVISORS

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Bankruptcy Court authorized the Debtors to retain and employ the following advisors: (a) Richards, Layton & Finger, P.A., as primary bankruptcy counsel to the Debtors [Docket No. 81]; (b) Walkers, as Cayman Islands counsel to the Debtors [Docket No. 84]; (c) McCarthy Tétrault LLP, as Canadian Counsel to the Debtors [Docket No. 140]; and (d) Barlow Lyde & Gilbert LLP, as United Kingdom Counsel to the Debtors [Docket No. 218]. In addition, on February 23, 2010, the Bankruptcy Court (i) approved the Debtors' motion to retain and compensate certain professionals utilized in the ordinary course of the Debtors' business [Docket No. 83], and (ii)

entered an order approving certain procedures for the interim compensation and reimbursement of retained professionals in the Chapter 11 Cases [Docket No. 82].

## C. DISPUTED MOTIONS

There have been several motions filed in the Chapter 11 Cases which are the subject of dispute between the Debtors and the Lenders (collectively, the "Disputed Motions"). The Debtors and Lenders have been engaged in negotiations as well as discovery regarding the Disputed Motions and the Chapter 11 Cases generally, which ultimately resulted in a compromise incorporated in the terms of the Plan. If the Plan is confirmed, it will settle all of the disputes between the Debtors and the Lenders and will render moot the relief requested in the Disputed Motions. The Disputed Motions are as follows:

### 1. Motion for Authority to Obtain Debtor in Possession Financing

On February 3, 2010, the Debtors sought approval to enter into a debtor-in-possession financing agreement [Docket No. 25] (the "Financing Motion"), which would give them access to a $5,000,000 post-petition loan to cover administrative expenses associated with the Chapter 11 Cases. On February 22, 2010, the Lenders filed an objection to the Financing Motion [Docket No. 79]. The Debtors and Lenders have agreed to adjourn the hearing on the Financing Motion pending the Effective Date of the Plan.

### 2. Motion to Employ a Chief Restructuring Officer

On February 3, 2010, the Debtors filed a motion to approve a services agreement between the Debtors and H Ronald Weissman, pursuant to which Mr. Weissman would serve as the Debtors' Chief Restructuring Officer [Docket No. 24] (the "CRO Motion"). On February 23, 2010, the Lenders filed an objection to the relief requested in the CRO Motion [Docket No. 86]. The Debtors and Lenders have agreed to adjourn the hearing on the CRO Motion pending the Effective Date of the Plan.

### 3. Motion to Appoint a Chapter 11 Trustee or Terminate Exclusivity

On February 23, 2010, the Lenders filed a motion for an order directing the appointment of a chapter 11 trustee or, in the alternative, terminating the Debtors' exclusive right to file and solicit acceptances of a chapter 11 plan [Docket No. 80] (the "Trustee Motion"). On March 18, 2010, the Debtors filed a preliminary objection to the Trustee Motion [Docket No. 147], and on March 18, 2010, J.C. Flowers II L.P., J.C. Flowers II-A, L.P., J.C. Flowers II-B, L.P., The HSH Coinvest (Cayman) Trust-A, The HSH Coinvest (Cayman) Trust-B, The HSH AIV 1 Trust, The HSH AIV 2 Trust, The HSH AIV 3 Trust, The HSH AIV 4 Trust, and The HSH AIV 5 Trust (collectively, the "Investors") filed an initial objection to the Trustee Motion [Docket No. 148]. The Debtors and Lenders have agreed to adjourn the hearing on the Trustee Motion pending the Effective Date of the Plan.

### 4. Motion to Appoint an Examiner

On March 24, 2010, the United States Trustee for the District of Delaware (the "U.S. Trustee") filed a statement in support of the Trustee Motion and an independent motion for an

order directing the appointment of an examiner [Docket No. 186] (the "Examiner Motion").  On April 20, 2010, the Debtors filed an objection to the Examiner Motion [Docket No. 229], and the Investors filed a joinder to such objection [Docket No. 230].  Additionally, on April 21, 2010, the Lenders filed a statement with respect to the Examiner Motion [Docket No. 233], by which the Lenders also opposed the relief requested in the Examiner Motion.  On April 23, 2010, the Bankruptcy Court held a hearing on the Examiner Motion solely to consider the limited issue of whether the appointment of an examiner under the circumstances of the Chapter 11 Cases is mandatory or discretionary.  On May 3, 2010, the Bankruptcy Court entered an order on that limited issue [Docket No. 258], determining that appointment of an examiner is not mandatory, denying the Examiner Motion on a preliminary basis and setting it for final hearing at the hearing on the Trustee Motion.  As the Trustee Motion is adjourned pending the Effective Date of the Plan, the Examiner Motion is similarly adjourned.

5. **Motion to Extend Exclusivity**

On May 20, 2010, the Debtors filed a motion to extend the period during which only the Debtors may file a chapter 11 plan and solicit acceptances thereof [Docket No. 274] (the "Exclusivity Extension Motion").  Although the Lenders have not filed a formal objection to the Exclusivity Extension Motion, the relief requested in the Exclusivity Extension Motion is directly contrary to the relief requested by the Lenders in the Trustee Motion, and the Lenders have made it clear to the Debtors that they oppose the relief requested in the Exclusivity Extension Motion.  The Debtors and Lenders have agreed to adjourn the hearing on the Exclusivity Extension Motion pending confirmation of the Plan; however, pursuant to Rule 9006-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtors' exclusive period is automatically extended until the Bankruptcy Court acts on the Exclusivity Extension Motion.

D. **UNSECURED CREDITORS**

1. **Committee Formation Meeting**

On February 18, 2010, the U.S. Trustee held a formation meeting to gauge creditor interest in the formation of an Official Committee of Unsecured Creditors.  Due to lack of interest, the U.S. Trustee was unable to appoint a committee.

2. **Meeting of Creditors**

The meeting of creditors pursuant to section 341 of the Bankruptcy Code was commenced on February 24, 2010 at 2:30 p.m. (Eastern Standard Time) at the J. Caleb Boggs Federal Building, 844 King Street, 2nd Floor, Room 2112, Wilmington, Delaware 19801.  In accordance with Bankruptcy Rule 9001(5) (which requires, at a minimum, that one representative of the Debtors appear at such meeting of creditors for the purpose of being examined under oath by a representative of the U.S. Trustee and by any attending parties in interest), Daniel Katsikas, authorized representative of the Debtors, as well as counsel to the Debtors, attended the meeting and answered questions posed by the U.S. Trustee.

E. **SCHEDULES**

On February 5, 2010, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs with the Bankruptcy Court [Docket Nos. 31-48].

## IV. SUMMARY OF THE PLAN

A. **ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS**

1. **Administrative Claims**

On the later of (i) the Effective Date or (ii) if the Administrative Expense Claim is not Allowed as of the Effective Date, 30 days after the date on which an Administrative Expense Claim becomes Allowed, the Debtors shall either (x) pay to each Holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (y) satisfy and discharge such Administrative Expense Claim in accordance with such other terms that the Debtors and such Holder shall have agreed upon; provided, however, that such agreed-upon treatment shall not be more favorable than the treatment provided in clause (x); and, provided further, that U.S. Trustee Fees shall be paid in accordance with Section 2.4 of the Plan.  Other than with respect to Professional Compensation Claims and Cure Claims, notwithstanding anything in the Plan to the contrary, if an Administrative Expense Claim arises (i) based on liabilities incurred in, or to be paid in, the ordinary course of business during the Postpetition Period or (ii) pursuant to an Executory Contract or Unexpired Lease, the Holder of such Administrative Expense Claim shall be paid in Cash by the applicable Debtor (or after the Effective Date, by the applicable Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreements giving rise to such Administrative Expense Claim without the need or requirement for the Holder of such Administrative Expense Claim to file a motion, application, claim or request for allowance or payment of an Administrative Expense Claim with the Bankruptcy Court.  A schedule of all known Administrative Expense Claims is attached hereto as Exhibit C.

2. **Professional Compensation Claims**

Notwithstanding any other provision of the Plan to the contrary, payment of any Professional Compensation Claims shall be made solely by the Trusts, and in no event shall any Professional Compensation Claims be paid out of Assets of the Estate or otherwise become an obligation of any other Person, including, but not limited to, the Debtors or the Reorganized Debtors.  Any Person asserting a Professional Compensation Claim shall, no later than 30 days after the Confirmation Date, file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date.  To the extent that such an application is granted by the Bankruptcy Court, the requesting Person shall receive from the Trusts: (i) payment of Cash in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Cases, such payment to be made within the later of (a) the Effective Date or (b) three Business Days after the order granting such Person's final fee application becomes a Final Order; or (ii) payment on such other terms as may be mutually agreed upon by the Holder of the Professional Compensation Claim and the Trusts (but in no event shall the payment exceed the amount

Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Cases. On or prior to the Effective Date, the Trusts shall deposit to an escrow account (the "Professional Compensation Claims Escrow") with Richards, Layton & Finger, P.A. an amount equal to the Professional Compensation Claims (including a reasonable estimate of an amount necessary to satisfy any Professional Compensation Claims pending approval by the Bankruptcy Court), pursuant to the terms of the Professional Compensation Claims Escrow Agreement.

### 3. Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) or (D), as applicable, of the Bankruptcy Code. A schedule of all known Priority Tax Claims is attached hereto as Exhibit D.

## B. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

### 1. Summary

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtors. A Claim or Interest is placed in a particular Class for purposes of voting on the Plan and of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

**SUMMARY OF CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Lender Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 5 | YFCPEC Claims | Impaired | Entitled to Vote |
| 6 | Interests | Impaired | Entitled to Vote |

2. **Classification and Treatment of Claims and Interests**

To the extent a Class contains Allowed Claims or Allowed Interests with respect to the applicable Debtor, the treatment provided to each Class for distribution purposes is specified below:

**Class 1 - Priority Non-Tax Claims**[3][5]

  a.  **Classification**

Class 1A through 1I consists of all Priority Non-Tax Claims against the Debtors.

  b.  **Impairment and Voting**

Class 1 Claims are Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

  c.  **Treatment**

Unless the Holder of such Claim and the Debtors agree to different treatment, on the later of the Effective Date and the date such Claim is Allowed, each Holder of an Allowed Class 1 Claim, in full satisfaction of such Claim, shall be paid in full in Cash.

**Class 2 - Secured Claims**[4][6]

  a.  **Classification**

Class 2A through 2I consists of all Secured Claims against the Debtors.

  b.  **Impairment and Voting**

Class 2 Claims are Unimpaired by the Plan. Each Holder of an Allowed Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

---

[3][5] The Debtors currently are not aware of any Priority Non-Tax Claims; however, out of an abundance of caution, the Debtors have created a Class for Priority Non-Tax Claims in the event that they become aware of any prior to confirmation of the Plan.

[4][6] The Debtors currently are not aware of any Secured Claims; however, out of an abundance of caution, the Debtors have created a Class for Secured Claims in the event that they become aware of any prior to confirmation of the Plan.

###### c. Treatment

Unless the Holder of such Claim and the Debtors agree to different treatment, on the Effective Date, each Holder of an Allowed Secured Claim shall have its Claim Reinstated.

### Class 3 – Lender Claims

###### a. Classification

Class 3A through ~~3I~~ 3D and 3F through 3H consists of all Lender Claims against the Debtors.

###### b. Impairment and Voting

Class 3 Claims are Impaired by the Plan. Each Holder of an Allowed Lender Claim is entitled to vote to accept or reject the Plan.

###### c. Allowance

The Lender Claims set forth on Exhibit B3 to the Plan shall be Allowed Class ~~2~~ 3 Claims in the amount set forth, and against the applicable Debtor(s) identified, in Exhibit B3 to the Plan.

###### d. Treatment

Each Holder of an Allowed Lender Claim shall participate, with respect to each Debtor, for its pro rata share of indebtedness under the Amended and Restated Credit Agreements, on the terms and in the amounts set forth in the Amended and Restated Credit Agreements and the Upside Sharing Agreement. Additionally, and as set forth in more detail in Article VII of the Plan, the organizational documents of the Reorganized Debtors will be amended to ensure that the Reorganized Debtors are managed in accordance, and in compliance, with the Restructuring Documents, and to provide for oversight by the Post-Effective Date Committee of the Reorganized Debtors' implementation of and compliance with the provisions of the Plan. Each Lender shall be entitled to participate in the Post-Effective Date Committee.

### Class 4 – General Unsecured Claims

###### a. Classification

Class 4A through 4I consists of all General Unsecured Claims against the Debtors.

###### b. Impairment and Voting

Class 4 Claims are Unimpaired by the Plan. Each Holder of an Allowed General Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

###### c. Allowance

The Class 4 Claims set forth on Exhibit B4 to the Plan shall be Allowed Class 4 Claims in the amount set forth, and against the applicable Debtor(s) identified, in Exhibit B4 to the Plan.

### d. Treatment

Unless the Holder of such Claim and the Debtors agree to different treatment, on the later of the Effective Date and the date such Claim is Allowed, each Holder of an Allowed Class 4 Claim, in full satisfaction of such Claim, shall be paid in full in Cash; provided, however, that each Holder of a Cayman GP Indemnity Claim shall have its Claim Reinstated; and provided further that, the Allowed Class 4 Claims of McCarthy Tetrault LLP and Barlow Lyde & Gilbert LLP shall be paid in full in Cash by the Trusts.

### Class 5 - YFCPEC Claims

### a. Classification

Class 5 consists of all YFCPEC Claims against the Luxembourg Fund II Debtor.

### b. Impairment and Voting

Class 5 Claims are Impaired by the Plan. Each Holder if an Allowed YFCPEC Claim is entitled to vote to accept or reject the Plan.

### c. Allowance

The YFCPEC Claims set forth on Exhibit B5 to the Plan shall be Allowed Class 5 Claims in the amount set forth, and against the applicable Debtor(s) identified, in Exhibit B5 to the Plan.

### d. Treatment

Each Holder of an Allowed YFCPEC Claim shall be entitled to retain such YFCPEC Claim, *provided that,* the rights attaching to such YFCPEC Claim shall be modified in accordance with the Amended YFCPEC Documents, the Plan and any other applicable Restructuring Document; *provided, further,* that no such modification or amendment to the maturity date shall detrimentally affect the tax situation of the Luxembourg Fund II Debtor or the tax situation of the Holders of the YFCPEC Claims.

### Class 6 – Interests

### a. Classification

Class 6A through 6I consists of all Interests in the Debtors.

### b. Impairment and Voting

Class 6 Interests are Impaired by the Plan. Each Holder of an Allowed Interest is entitled to vote to accept or reject the Plan.

### c. Allowance

The Interests set forth on Exhibit B6 to the Plan shall be Allowed Class 6 Interests to the extent set forth therein, and in the applicable Debtor(s) identified, in Exhibit B6 to the Plan. The Interests held by New GP are specifically deemed not Allowed, and no distribution shall be made to the New GP on account thereof.

### d. Treatment

Each Holder of an Allowed Interest shall be entitled to retain such Interest, *provided that,* the rights attaching to such Interest shall be modified in accordance with the New Organizational Documents, the Plan and any other applicable Restructuring Document.

## C. SPECIAL PROVISIONS GOVERNING UNIMPAIRED CLAIMS

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

## D. ACCEPTANCE OR REJECTION OF THE PLAN

### 1. Voting Classes

Classes 3, 5 and 6 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

### 2. Presumed Acceptance of the Plan

Classes 1, 2 and 4 are Unimpaired under the Plan. Pursuant to section 1126(f) of the Bankruptcy Code the Holders of Claims and Interests in such Classes are conclusively presumed to have accepted the Plan and are therefore not entitled to vote to accept or reject the Plan.

## E. CONTROVERSY CONCERNING IMPAIRMENT

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## V. MEANS FOR IMPLEMENTATION OF THE PLAN AND POSTPETITION GOVERNANCE OF REORGANIZED DEBTORS

## A. OVERVIEW

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Restructuring, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. The Plan provides for,

among other things, the capitalization of all outstanding and unpaid interest and costs under the Credit Agreements as of the Record Date, the amendment and restatement of the Credit Agreements and the extension of the maturities thereunder, the terms under which the HSH Shares or the Relevant Equity Interests can be disposed of (in accordance with the Agreed Sale Conditions), and the rights of the Lenders to share in any Upside Amount recovered pursuant to any such sale, on the terms described in the Term Sheet and the Restructuring Documents. The organizational documents of certain Debtors will be amended to ensure that they are managed in accordance, and in compliance, with the Restructuring Documents, and a Post-Effective Date Committee will be appointed to oversee the compliance by the Reorganized Debtors with the provisions of the Plan and the Restructuring Documents. The key terms of the Restructuring include, without limitation, the following:

(a)     Subject to the terms of the Amended and Restated Credit Agreements, the amounts outstanding under the Facilities and the Hedging Arrangements will remain outstanding until they are put on demand by the Facility Agent, at which time they will become immediately due and payable. The Facility Agent will have the ability to put the Facilities and the Hedging Arrangements on demand (i) at any time on and from December 31, 2014, provided that the relevant Reorganized Debtor has received not less than 30 days prior written notice from the Facility Agent (such that the first date that the Facility Agent can put the Facilities on demand is December 31, 2014 if prior notice has been given in accordance with this paragraph (a)); or (ii) immediately on the occurrence of a Termination Event; or (iii) simultaneously with the completion of any sale or transfer of all of the HSH Shares or Relevant Equity Interests. During the Lock Up Period only, the Reorganized Debtors will have the ability to prepay all (but not part) of the Facilities and the Hedging Arrangements by prepaying an amount equal to the Par Amount at that time (and at the same time for each Facility) on 10 Business Days notice. For the avoidance of doubt, a Voluntary Prepayment must be in respect of all the Facilities and the Hedging Arrangements.

(b)     Until the Facilities are repaid in full, the Reorganized Debtors will, provided that they do so in accordance with the terms of the Amended and Restated Credit Agreements and the Agreed Sale Conditions, have the ability to effect a sale of the HSH Shares or the Relevant Equity Interests at any time (subject to a right of first refusal or consultation, as applicable, as set out in the Restructuring Documents), in order to effect a full or, as the case may be, partial repayment or prepayment of the Par Amount (provided that, during the Lock Up Period, the Reorganized Debtors will not effect a disposal of the HSH Shares or the Relevant Equity Interests below the Par Amount without the consent of the Trusts). Any excess amount over and above the Par Amount received on a sale or other disposal of the HSH Shares and/or the Relevant Equity Interests will be split between the Lenders and the relevant Debtors or the Trusts, as applicable, on a 50/50 basis; provided that if contracts for the sale or disposal of the HSH Shares and/or the Relevant Equity Interests are executed on a date which is later than 6 months after a Voluntary Prepayment, any Upside Amount will be split between the Lenders and the relevant Debtors or the Trusts, as applicable, on a 25/75 basis.

(c)     To ensure compliance by the Debtors with the agreed terms of the Restructuring and the Plan, certain modifications and amendments will be made to the corporate structure and organizational documents of the Alberta Debtors, the Delaware Debtor, the Delaware LLC and the Luxembourg Fund II Debtor. In particular (but without limitation): (i)

the New GP will withdraw as a general partner of each of the Alberta Debtors and the Alberta Debtors will be managed solely by the Cayman GPs; (ii) PlanCo SPV will be admitted as a member of the Delaware LLC with sole power to control the appointment and removal of the managers of the Delaware LLC; (iii) an additional class of shares in the Luxembourg Fund II Debtor will be created and allocated to PlanCo SPV (which shares will grant PlanCo SPV the exclusive right to propose to the general shareholders meeting of the Luxembourg Fund II Debtor candidates to be appointed at board level); and (iv) all of the shares in the Cayman GPs will be transferred to PlanCo SPV. The New Organizational Documents will, among other things, prohibit any sale or transfer of the HSH Shares or the Relevant Equity Interests other than in accordance with the Agreed Sale Conditions and in accordance with the terms of the Amended and Restated Credit Agreements.

(d)     The Luxembourg Co-Invest Debtor will not be subject to any changes to its constitution, management or corporate structure. The Luxembourg Co-Invest Debtor and the Trust which is its shareholder will enter into certain contractual arrangements described in the Term Sheet and the Restructuring Documents which will bind the Luxembourg Co-Invest Debtor and its shareholder Trust to the arrangements contemplated by the Term Sheet and the Plan, including, without limitation, the sale of the HSH Shares and/or the Relevant Equity Interests in accordance with the Agreed Sale Conditions, the granting of security for the Secured Obligations and the sharing of any Upside Amount.

(e)     To secure the Secured Obligations, the Reorganized Debtors and the Trusts will provide to the Lenders security over the YFCPEC Claims, the Relevant Equity Interests, the LLC Interest and, to the extent possible, the HSH Shares, together with certain powers of attorney, stock powers and other applicable instruments in order to enable the Lenders to enforce their security and effect a sale of the YFCPEC Claims, the Relevant Equity Interests, the LLC Interest and/or the HSH Shares in accordance with the terms of the Restructuring Documents. The applicable Debtors and the Trusts will use their commercially reasonable efforts to obtain the consent of HSH to enable the applicable Debtors to provide direct security over the HSH Shares held by the Debtors to the Lenders. If the Lenders are not granted security over the HSH Shares, all HSH Share Title Documents will be physically deposited with the HSH Shares Custodian on the Effective Date and held pursuant to the terms of the Custodian Agreement. If the Lenders are granted security over the HSH Shares, all HSH Share Title Documents will be physically deposited with the Security Trustee on the Effective Date; provided that, following a Voluntary Prepayment, such documents will be transferred to the HSH Shares Custodian and held pursuant to the terms of the Custodian Agreement, pending payment of any Upside Amount.

(f)     The Post-Effective Date Committee established pursuant to Article VIII of the Plan will oversee the implementation of the Plan in accordance with the Plan and the New Organizational Documents.

(g)     The Liquidators will remain in office and will continue to manage the Cayman GPs, provided that, for the avoidance of doubt, nothing in the Plan is intended to, nor shall it, supersede any authorizations and/or statutory compliance required of the Liquidators under the law of the Cayman Islands.

B.    **DISTRIBUTION OF AVAILABLE CASH**

On the Effective Date, all Available Cash of each Debtor will be applied against the obligations of that Debtor in the manner described in the Amended and Restated Credit Agreements.

C.    **CONTINUED EXISTENCE OF THE DEBTORS**

Except as specifically provided in the Plan, each Debtor will continue to exist on or after the Effective Date as a separate corporate or other applicable entity, with all the rights and powers applicable to such entity under applicable law, subject to, where applicable, the terms of the New Organizational Documents.

D.    **IMPLEMENTATION TRANSACTIONS**

The Debtors (or, after the Effective Date, the Reorganized Debtors) and the Trusts shall implement the Plan through the transactions described in the Term Sheet, including, without limitation: (i) the withdrawal of the New GP as a general partner of each of the Alberta Debtors; (ii) the transfer of all shares in the Cayman GPs to PlanCo SPV; (iii) the admission of PlanCo SPV as a member of the Delaware LLC; and (iv) the creation and allocation of the B Shares to PlanCo SPV. The Reorganized Debtors may engage in any other transaction in furtherance of the Plan, provided that such transaction does not conflict with the terms of the Amended and Restated Credit Agreements and the Restructuring Documents.

E.    **REORGANIZED DEBTORS; RESTRUCTURING TRANSACTIONS AND DOCUMENTS**

On the Effective Date, the Reorganized Debtors, the Trusts and the Lenders (as applicable), and any other necessary Person, will adopt, execute, or enter into, as applicable, the Restructuring Documents, including, without limitation, the Amended and Restated Credit Agreements, the Upside Sharing Agreement, the Cayman Settlement Agreements, the Luxembourg Settlement Agreements, the Luxembourg Voting Agreement, the New GP Withdrawal and Release Documents, the Security Agreements, and the New Organizational Documents. The Reorganized Debtors may, provided that such action does not conflict with the terms of the Amended and Restated Credit Agreements or the Restructuring Documents, adopt any other agreements, documents and instruments and to take any other action necessary and desirable to consummate the Plan. The New Organizational Documents, which evidence the new corporate and corporate governance structure of the Reorganized Debtors, will be substantially as described in the Term Sheet and in the form Filed in the Plan Supplement. After the Effective Date, the New Organizational Documents may not be amended other than in accordance with the terms of such documents (such terms to include a prohibition on any amendment to the New Organizational Documents absent the prior consent of the Cayman GPs, the Delaware LLC or PlanCo SPV, as applicable). Unless the prior written consent of the Post-Effective Date Committee, Cayman GP, or Delaware LLC, as applicable, is obtained, (i) the appointment or removal of any general partner of a Reorganized Debtor that is a limited partnership, and (ii) the removal of PlanCo SPV as a member of the Delaware LLC or the Luxembourg Fund II Debtor, will be prohibited.

The New Organizational Documents shall prohibit the issuance of non-voting equity securities to the extent required by section 1123(a) of the Bankruptcy Code.

**F.  POST-EFFECTIVE DATE MANAGEMENT**

On and after the Effective Date, other than in the case of the Luxembourg Co-Invest Debtor, the business and affairs of the Reorganized Debtors will be managed by the officers, directors or other responsible persons identified in the New Organizational Documents. Information regarding these proposed officers, directors, managers and other responsible persons as required by section 1129(a)(5) of the Bankruptcy Code will be set forth in a Plan Supplement to be filed on or before the Supplement Filing Date.

**G.  EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS**

On and after the Effective Date, the Reorganized Debtors are authorized to and may, in the name of and on behalf of the applicable Reorganized Debtors, issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Amended and Restated Credit Agreements, the other Restructuring Documents and/or the Plan.

**H.  ENTITY ACTION**

Upon the Effective Date, all actions contemplated by the Plan shall be deemed ratified, authorized, and approved in all respects, including but not limited to: (i) the adoption of the New Organizational Documents; (ii) the selection of the new directors, officers and managers of the Reorganized Debtors; (iii) the issuance of B Shares in the Luxembourg Fund II Debtor to PlanCo SPV; (iv) the admission of PlanCo SPV as a member of the Delaware LLC; (v) the transfer of the shares in the Cayman GPs to PlanCo SPV; (vi) the execution and entry into the Restructuring Documents, including, without limitation, the Amended and Restated Credit Agreements, the Upside Sharing Agreement, the Security Agreements, and any other ancillary agreements relating thereto; and (vii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, the documents set forth in the Plan Supplement and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated herein shall be effective notwithstanding any requirements under any non-bankruptcy law.

## I. LIQUIDATION/DISSOLUTION OF THE REORGANIZED DEBTORS

Upon a sale or transfer of the HSH Shares, and provided that the Secured Obligations are not repaid in full as a result of such sale, the Reorganized Debtors will be liquidated or dissolved in a manner determined by the Post-Effective Date Committee, in its sole discretion.

## J. CONTROL OF THE DEBTORS AFTER VOLUNTARY PREPAYMENT

Following a Voluntary Prepayment in full and a discharge in full of the Secured Obligations, the Trusts will have the ability to alter the management of the Reorganized Debtors in accordance with the terms of the New Organizational Documents.  In such event, the Post-Effective Date Committee and the Facility Agent will thereafter retain the following two rights (as well as the right to veto or disapprove any amendment, waiver, limitation or termination of such rights):  (i) withhold consent to the sale of the HSH Shares and a sale of the Relevant Equity Interests only if they are not reasonably satisfied that the total sale proceeds will be paid to a bank account of a third party agent appointed by both the Reorganized Debtors and the Lenders who has unconditional instructions from the Reorganized Debtors and/or the Trusts to pay any Upside Amount due to the Lenders directly to the Lenders before any remaining proceeds are paid to the Reorganized Debtors or the Trusts, and (ii) consent to the granting of security over any assets of any Alberta Debtor, the Delaware Debtor or any Luxembourg Debtor (and the Trust may not grant any security over the Relevant Equity Interests to any third party financier of any Reorganized Debtor or the Trust) where the secured obligations (in aggregate) exceed the Par Amount with respect to the facilities borrowed by the relevant Reorganized Debtor or Trust.

## K. POST-EFFECTIVE DATE COMMITTEE

### 1. Creation and Dissolution

On the Effective Date, there shall be created a Post-Effective Date Committee (the "Post-Effective Date Committee").  Unless the Post-Effective Date Committee unanimously votes to disband earlier, the Post-Effective Date Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases and/or administration of the Plan on the Final Settlement Date.

### 2. Membership

The members of the Post-Effective Date Committee shall be the Lenders, as identified in the Plan Supplement.  In the event of the resignation of a member of the Post-Effective Date Committee for any reason, the remaining members may, but need not, designate a successor.  Unless and until such vacancy is filled, the Post- Effective Date Committee shall function with such reduced membership.

### 3. Governance

The Post-Effective Date Committee shall have the power to adopt rules of procedure and may choose one of its members to act as chairperson.

4. **Responsibilities and Powers**

The Post-Effective Date Committee shall have the following responsibilities and powers:

(a)     consent rights in respect of the matters expressly referred to in the Plan, the Term Sheet or the Restructuring Documents;

(b)     oversight to ensure that, prior to a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, any sale of the HSH Shares or Relevant Equity Interests pursuant to the Plan is made in accordance with the Agreed Sale Conditions;

(c)     oversight of the implementation of the Plan, to ensure that the Reorganized Debtors are performing their obligations in accordance with the Plan and that the Reorganized Debtors are being managed in accordance with the Plan;

(d)     prior to a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, a veto right in respect of any Person proposed to be the HSH Supervisory Board Representative;

(e)     independent standing to appear and be heard in the Bankruptcy Court as to any matter relating to the Plan, the Estate or the Reorganized Debtors, including any matter as to which the Bankruptcy Court has retained jurisdiction pursuant to the Plan;

(f)     power to perform such additional functions as may be agreed by the Reorganized Debtors, or contemplated in the Confirmation Order or any other order entered in connection with the Plan; and

(g)     prior to a Voluntary Prepayment in full and/or a discharge in full of the Secured Obligations, a veto right in respect of the appointment, removal or replacement of any manager of any Reorganized Debtor (other than the New GP or the Luxembourg Co-Invest Debtor).

5. **Limitation of Liability**

Neither the Post-Effective Date Committee, nor any of its members, nor any of its employees (or the employees of its members), professionals or agents, shall in any way be liable ~~or answerable~~ for ~~anything~~ conduct in connection with the Plan, including, but not limited to, the confirmation, execution, consummation, administration of the Plan and/or any transaction contemplated thereby, except for such acts or omissions that are finally determined by a court of competent jurisdiction to result from the willful misconduct, gross negligence, bad faith or fraud of such member or such member's employee, professional or agent. The Post-Effective Date Committee shall be entitled to rely upon any opinion of counsel and other professionals employed by the Post-Effective Date Committee, and shall not be liable for any action taken or omitted in good faith on such reliance. The Post-Effective Date Committee shall not owe any fiduciary or other duties to any person, including without limitation, the Debtors, the

Reorganized Debtors, or any Holder of a Claim against or Interest in the Debtors or the Reorganized Debtors.

### 6. Indemnity

The Estate shall indemnify and hold harmless the Post-Effective Date Committee, its members, employees (or the employees of its members) and its professionals and agents from and against any and all liabilities, expenses, claims, damages or losses incurred by them as a direct result of acts or omissions taken by them in good faith in their capacities as members of or professionals or agents for the Post-Effective Date Committee, except those that are finally determined by a court of competent jurisdiction to have resulted from gross negligence, willful misconduct, bad faith or fraud.

### 7. Co-operation

Until the termination or dissolution of the Post-Effective Date Committee in accordance with Section 8.1 of the Plan, the Reorganized Debtors will provide cooperation to the Post-Effective Date Committee as may be reasonably requested in respect of the exercise by the Post-Effective Date Committee of its powers and functions under the Plan.

## L. VESTING OF ASSETS IN THE REORGANIZED DEBTORS

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in the Estates, all Causes of Action, and any property acquired by the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, granted by the Plan or any agreement, instrument or other document incorporated therein). On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## M. EXEMPTION FROM CERTAIN TAXES AND FEES

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents under the Plan, (b) the creation of any mortgage, deed of trust, Lien, pledge or other security interest under the Plan, (c) the making or assignment of any lease or sublease pursuant to the Plan, or (d) the making or delivery of any deed or other instrument of transfer under, pursuant to, or in connection with the Plan, including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, assignments, and transfers of tangible property executed in connection with the Plan or the Confirmation Order, shall not be subject to any stamp tax or similar tax or government assessment to the fullest extent provided for under the Bankruptcy Code.

## VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Except as otherwise provided in the Plan or pursuant to the Confirmation Order, all Executory Contracts and Unexpired Leases that exist between the Debtors and any Person shall be deemed rejected as of the Confirmation Date, except for such contract or lease (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Confirmation Date, or (ii) as to which a motion for approval of the assumption or rejection of such contract or lease has been Filed prior to the Confirmation Date; *provided that*, the applicable Debtor or Debtors will assume, or assume and assign, each Executory Contract or Unexpired Lease listed in a Plan Supplement to be Filed on or before the Supplement Filing Date. Entry of the Confirmation Order shall constitute the approval, pursuant to section 365(a) of the Bankruptcy Code, of the assumption or rejection of the Executory Contracts and Unexpired Leases assumed or rejected pursuant to Section 6.1 of the Plan.

## VII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A. REVESTING OF ASSETS

Except as expressly provided in the Plan, or as provided in a prior or future order of the Bankruptcy Court, no Asset of the Estate shall be deemed abandoned and no Cause of Action shall be deemed released or compromised by or as a result of the Plan, its Confirmation, its consummation or its treatment of any Claim or Creditor. Further, no defense, set-off, counterclaim or right of recoupment of the Debtors or the Estate shall be deemed waived or compromised. The Reorganized Debtors, under the supervision and subject to the consent of the Post-Effective Date Committee, are authorized to investigate, prosecute and, if necessary, litigate, any Cause of Action.

### B. DISCHARGE

#### 1. Discharge of Claims Against the Debtors and the Reorganized Debtors

**Except as otherwise expressly provided in the Plan or the Confirmation Order, the Confirmation of the Plan shall, as of the Effective Date: (i) discharge the Debtors, the Reorganized Debtors or any of its or their Assets from all Claims, demands, liabilities, other debts and Interests that arose on or before the Effective Date, including all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based on such debt has accepted the Plan; and (ii) preclude all Persons from asserting against the Debtors, the Reorganized Debtors, or any of their Assets, any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections 524 and 1141 of the Bankruptcy Code. The discharge provided in this provision shall extinguish any liability of the Debtors to the extent that such liability relates to a discharged Claim or cancelled Interest, whether such liability is reduced to judgment or not.**

2. **Injunction Related to the Discharge**

Except as otherwise provided in the Plan or the Confirmation Order, all entities, wherever located in the world, that have held, currently hold, or may hold Claims or other debts or liabilities against the Debtors, or any Interest in any or all of the Debtors, that are discharged pursuant to the terms of the Plan, are permanently enjoined, on and after the Effective Date, from taking, or causing any other entity to take, any of the following actions on account of any such Claims, debts, liabilities or Interests or rights: (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt, liability, Interest, or right, other than to enforce any right to a distribution pursuant to the Plan; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; (iii) creating, perfecting, or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors, or any of their Assets on account of any such Claim, debt, liability, Interest or right; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors, the Reorganized Debtors, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; and (v) commencing or continuing any action, in any manner, in any place in the world that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Such injunction shall extend to any successor of the Debtors, the Reorganized Debtors, and any of their Assets. Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

C. **RELEASES**

1. **Releases by the Debtors.**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors in their individual capacity and as debtors in possession shall be deemed to release and forever waive and discharge the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtors, the Chapter 11 Cases, the Plan, the Restructuring Documents, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other

occurrence taking place on or before the Effective Date and that could have been asserted by or on behalf of the Debtors or their Estate at any time on or prior to the Effective Date against one or more of the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, gross negligence, bad faith or fraud. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any Person under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

2. **Releases by Holders of Claims and Interests**

~~For good and valuable consideration~~**Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the Restructuring, releases and other benefits provided under the Plan,** on and after the Effective Date, Holders of Claims and Interests, and their respective successors, assigns and transferees, shall be deemed to have released and forever waived and discharged the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtors, the Chapter 11 Cases, the Plan, the Restructuring Documents, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiations, formulation, or preparation of the Plan, the related Disclosure Statement, the related Plan Supplement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date and that could have been asserted by or on behalf of any Holder of a Claim or Interest at any time up to immediately prior to the Effective Date against one or more of the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, gross negligence, bad faith or fraud. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations (except Cure Claims that have not been Filed timely) of any Person under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

3. **Exculpation**

On and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party is hereby released from, any claim, cause of action, or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, for any act or omission that occurred during and in connection with the Chapter 11 Cases or in connection with the preparation and filing of

36

the Chapter 11 Cases, the formulation, negotiation, and/or pursuit of confirmation of the Plan, the consummation of the Plan, and/or the administration of the Plan and/or the property to be distributed under the Plan, except for claims, causes of action, or liabilities arising from the gross negligence, willful misconduct or fraud of any Exculpated Party, in each case subject to determination of such by final order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the Debtors, the Estate, the Trusts, the Lenders, and the Liquidators and their respective officers, directors, employees, members, attorneys, crisis managers, financial advisors, and professionals, shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code. Except as provided in Section 10.3 of the Plan, no provision of the Plan, the Disclosure Statement, or the Confirmation Order shall be deemed to act upon or release any claims, Causes of Action or liabilities that the Debtors, the Estate, or any party in interest may have against or to any Person for any act, omission, or failure to act that occurred prior to the Petition Date other than in connection with the preparation and filing of the Chapter 11 Cases.

4. **Injunction Related to Releases and Exculpation**

To the fullest extent allowed by law, and except as otherwise provided in the Plan or the Confirmation Order, all Persons that have held, currently hold, or may hold claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities that are released, waived, or exculpated pursuant to Section 10.3 of the Plan are permanently enjoined, on and after the Effective Date, from taking or causing any other Person to take, any of the following actions, at any time or at any place in the world, on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities: (i) commencing or continuing in any manner any action or other proceeding of any kind against a Released Party or Exculpated Party with respect to any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against any Released Party or any Exculpated Party or any of its or their assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; (iii) creating, perfecting, or enforcing any Lien or encumbrance against any Released Party or any Exculpated Party or any of its or their assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to any Released Party or any Exculpated Party or any of its or their assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; and (v) commencing or continuing any action, in any manner, in any place in the world that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Such injunction shall extend to any successor of any Released Party or any Exculpated Party or any of its or their assets. Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

5. **Injunctions in Furtherance of the Plan**

As consideration for the releases set forth herein and in furtherance of the implementation of the Plan in accordance with its terms and the terms of the Restructuring Documents (i) prior to the Final Settlement Date, no Released Party shall take any step towards the commencement or initiation of bankruptcy, dissolution or other insolvency proceedings in any jurisdiction in relation to any Reorganized Debtor or any Trust other than in accordance with the New Organizational Documents and with the prior consent of the Post-Effective Date Committee; (ii) no Released Party shall commence or continue any action, or take any step, in any manner, in any place in the world that does not comply with or is inconsistent with the provisions of the Restructuring Documents, the Plan or the Confirmation Order; (iii) no Released Party shall oppose any claim for specific performance brought by the Lenders, the Facility Agent, the Security Trustee, the Liquidators, the Post-Effective Date Committee or PlanCo SPV as a result of a breach of any term of a Restructuring Document (it being acknowledged by the Released Parties that specific performance and/or an injunction to compel performance are the appropriate remedies for any such breach and that damages are an inadequate and inappropriate remedy); and (iv) no Released Party shall oppose, obstruct, or refuse consent to any request, application, motion or proceeding brought by the Lenders, the Facility Agent, the Security Trustee, the Liquidators, the Post-Effective Date Committee or PlanCo SPV before any court or judicial, regulatory or administrative body in order to give effect to, or assist in the implementation of, the Plan and the Restructuring, provided that such request, application, motion or proceeding is consistent with the terms of the Plan and Restructuring Documents.

6. **Consent to Injunctions**

In exchange for the distributions pursuant to the Plan, each Holder of an Allowed Claim receiving such distribution pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in Section 10.3 of the Plan.

D. **INTEGRAL TO PLAN**

Each of the discharge, injunction and release provisions provided in Article X of the Plan is an integral part of the Plan and is essential to its implementation. Each of the Released Parties shall have the right to independently seek the enforcement of the discharge, injunction and release provisions set forth in Article X of the Plan.

E. **NO SUCCESSOR LIABILITY**

Except as otherwise expressly provided in the Plan, none of the Released Parties shall be determined to be successors to any of the Debtors or to any Person for which the Debtors may be held legally responsible, by reason of any theory of law or equity, and none can be responsible for any successor or transferee liability of any kind or character. The Released Parties do not agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors or the Reorganized Debtors, whether arising before, on, or after the Effective Date, except as otherwise expressly provided in the Plan.

F.    **RELEASE OF LIENS**

Except as otherwise expressly provided in the Plan, the Confirmation Order shall release any and all prepetition Liens against the Debtors, the Reorganized Debtors and any of their Assets.

G.    **WITHDRAWAL OF MOTIONS**

On the Effective Date, the Debtors' CRO Motion, the Debtors' DIP Motion, the Lenders' Trustee Motion and the U.S. Trustee Examiner Motion shall be deemed withdrawn, with prejudice, without any further action.

VIII.   **CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

A.    **CONDITIONS PRECEDENT TO CONFIRMATION**

The following are conditions precedent to Confirmation of the Plan, each of which must be (i) satisfied or (ii) waived in accordance with Section 9.3 of the Plan:

1.    The Bankruptcy Court shall have approved by Final Order a Disclosure Statement with respect to the Plan in form and substance reasonably acceptable to the Debtors and the Facility Agent; and

2.    The Exhibits, Supplements, schedules, documents, or agreements to be executed in connection with the Plan shall be in form and substance reasonably acceptable to the Debtors and the Facility Agent.

B.    **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be (i) satisfied or (ii) waived in accordance with Section 9.3 of the Plan:

1.    The Confirmation Order, in form and substance reasonably acceptable to the Debtors and the Facility Agent, shall have been entered by the Bankruptcy Court;

2.    The Confirmation Order shall contain a provision, reasonably satisfactory to the Debtors and the Facility Agent, that deems the Debtors' CRO Motion, the Debtors' DIP Motion, the Lenders' Trustee Motion and the U.S. Trustee Examiner Motion withdrawn with prejudice upon the Effective Date;

3.    The Confirmation Order shall be a Final Order, the Confirmation Date shall have occurred, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending;

4.    All statutory fees then due and payable to the United States Trustee shall have been paid in full;

5. All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained;

6. Any and all consents required under the terms of the Trust Agreements shall have been obtained, and any necessary amendments and modifications to the Trust Agreements shall have made, in each case as is necessary to effect the transactions contemplated by the Plan and the Restructuring Documents (and such consents and/or amendments shall be in form and substance satisfactory to the Facility Agent);

7. All Restructuring Documents shall be completed and in final form acceptable in all material respects to the Debtors and the Facility Agent and, to the extent necessary, shall have been executed and delivered by the respective parties thereto, and become unconditional in all respects except for confirmation of the Plan, including, without limitation, the Amended and Restated Credit Agreements, the Upside Sharing Agreement, the Cayman Settlement Agreements, the Luxembourg Settlement Agreements, the Luxembourg Voting Agreement, the New GP Withdrawal and Release Documents, the Security Agreements, and the New Organizational Documents, and the releases to be exchanged between and among the Released Parties pursuant to the terms of the Term Sheet and consistent with the releases provided in Section 10.3 of the Plan; and

8. All conditions precedent to the effectiveness of the Amended and Restated Credit Agreements shall have been provided to the Facility Agent in form and substance satisfactory to the Facility Agent.

## C. WAIVER OF CONDITIONS

The Facility Agent may waive any or all of the conditions set forth in Sections 9.1 and 9.2 of the Plan (except for the conditions set forth in Section 9.1(a) or 9.2(a)) at any time, provided that any waiver of the conditions set forth in Sections 9.1(b) and 9.2(g) of the Plan shall also require the consent of the Debtors. Any such waiver may be effected at any time by filing a notice thereof with the Bankruptcy Court.

## D. NOTICE OF EFFECTIVE DATE

The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Section 9.2 of the Plan have been satisfied or waived pursuant to Section 9.3 of the Plan.

## E. ORDER DENYING CONFIRMATION

If an Order denying confirmation of the Plan is entered by the Bankruptcy Court and such Plan is not consummated, then nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Interests in the Debtors, (b) prejudice in any manner the rights of the Holder of any Claim against, or Interest in, the Debtors, (c) prejudice in any manner any right, remedy or Claim of the Debtors, (d) be deemed an admission against interest by the Debtors, or (e) constitute a settlement, implicit or otherwise, of any kind whatsoever.

**F.      RETENTION OF JURISDICTION**

Following the Effective Date, and in light of the close nexus to the interpretation, implementation, consummation, execution and administration of the Plan that each of the transactions contemplated hereby has, the Bankruptcy Court shall retain jurisdiction over all matters arising from or relating to the Chapter 11 Cases to the fullest extent of applicable law, including, without limitation, jurisdiction to:

1.      Determine any and all objections to the allowance of Claims;

2.      Ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished as provided herein.

3.      Determine any and all motions to estimate Claims at any time, regardless of whether the Claim to be estimated is the subject of a pending objection, a pending appeal, or otherwise;

4.      Hear and determine all Professional Compensation Claims and Administrative Expense Claims;

5.      Hear and determine all matters with respect to the assumption or rejection of any Executory Contract or Unexpired Lease to which one or more of the Debtors is a party or with respect to which the Debtors may be liable, including, if necessary, the nature or amount of any Cure Claim arising therefrom;

6.      Hear and determine any and all adversary proceedings, motions, applications and contested or litigated matters arising out of, under or related to, the Chapter 11 Cases;

7.      Enter such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

8.      Hear and determine disputes arising in connection with the interpretation, implementation, consummation or enforcement of the Plan and all contracts, instruments and other agreements executed in connection with the Plan;

9.      Hear and determine any request to modify the Plan or to cure any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court;

10.      Issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with the implementation, consummation or enforcement of the Plan or the Confirmation Order, including to invoke the Bankruptcy Court's power of contempt for any violation of the Confirmation Order and/or any Person's failure to comply with their obligations under the Plan or the transactions contemplated hereby;

11.      Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified or vacated;

RLF1 3593748v. 5

12.     Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

13.     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

14.     Recover all assets of the Debtors and property of the Debtors' Estate, wherever located;

15.     Hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

16.     Hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

17.     Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under or not inconsistent with, provisions of the Bankruptcy Code; and

18.     Enter a final decree closing the Chapter 11 Cases.

## IX.     MISCELLANEOUS PROVISIONS

### A.     TERMS BINDING

Upon the occurrence of the Effective Date, all provisions of the Plan, including all agreements, instruments and other documents Filed in connection with the Plan and executed by the Debtors or the Reorganized Debtors in connection with the Plan, shall be binding upon the Debtors, the Reorganized Debtors, all Holders of Claims and Interests and all other Persons that are affected in any manner by the Plan.  All agreements, instruments and other documents Filed in connection with the Plan shall have full force and effect, and shall bind all parties thereto as of the entry of the Confirmation Order, whether or not such exhibits actually shall be executed by parties other than the Debtors or the Reorganized Debtors, or shall be issued, delivered or recorded on the Effective Date or thereafter. The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### B.     GOVERNING LAW

Except to the extent that the Bankruptcy Code or any other federal law is applicable or to the extent the law of a different jurisdiction is validly elected by the Debtors and the Lenders, the rights, duties and obligations arising under the Plan shall be governed in accordance with the substantive laws of the United States of America and, to the extent federal law is not applicable, the laws of the State of Delaware.

RLF1 3593748v. 5

## C.  SEVERABILITY

If the Bankruptcy Court determines at the Confirmation Hearing that any material provision of the Plan is invalid or unenforceable, with the consent of the Debtors and the Lenders, such provision, subject to section 1127 of the Bankruptcy Code, shall be altered or interpreted in such a way as to make the provision valid or enforceable to the maximum extent practicable, consistent with the original purpose of the provision, or, if not practicable, shall be severable from the Plan and shall be null and void, and, in such event, such determination shall in no way limit or affect the enforceability or operative effect of any or all other portions of the Plan.

## D.  CONFIRMATION OF THE PLAN FOR A SINGLE DEBTOR

The Plan constitutes a separate plan of reorganization for each Debtor.  However, in the event that the Plan cannot be confirmed with respect to one of the Debtors, the Plan may not be confirmed with respect to the other Debtors.

## E.  CONFIRMATION ORDER AND PLAN CONTROL

Except as otherwise provided in the Plan, in the event of any inconsistency between the Plan and the Disclosure Statement, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the Plan shall control.  In the event of any inconsistency between the Term Sheet and any Restructuring Document, such Restructuring Document shall control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## F.  INCORPORATION BY REFERENCE

Each Exhibit, schedule or Supplement to the Plan is incorporated herein by reference.

## G.  PLAN SUPPLEMENTS

Each of the Plan Supplements shall be in form and substance satisfactory to the Facility Agent.

## H.  MODIFICATIONS TO THE PLAN

The Debtors, with the consent of the Facility Agent, may amend or modify the Plan, and any Exhibit, schedule or Supplement to the Plan, at any time prior to the Confirmation Date in accordance with the Bankruptcy Code and Bankruptcy Rules.  Notwithstanding the foregoing, prior to the Voting Deadline, the Debtors may make non-material, administrative amendments or modifications to the Plan, and any Exhibit, schedule or Supplement to the Plan, without the consent of the Facility Agent.

## I.  REVOCATION, WITHDRAWAL OR NON-CONSUMMATION

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date, provided that the Debtors may not revoke or withdraw the Plan without the

consent of the Facility Agent. If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Effective Date does not occur by December 31, 2010 (unless extended by mutual agreement of the Debtors and the Facility Agent), then the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), the assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be null and void; provided, however, that all orders of the Bankruptcy Court and all documents executed pursuant thereto, except the Confirmation Order and any order approving the Disclosure Statement, shall remain in full force and effect. In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against any of the Debtors or any other Person, to prejudice in any manner the rights of any of the Debtors or any Person in any further proceedings or to constitute an admission of any sort by any of the Debtors or any other Person.

**J.      PAYMENT OF STATUTORY FEES**

All U.S. Trustee Fees, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

**K.      NOTICE**

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)  If to the Debtors:

c/o J.C. Flowers & Co. LLC
717 Fifth Avenue, 26th Floor
New York, New York  10022
Attn:  Daniel Katsikas
        Sally Rocker
Facsimile:  +1 (212) 404-6988

with copies to:

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn:  Mark D. Collins, Esq.
Facsimile:  +1 (302) 651-7701

- and -

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Lori R. Fife, Esq.
Facsimile:  +1 (212) 310-8007

- and (if to the Alberta Debtors) -

PWC CORPORATE FINANCE & RECOVERY (CAYMAN) LIMITED
P.O. Box 258
Strathvale House, George Town, Grand Cayman, KY1-1104
Cayman Islands
Attn:  Ian Stokoe and David Walker
Facsimile:  +1 (345) 945-4237

(b)  If to the Reorganized Debtors:

- if to the Alberta Debtors, the Delaware Debtor, the Delaware LLC or the Luxembourg
Fund II Debtor -

PWC CORPORATE FINANCE & RECOVERY (CAYMAN) LIMITED
P.O. Box 258
Strathvale House, George Town, Grand Cayman, KY1-1104
Cayman Islands
Attn: Ian Stokoe and David Walker
Facsimile: +1 (345) 945-4237

with copies to:

c/o J.C. Flowers & Co. LLC
717 Fifth Avenue, 26th Floor
New York, New York  10022
Attn:  Daniel Katsikas
        Sally Rocker
Facsimile:  +1 (212) 404-6988

with copies to:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Lori R. Fife, Esq.
Facsimile:  +1 (212) 310-8007

- and -

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins, Esq.
Facsimile: +1 (302) 651-7701

- if to the Luxembourg Co-Invest Debtor -

c/o J.C. Flowers & Co. LLC
717 Fifth Avenue, 26th Floor
New York, New York 10022
Attn: Daniel Katsikas
      Sally Rocker
Facsimile: +1 (212) 404-6988

with copies to:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn: Lori R. Fife, Esq.
Facsimile: +1 (212) 310-8007

- and -

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins, Esq.
Facsimile: +1 (302) 651-7701

## L.     NO WAIVER

Neither the failure of a Debtor to list a Claim or Interest in the Debtor's Schedules, the failure of a Debtor to object to any Claim, Administrative Expense Claim or Interest for purposes of voting, the failure of a Debtor to object to a Claim, Administrative Expense Claim or Interest prior to the Confirmation Date or the Effective Date shall, in the absence of a legally-effective express waiver or release executed by the Debtor with the approval of the Bankruptcy Court, if required, and with any other consents or approvals required under the Plan, be deemed a waiver or release of the right of a Debtor, a Reorganized Debtor, or their respective successors, either before or after solicitation of votes on the Plan, the Confirmation Date or the Effective Date, to object to or examine such Claim, Administrative Expense Claim or Interest, in whole or in part.

46

# X.  SOLICITATION AND VOTING PROCEDURES

The following briefly summarizes procedures to accept and confirm the Plan.

## A.  THE SOLICITATION PACKAGE

The following materials constitute the Solicitation Package:

- the Disclosure Statement, together with the Plan and other exhibits annexed thereto;

- the appropriate Ballot(s), together with a return envelope; and

- such other materials as the Court may direct or approve, including supplemental solicitation materials that the Debtors may file with the Court.

The Classes entitled to vote to accept or reject the Plan shall be served a paper copy of the Disclosure Statement and all exhibits to the Disclosure Statement, including the Plan.

## B.  VOTING INSTRUCTIONS

Only the Holders of Claims in Classes 3 and 5 and Interests in Class 6 are entitled to vote to accept or reject the Plan, and they may do so by completing the Ballot and returning it in the envelope provided to counsel to the Debtors by the Voting Deadline.  Voting instructions are attached to each Ballot.  Counsel to the Debtors will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will File a voting report containing the results as soon as practicable before the Confirmation Hearing.

The Voting Deadline is **5:00 p.m. (Eastern Daylight Time) on October 14, 2010.**

Ballots must be actually received by counsel to the Debtors by the Voting Deadline by using the envelope provided, or by First Class Mail, Overnight Courier or Personal Delivery to:

Richards, Layton & Finger, P.A. ("RL&F")
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Attn:  Lee E. Kaufman, Esq.

If you have any questions on the procedures for voting on the Plan, please call RL&F at the following telephone number: **302-651-7582**

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM, BUT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL NOT BE COUNTED.**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF THEIR CLAIMS WITHIN A PARTICULAR PLAN CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT THEIR VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM IN CLASSES 3 OR 5 AND EACH HOLDER OF AN INTEREST IN CLASS 6 WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.**

**ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.**

<u>For all Holders of Claims in Classes 3 and 5 and Holders of Interests in Class 6</u>:

By signing and returning a Ballot, each Holder of a Claim in Classes 3 and 5 or Holder of an Interest in Class 6 will be certifying to the Bankruptcy Court and the Debtors that, among other things:

- the Holder has received and reviewed a copy of the Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the Holder has cast the same vote with respect to all Claims in a single Class; and

- no other Ballots with respect to the amount of the Claims or Interests have been cast or, if any other Ballots have been cast with respect to such Claims or Interests, then any such earlier Ballots are thereby revoked.

## C. VOTING TABULATION

To ensure that a vote is counted, the Holder of a Claim or Interest should: (a) complete a Ballot; (b) indicate the Holder's decision either to accept or reject the Plan in the boxes provided in the Ballot; and (c) sign and timely return the Ballot to the address set forth on the enclosed prepaid envelope by the Voting Deadline.

The Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim. Only Holders of Claims in the single voting Class shall be entitled to vote with regard to such Claims.

Ballots received after the Voting Deadline may not be counted. The method of delivery of the Ballots to RL&F is at the election and risk of each Holder of a Claim. Except as otherwise provided in the solicitation procedures approved by the Court in the *Order (I) Approving Notice and Objection Procedures for the Disclosure Statement Hearing; (II) Approving the Disclosure Statement; (III) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, Including (A)*

*Fixing the Voting Record Date, (B) Approving Solicitation Packages and Procedures for Distribution Thereof, and (C) Approving Forms of Ballots and Establishing Procedures for Voting on the Plan; (V) Scheduling a Confirmation Hearing and Establishing Notice and Objection Procedures in Respect of Confirmation of the Plan; and (V) Granting Related Relief* [Docket No. [___]370], a Ballot will be deemed delivered only when RL&F actually receives the original executed Ballot. Delivery of a Ballot to RL&F by facsimile, e-mail or any other electronic means will not be accepted. No Ballot should be sent to the Debtors, the Debtors' agents (other than RL&F), or the Debtors' financial or legal advisors (other than RL&F). The Debtors expressly reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications). The Bankruptcy Code requires the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Plan Confirmation. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Holders must vote all of their Claims within a particular Plan Class either to accept or reject the Plan and may not split their vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the same Class, the Debtors may, in their discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party-in-interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim or Interest will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots, nor will any of them incur any liability for failure to provide such notification.

The Debtors will file the Voting Report with the Bankruptcy Court. The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each an "Irregular Ballot") including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or electronic mail or damaged. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.

## XI. CONFIRMATION PROCEDURES

### A. CONFIRMATION HEARING

The Confirmation Hearing will commence on ———October 19, 2010 at ——— 9:30 a.m. (Eastern Daylight Time), before The Honorable Mary F. Walrath, United States

Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 5th Floor, Courtroom 4, 824 North Market Street, Wilmington, DE 19801. Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

**B. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (2) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the cases, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an Impaired Claim or Impaired Interest has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Claims and Interests deemed to reject the Plan.

- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority

Non-Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- A least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtors will pay quarterly fees no later than the last day of the calendar month, following the calendar quarter for which the fee is owed in the Debtors' Chapter 11 Cases for each quarter (including any fraction thereof), to the Office of the U.S. Trustee, until the case is closed.

### 1. Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed. Based upon the current market and the nature of the assets, the Debtors believe that the chapter 7 liquidation price of the HSH shares would be far below that required to pay all of the Claims in full but, if the Debtors are reorganized, the price of the HSH Shares that may be achieved in the future is likely to enable the Debtors to pay all of the Claims in full and provide a recovery to Interest holders. Accordingly, the Debtors believe that Holders of Allowed Claims or Interests will receive or retain under the Plan property of a value, as of the effective date of the Plan, that is greater than the amount that such Holders would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code.

### 2. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization, unless the plan contemplates such liquidation. For purposes

of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct its business.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. Under the terms of the Amended and Restated Credit Agreements, the Debtors will not be required to make any payments under such agreements until December 31, 2014. Further, the Debtors will have minimal operating expenses in the ordinary course, and, pursuant to the "Available Cash" provisions in the Term Sheet, there will be a reserve put in place to cover such day-to-day expenses. Accordingly, even assuming that HSH does not resume dividend payments prior to December 31, 2014, the Debtors believe that they will have sufficient cash flow and availability to satisfy their minimal financial obligations in the meantime under the terms of the Amended and Restated Credit Agreements.

3. **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Similarly, section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in amount of the allowed interests of such class held by holders of such interests.

The Claims in Classes 1, 2 and 4 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan.

The Claims in Classes 3 and 5 and the Interests in Class 6 are Impaired under the Plan, and, as a result, are entitled to vote to accept or reject the Plan. Classes 3 and 5 will have

accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Classes (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan, and Class 6 will have accepted the Plan if the Plan is accepted by at least two-thirds in amount of the Allowed Interests held by Holders of such Allowed Interests in Class 6.

## XII.  PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

### A.  RISKS RELATED TO CONFIRMATION, EFFECTIVENESS AND IMPLEMENTATION

#### 1.  Parties in Interest May Object to the Debtors' Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.  Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

#### 3.  Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is

contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims or Allowed Interests would receive with respect to their Allowed Claims or Allowed Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4.    **Nonconsensual Confirmation**

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted, or is deemed not to have accepted, the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code if necessary. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

5.    **Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Reorganized Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject

54

to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

6. **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

B. **DISCLOSURE STATEMENT DISCLAIMER**

1. **Information Contained Herein Is for Soliciting Votes**

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

2. **No Legal or Tax Advice Is Provided to You by this Disclosure Statement**

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Interest should consult his, her or its own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

3. **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Person (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Interests or any other parties in interest.

4. **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement or Plan. The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute litigation claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such litigation claims or Objections to Claims.

5. **Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Recover Transfers and Assets.**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waive or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any

preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Cause of Action of the Debtors or their Estate are specifically or generally identified herein.

6.      **No Waiver of Right to Object or Right to Recover Transfers and Assets**

Except as specifically provided in the Plan, the vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their Estate are specifically or generally identified herein.

7.      **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

8.      **Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

9.      **No Representations Outside this Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

C.      **LIQUIDATION UNDER CHAPTER 7**

If no plan can be Confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities

established by the Bankruptcy Code. The Debtors believe that if this were to occur, it would result in a fire-sale liquidation price of the HSH shares far below their true intrinsic value, and far below the value likely to be realized in any initial public offering or other sale or disposition of the HSH Shares in the future. Accordingly, the Debtors believe that Holders of Allowed Claims or Interests will receive or retain under the Plan property of a value, as of the effective date of the Plan, that is greater than the amount that such Holders would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code.

## XIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

*__IRS Circular 230 Notice__: To ensure compliance with IRS Circular 230, holders of Claims and Interests are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims and Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.*

The Debtors are currently treated as pass-through entities for U.S. federal income tax purposes. Pursuant to the Plan, Allowed Lender Claims, Allowed YFCPEC Claims and Interests are being modified and amended in certain respects. The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. Each holder of an Allowed Lender Claim, Allowed YFCPEC Claim or each holder of an Interest has been involved in the creation of the Plan. We understand that each holder of an Allowed Lender Claim, Allowed YFCPEC Claim and each holder of an Interest has been represented by an independent tax advisor. Accordingly, the tax consequences of the Plan to such holders are not described herein, and holders of Claims and Interests should consult their own tax advisors as to all U.S. federal, state, local and foreign income and other tax consequences resulting from the Plan, with specific reference to such holder's own particular tax situation and recent changes in applicable law. Each holder of an Allowed Priority Non-Tax Claim, Allowed Secured Claim, or Allowed General Unsecured Claim will be unimpaired under the Plan. Accordingly the tax consequences of the Plan to such holders are not described herein.

# XIV. CONCLUSION AND RECOMMENDATION

The Debtors believe that the Plan is in the best interest of all creditors and urge the Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by RL&F no later than **5:00 p.m. (Eastern Daylight Time) on** ~~_____~~ **October 14, 2010.**

Dated:    August ~~13~~27, 2010          On behalf of the Debtors
          ~~_____~~ Wilmington, Delaware


                              _/s/ Daniel Katsikas_
                              Name:  Daniel Katsikas
                              Title:    Authorized Signatory




Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Michael J. Merchant (No. 3854)
Marcos A. Ramos (No. 4450)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701


_Counsel for the Debtors and Debtors-in-Possession_

# EXHIBIT A

**Joint Plan of Reorganization**

# EXHIBIT B

## Term Sheet

## EXHIBIT C

**Schedule of Administrative Expense Claims**

| Claimant | Amount of Administrative Claim (USD)[1] |
|---|---|
| Barlow Lyde & Gilbert LLP | $103,618.00 |
| McCarthy Tétrault LLP | $117,636.00 |
| Richards, Layton & Finger, P.A. | $1,700,000.00 |
| Walkers | $743,865 |

---

[1] Amounts are as of July 31, 2010.

<u>**EXHIBIT D**</u>

**Schedule of Priority Tax Claims**

| Claimant | Amount of Priority Tax Claim |
|---|---|
| None[1] | |
| | |
| | |
| | |

---

[1] The Debtors are not aware of any Priority Tax Claims.

| Comparison Details | |
|---|---|
| Title | **pdfDocs compareDocs Comparison Results** |
| Date & Time | 8/27/2010 3:56:28 PM |
| Comparison Time | 7.33 seconds |
| compareDocs version | v3.2.6.16 |


| Sources | |
|---|---|
| Original Document | [#3593748] [v9] HSH - Disclosure Statement to Joint Plan of Reorganization (Filed 8/13/10).doc |
| Modified Document | [#3603074] [v1] HSH - Disclosure Statement to Joint Plan of Reorganization (Filed 8/27/10) - Solicitation Version.doc |


| Comparison Statistics | |
|---|---|
| Insertions | 8 |
| Deletions | 1 |
| Changes | 160 |
| Moves | 0 |
| TOTAL CHANGES | 169 |
| | |
| | |
| | |
| | |
| | |


| Word Rendering Set Markup Options | |
|---|---|
| Name | Standard |
| Insertions | |
| Deletions | |
| Moves / Moves | |
| Inserted cells | |
| Deleted cells | |
| Formatting | Color only. |
| Changed lines | Mark left border. |
| Comments color | ByAuthor |
| Balloons | False |


| compareDocs Settings Used | Category | Option Selected |
|---|---|---|
| Open Comparison Report after Saving | General | Always |
| Report Type | Word | Track Changes |
| Character Level | Word | False |
| Include Headers / Footers | Word | True |
| Include Footnotes / Endnotes | Word | True |
| Include List Numbers | Word | True |
| Include Tables | Word | True |
| Include Field Codes | Word | True |
| Include Moves | Word | True |
| Show Track Changes Toolbar | Word | True |
| Show Reviewing Pane | Word | False |
| Update Automatic Links at Open | Word | False |
| Summary Report | Word | End |
| Include Change Detail Report | Word | Separate |
| Document View | Word | Print |
| Remove Personal Information | Word | False |